WILLIAM W. MANLOVE, OSB #891607
Senior Deputy City Attorney
william.manlove@portlandoregon.gov
Portland City Attorney's Office
1221 SW 4th Ave., Rm. 430
Portland, OR  97204
Telephone: (503) 823-4047
Facsimile: (503) 823-3089
*Of Attorneys for Defendant City of Portland*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **MEGHAN OPBROEK**, an individual, | Case No.: 3:22-cv-00610-JR |
| **PLAINTIFF,** | |
| v. | **DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS** |
| **CITY OF PORTLAND**, a municipal corporation, **ZACHARY DOMKA** in his individual capacity, **BRENT TAYLOR**, in his individual capacity, **MARK DUARTE**, in his individual capacity, and **ERIK KAMMERER** in his individual capacity, | *Oral Argument Requested* |
| **DEFENDANTS.** | |

## MOTION

Defendant City of Portland ("Defendant City") hereby moves pursuant to Fed. R. Civ. P. 12(b)(1), for an order dismissing all state law claims with prejudice on the basis that the Court lacks subject matter jurisdiction over Plaintiff's state law claims.  (See First Amended Complaint ("FAC"), Third, Fourth and Fifth Claims for Relief, ¶¶ 58-73.)  Under ORS 30.265(3)(e), Defendant City retains sovereign immunity for Plaintiff's state law claims of assault, battery and negligence.

Page  1  – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

## CERTIFICATE PURSUANT TO LOCAL RULE 7-1

Counsel for Defendant City certifies that counsel for Defendant City and counsel for Plaintiff have made good faith effort through a telephone conversation on June 13, 2022, to resolve the issues in dispute in this motion, and were unable to do so.

## STANDARD

In a motion challenging the court's subject matter jurisdiction under Rule 12(b)(1), a defendant may raise a "factual" objection to jurisdiction. *Leite v. Crane Co.,* 749 F.3d 1117, 1121 (9th Cir. 2014) *cert. den.* 135 S. Ct. 361 (2014).[1]  "When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with 'competent proof,' under the same evidentiary standard that governs in the summary judgment context." *Leite,* 1121 (citations omitted); *see also, Green v. U.S.,* 630 F.3d 1245, 1248 n.3 (9th Cir. 2011) ("On a motion to dismiss for lack of subject matter jurisdiction under Fed. R .Civ. P. 12(b)(1), proof of jurisdictional facts may be supplied by affidavit, declaration, or any other evidence properly before the court, in addition to the pleadings challenged  by the motion.")  As such, the trial court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004) *citing  Savage v. Glendale Union High Sch.,* 343 F.3d 1036, 1039 n. 2 (9th Cir. 2003). When the facts challenged in the motion are <u>not</u> the same facts constituting the actual merits of the case, the trial court makes appropriate findings to resolve the jurisdictional question.  *See, e.g., Green, supra.*

Rule 12(b)(1) motions are the appropriate vehicle for asserting sovereign immunity.  *See, Raj v. Louisiana State University,* 714 F.3d 322, 327-29 (5th Cir. 2013); *Meyers ex rel. Benzing v. Texas,* 410 F.3d 236, 240 (5th Cir. 2005) *cert. den.* 127 S. Ct. 2126 (2007).

---

[1] As opposed to a "facial" challenge that simply objects to jurisdiction because the plaintiff failed to plead jurisdictional facts. *See, e.g., Leite v. Crane Co., supra.*

Page  2  – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

**MEMORANDUM OF LAW**

I.    **FACTUAL BACKGROUND**

On the evening of Thursday, June 25, 2020, protestors gathered around the Portland Police Bureau's ("PPB") North Precinct located between NE Killingsworth and NE Emerson streets and Martin Luther King Boulevard ("MLK") and NE 6th Avenue in Portland, Oregon. (FAC, ¶ 1.) (Declaration of William W. Manlove ("Manlove Decl."), ¶ 2, Exhibit 3 (Declaration of Anthony Passadore in *Don't Shoot Portland et al. v. City of Portland et al.*, Case 3:20-cv-00917-HZ ("Passadore Decl."), ¶ 27).) Beginning at around 10:00 p.m., hundreds of protestors had gathered at the precinct, had started erecting a fence along the south side of the precinct along NE Emerson, had blocked north bound traffic along MLK, and some protestors had thrown projectiles, including glass bottles, at the police. (*Id*.) By 11:00 p.m., protestors had begun moving dumpsters to erect barriers around the precinct and had used the dumpsters as battering rams against the doors of the precinct to attempt to breach the North Precinct building. When the protestors failed to breach the building, they were using drills to fasten lumber to barricade the police inside the North Precinct building. (Manlove Decl., ¶ 2, Exh. 3, Passadore Decl., ¶¶ 28, 31, and Exhibit 6, pp. 1-5 (photos of barricaded doors and vandalism).)

The crowd had erected a fortified barricade on NE Emerson Street. (Declaration of Franz Schoening ("Schoening Decl."), ¶ 11.) The crowd was tightly packed behind the barricade, greatly outnumbered the police, and were wearing helmets, goggles, padding and carrying shields. (Schoening Decl., ¶¶ 11, 12.) A number of persons began shining green laser pointers at officers, and some in the crowd yelled that they would burn North Precinct down. (Schoening Decl., ¶ 14.)

At 12:35 a.m., on June 26, 2020, the police received information that protestors had placed flammable liquid at the doors of the precinct building and that protestors had obscured the precinct's security cameras. (Declaration of McKay Fenske ("Fenske Decl."), ¶ 3, Exhibit 1, Police Report "IC Radio Log," p. 1.) Although within about eight minutes the police determined

Page  3  – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

the liquid was not flammable, the reports of protestors obscuring the security cameras were correct. (Fenske Decl., Exh. 1, p. 2; Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 32, Exhibit 8, pp. 1-8 (photos of obscured video cameras).)

A protestor filmed a video of the demonstration at North Precinct, including when the crowd was gathered behind the barricade on NE Emerson. (See Declaration of Cory Craig, ("Craig Decl."), ¶ 3, Exhibit 2 - thumb drive of protestor video posted on Twitch.TV social media platform ("Twitch.TV video".) The Twitch.TV video shows the crowd gathered on NE Emerson Street, adjacent to and south of the precinct building, depicts the green laser lights coming from the crowd towards the officers, and depicts PPB giving at six different times an Unlawful Assembly announcement, ordering the crowd to disperse and warning that riot control agents or impact munitions might be used. (Schoening Decl., ¶ 28.)

Plaintiff alleges she arrived at MLK and NE Emerson Street at around 1:10 a.m. (FAC, ¶ 12.) Due to the life safety issues of both police personnel and arrestees inside North Precinct, the PPB Incident Commander, Captain Passadore, ordered multiple Unlawful Assembly announcements to begin moving the crowd on NE Emerson away from the building. (Manlove Decl., Exh. 3-Passadore Decl., ¶ 34.) PPB made six Unlawful Assembly announcements between 1:10 a.m. and 1:14 a.m. (See Fenske Decl., ¶ 3, Exh. 1, pp. 2-3.) At around 1:21 a.m., PPB began dispersing the crowd. (Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 36; See Fenske Decl., ¶ 3, Exh. 1, p. 3.)

The Twitch.TV video shows the police dispersing the crowd off NE Emerson and onto MLK, and shows the police coming from NE Emerson onto MLK. (Schoening Decl., ¶¶ 29, 30.) The Twitch.TV video shows the police making an Unlawful Assembly announcement, ordering the crowd to disperse and warning that riot control agents or impact munitions might be used. (Schoening Decl., ¶ 30.) The police began to move onto MLK at about 1:24 a.m. (See Fenske Decl., ¶ 3, Exh. 1, p. 3)

At approximately 1:28 a.m., PPB began moving the crowd north on MLK. (Fenske

Page 4 – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

Decl., ¶ 3, Exh. 1, p. 4.) As the PPB pushed the crowd north, protestors were fighting with the police and had shot paintballs at the police, obscuring at least one officer's vision. (Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 36; See Fenske Decl., ¶ 3, Exh. 1, p. 4.) The Twitch.TV video shows protestors resisting the police movement north on MLK, shows the barricade the protestors had erected on MLK, near NE Emerson, and shows PPB pushing the protestors past that barricade. (Schoening Decl., ¶ 30.) During this dispersal by PPB, at three different times on the Twitch.TV video, someone in the crowd yells "Hold the barricades." (*Id*.) During this dispersal by PPB, at two different times on the Twitch.TV video, someone in the crowd yells "Hold the line." (*Id*.) Plaintiff alleges she was part of this crowd being pushed north on MLK. (See FAC, ¶ 14.)

During this push north, at approximately 1:30 a.m. and 1:32 a.m., protestors threw projectiles at the police. (Fenske Decl., ¶ 3, Exh. 1, p. 4.) During this push north, at approximately 1:29 a.m., 1:32 a.m., and 1:33 a.m., PPB made Unlawful Assembly announcements, ordering the crowd to disperse and warning that riot control agents or impact munitions might be used. (*Id*.) The Twitch.TV video shows at least one projectile being thrown at the police, and also shows the Unlawful Assembly announcements. (Schoening Decl., ¶ 30.) By 1:38 a.m., the protestors had erected a barricade and lit a large fire on MLK, just south of the intersection with NE Killingsworth. (Fenske Decl., ¶ 3, Exh. 1, p. 5.) The Twitch.TV video shows this large fire burning for at least 40 minutes. (See Schoening Decl., ¶¶ 34, 38, 41.)

Prior to being injured, Plaintiff alleges she heard the Unlawful Assembly announcements, ordering the crowd to leave the area and disperse, and warning that riot control agents or impact munitions might be used. Nonetheless, Plaintiff alleges she refused to obey the police orders. (See FAC, ¶ 15.) In fact, prior to being injured, **Plaintiff is visible on the Twitch.TV video**, and is seen walking back and forth across MLK, near a group of protestors, closest to the police line. (See Schoening Decl., ¶¶ 26, 27, 31, 33.) Prior to Plaintiff being injured, the Twitch.TV video shows PPB making six Unlawful Assembly announcements over the course of approximately

Page  5  – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

four minutes to the protestors on MLK.  (See Schoening Decl., ¶¶ 32-34.)

At approximately 1:36 a.m., PPB began a renewed effort to disperse the crowd of protestors north on MLK, and deployed smoke around that time. (Fenske Decl., ¶ 3, Exh. 1, p. 4.)  Plaintiff alleges she was injured after the police deployed smoke at her feet and legs, and as she began to walk backwards from the police line.  (FAC, ¶ 16.)  Plaintiff alleges she was injured when a device exploded near her, causing injury to her legs and other body parts.  (FAC, ¶¶ 17-18.)

*In fact, the Twitch.TV video shows Plaintiff on MLK, near the front line of protestors, starting to move back, an object rolling behind Plaintiff into the crowd closest to the police line, and then moving suddenly towards Plaintiff's feet, and apparently exploding near her feet.  (Schoening Decl., ¶ 35.)  The Twitch.TV video shows Plaintiff then running about 10 feet to the center of MLK and then turning around just in front of the burning barricade located on the intersection of MLK and NE Killingsworth, and running to the east.  (Id.)*

After Plaintiff was apparently injured, PPB continued its efforts to disperse the crowd that had gathered at North Precinct.  (See Fenske Decl., ¶ 3, Exh. 1, pp. 5-11; Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 39-43.)  The protestors continued to move dumpsters in the street to reinforce their barricade at MLK and NE Killingsworth.  PPB continued to give repeated Unlawful Assembly announcements.  (Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 40, Exhibit 11, pp. 1-2, (photos of dumpsters on fire at barricade on MLK and NE Killingsworth); Schoening Decl., ¶¶ 36-38.)

Approximately 35 minutes after Plaintiff was apparently injured, by approximately 2:14 a.m., protestors had lit the north side of the precinct building on fire. (Fenske Decl., ¶ 3, Exh. 1, pp. 8-9.)  The Twitch.TV shows the protestors moving a dumpster next to the building, the building on fire, the panic in the crowd to put the fire out, and PPB advancing into the intersection and initially dispersing the crowd north of the intersection of MLK and NE Killingsworth.  (Schoening Decl., ¶ 39; Manlove Decl., ¶2, Exh. 3-Passadore Decl., ¶ 41, Exhibit

Page  6  – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

12, pp. 1-2 (photos of North Precinct on fire, damage from fire).) At the time the building was on fire, police personnel remained barricaded by the protestors inside the North Precinct building. (Schoening Decl., ¶ 19.)

PPB again dispersed the crowd north of the intersection of MLK and NE Killingsworth. At 2:22 a.m., the protestors launched a large firework at the police. (Fenske Decl., ¶ 3, Exh. 1, p. 8.) At 2:29 a.m., protestors were throwing chunks of concrete at the police. (*Id*.) By 2:36 a.m., protestors were looting the Top to Bottom store, at 5824 NE MLK, north of NE Killingsworth. (See *Id*., p. 9.) By 2:31 a.m., officers from Multnomah County Sheriff's Office had arrived to help PPB. (*Id*.) By 2:41 a.m., the protestors had started a fire at the Bank of America building at 5775 NE MLK, north of NE Killingsworth. (*Id*.) Protestors were looting and destroying businesses as they moved north along MLK. (Schoening Decl., ¶ 23; Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 43, Exhibit 13, pp. 1-2 (photos of vandalized businesses along MLK).)

The Twitch.TV video shows the continued police effort to disperse the crowd north along MLK, PPB's repeated Unlawful Assembly announcements, (at least approximately 11 over the course of 12 minutes), and the protestors' refusal to obey those commands. (Schoening Decl., ¶¶ 40-42.)

The police effort to disperse the crowd from the area of North Precinct went on until approximately 3:27 a.m., on Friday, June 26, 2020. (Fenske Decl., ¶ 3, Exh. 1, p. 10.) Numerous police officers sustained minor injuries during the police effort to disperse the crowd; one officer was taken to the hospital for a serious injury. (Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 45.) The police arrested four people during the effort to disperse the crowd, including arrests for assaults or attempted assaults on Peace Officers. (See Manlove Decl., ¶ 2, Exh. 3-Passadore Decl., ¶ 46.)

///

///

///

II.   ARGUMENT

At this stage, the Court need not address the merits of Plaintiff's case to resolve whether or not it has jurisdiction over Plaintiff's state law claims directed solely at Defendant City. (See FAC, Third, Fourth and Fifth Claims for Relief, ¶¶ 58-73.)   That is, the Court need not decide if Defendant City's police officers used excessive force on Plaintiff in violation of the Fourth Amendment, (see FAC, First Claim for Relief, Counts 1 and 2, ¶¶ 28-44), or whether those officers somehow violated Plaintiff's First Amendment rights "peaceably to assemble" (see FAC, Second Claim for Relief, Count 1, ¶¶ 48-53), or committed any other constitutional violation.  Likewise, the Court need not decide the *Monell* claims directed at Defendant City, (see FAC, First Claim for Relief, Counts 3 and 4, ¶¶ 48-53; Second Claim for Relief, Count 2, ¶¶ 54-56), as those claims rely on a predicate constitutional violation.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  Those questions about Plaintiff's federal claims may be addressed in future proceedings.  Instead, in this jurisdictional motion, the only factual question raised is whether the First Amended Complaint seeks to hold the City liable for conduct "arising out of" a riot, civil commotion or mob action; if it does, sovereign immunity bars the action.

Under Oregon law, public bodies do not waive their sovereign immunity for the conduct by their police officers during riots, moments of civil commotion or mob action.  Rather, under Oregon law, sovereign immunity remains intact and inviolate for such conduct. On that basis, neither state nor federal courts have jurisdiction over Plaintiff's state law claims in this dispute (see FAC, ¶¶ 58-73), and the Court should dismiss those claims with prejudice.

The Oregon Tort Claims Act represents a limited waiver of the government's sovereign immunity. See, *Rabkin v. OHSU*, 350 F.3d 967, 975 (9th Cir. 2003) citing *Griffin ex rel. Stanley v. Tri–County Metro. Transp. Dist. of Or*., 318 Or. 500, 513 (1994). Waiver of sovereign immunity may not be implied; it must be stated by unambiguous legislative action. *Horton v. OHSU,* 359 Or. 168, 221-22 (2016); *Newport Church of Nazarene v. Hensley*, 335 Or. 1, 17 (2002).

Page  8  – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

The OTCA specifically retains immunity for any public body or its employee's conduct undertaken within the scope of their employment during a riot, civil commotion or mob action.

> Every public body and its officers, employees and agents acting within the scope of their employment or duties *** are immune from liability for:
>
> ***
> Any claim arising out of riot, civil commotion or mob action or out of any act or omission in connection with the prevention of any of the foregoing.

ORS 30.265(6)(e).

When a gathering of five or more persons are unlawfully or riotously assembled, ORS 131.675 authorized Oregon law enforcement officers to order that group of persons to disperse the area where they are gathered. As stated recently by Judge Immergut in *Wise v. City of Portland*, 483 F. Supp. 3d 956, 968 (D. Or. 2020):

> Under Oregon law, Portland police have authority to disperse unlawful or riotous assemblies and arrest those who do not immediately comply. Or. Rev. Stat., §131.675. Portland police are entitled to use some level of reasonable force under the circumstances to effectuate the dispersal. *Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001).

Whether or not a gathering or assembly of five or more people has become unlawful is determined by whether the conduct of persons within the group presents a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order . . ." *City of Portland v. Hemstreet*, 119 Or App 239, 242 (1993) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). *See also Feiner v. New York*, 340 U.S. 315, 320 (1951) ("This Court, respects, as it must, the interests of the community in maintaining peace and order on its streets.")

Moreover, "[i]t is the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit." *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107,

Page 9 – DEFENDANT CITY OF PORTLAND'S PARTIAL MOTION TO DISMISS

120 (D.C. Cir. 1977).  As the Ninth Circuit has recognized, the unlawful actions of a few may impair the ability of others to exercise their rights:

> In balancing desired freedom of expression and the need for civic order, to accommodate both of these essential values, a measure of discretion necessarily must be permitted to a city, on the scene with direct knowledge, to fashion remedies to restore order once lost.  It may be that a violent subset of protesters who disrupt civic order will by their actions impair the scope and manner of how law-abiding protesters are able to present their views.

*Menotti v. Seattle*, 409 F.3d 1113, 1115 (9th Cir. 2005) (declining "to hold unconstitutional the City's implementation of procedures necessary to restore safety and security" when confronted by protestors with "violent and disruptive aims" that "substantially disrupt civic order.")

There can be no doubt from the face of the First Amended Complaint ("FAC"), and the filings submitted herein, especially the 99-minute Twitch.TV video, the photographs attached to Captain Passadore's declaration from the *Don't Shoot Portland* case, the police report attached to Officer Fenske's declaration, and the description of events described by Lt. Schoening in his declaration, that ORS 30.265(6)(e) applies to this case.[2]

First, Plaintiff's own allegations make clear that the scene of her interactions with the City's police officers was a riot, a location of a civil commotion, or an occurrence of mob action.  "Around approximately 1:10 a.m., in the early hours of June 26, 2020, Opbroek arrived at the area around North Precinct on NE Martin Luther King, Jr. Boulevard and NE Emerson Street.  There, Opbroek encountered PPB officers in *riot* gear, lined up on NE Martin Luther King, Jr. Boulevard."  (FAC, ¶

---

[2] The FAC, Twitch.TV video and other materials show the mob of protestors having committed or committing the following crimes, and Portland City Code ("PCC") violations:  Interfering with a Peace Officer (ORS 162.247(1)(b)); Unlawful Directing of Light from a Laser Pointer (ORS 163.709); Burglary in the Second Degree (ORS 164.215); Arson in the First Degree (ORS 164.325); Reckless Burning (ORS 164.335); Criminal Mischief in the Third Degree (ORS 162.345); Criminal Mischief in the Second Degree (ORS 164.354); Criminal Mischief in the First Degree (ORS 164.365); Unlawfully Applying Graffiti (ORS 164.383); Riot (ORS 166.015); Disorderly Conduct in the Second Degree (ORS 166.025); and Interfering with Public Transportation (ORS 166.709); PCC 14C.30.010(D) (refusing to leave a restricted area due to emergency); 14C.30.030 (PPB authority to direct pedestrian and vehicular traffic on any public right of way).  PCC 1.01.140 makes violations of city code unclassified misdemeanors.

12.) (Emphasis added.) "Within minutes of her arrival, PPB officers forcibly moved demonstrators north on NE Martin Luther King Boulevard. Opbroek witnessed PPB officers firing flashbang grenades and other impact munitions directly into the crowd of people." (FAC, ¶ 13.) "During this time, at least two PPB officers forcefully and repeatedly shoved Opbroek as she was walking away from the police in the direction the police told demonstrators to move." (FAC, ¶ 14.) Plaintiff admits she refused to obey the police orders to disperse. "PPB announced an "unlawful assembly" and ordered demonstrators to disperse, but Opbroek and many people did not. Instead, Opbroek and demonstrators near her continued to stand there, chanting and yelling at the police." (FAC, ¶ 15.) Plaintiff alleges she refused to move until PPB deployed a riot control agent that produced smoke near her. "Opbroek continued to chant and shout… while standing a distance from the police line toward the front of the crowd with a few demonstrators in front of her. PPB officers then launched at least one weapon at the demonstrators. The weapon landed at the feet of the demonstrators in front of Opbroek, producing smoke at their feet and legs. Those demonstrators and Opbroek started walking backwards away from the police…" (FAC, ¶ 16.) Plaintiff alleges she "turned away from the police in order to continue moving in the direction the police had told the demonstrators to go" when one of the individual defendants "fired at least one weapon at her," injuring her. (FAC, ¶ 17.)

In short, Plaintiff's allegations show she was injured after the City's police officers had declared an Unlawful Assembly, were ordering demonstrators to leave the area, and when many refused to do so, including Plaintiff, and had to use physical force to make the demonstrators leave the area around PPB's North Precinct.

Beyond the pleadings, Exhibit 1 to the Declaration of McKay Fenske clearly shows the City's police command had declared an Unlawful Assembly at 1:10 a.m., when Plaintiff arrived at North Precinct. (Fenske Decl., ¶ 3, Exh. 1, p. 2.) Officer Fenske's police report shows PPB declared an Unlawful Assembly 10 more times before the City's police officers deployed the smoke or tear gas near Plaintiff at approximately 1:36 a.m. (*Id.*, pp. 2-4.) Moreover, Officer Fenske's report documents the intervening public disorder, criminality, and threats to life safety

caused by the mob of demonstrators occurring between the time Plaintiff arrived at MLK and NE Emerson, her refusal to disperse, and the time the police pushed the crowd, including Plaintiff, north on MLK through the intersection on NE Killingsworth.  (Fenske Decl., Exh. 1, pp. 2-5.)

Exhibit 2 to the Declaration of Cory Craig is the Twitch.TV/TeebsGaming video ("Twitch.TV video") filmed by a protestor on June 25 and June 26, 2020, from around the City's North Precinct.  The Twitch.TV video corroborates and graphically illustrates without dispute the public disorder, criminality and threats to life safety caused by the mob of demonstrators noted in Officer Fenske's report.  (See Schoening Decl., ¶¶ 26-42.)  The Twitch.TV video shows Plaintiff in the middle of MLK as the police physically have to push protestors around a barricade, protestors fighting with the police to "hold the barricades," and "hold the line" and depict repeated Unlawful Assembly announcements and force warnings in the minutes before she was injured.  (Schoening Decl., ¶¶ 30-34.)

All questions about the constitutionality of Defendant City's police officers' use of force aside, it is beyond any reasonable debate that such conduct–good or bad–arose out of a riot, moment of civil commotion or mob action. Therefore, the City is immune from Plaintiff's state law claims.

ORS 30265(6)(e) also provides immunity for any conduct "in connection with" the *prevention* of a riot or civil commotion.  Thus, even if Plaintiff argues that circumstances had not yet devolved into a full blown "riot," the statute still provides for immunity for any steps taken to prevent such commotion (the most obvious examples would be dispersing crowds that had barricaded police inside a building and had threated to burn the building down.)

Judge Panner had occasion to apply ORS 30.265(6)(e) (previously numbered ORS 30.265(3)(e)) when an officer shot a participant during a prison riot. *Albers v. Whitley,* 546 F. Supp. 726 (1982) *aff'd* 788 F.2d 650 (9th Cir. 1986).  Judge Panner explained:

> I hold that recovery is barred by the Oregon Tort Claims Act. [ORS] 30.265(3)(e) provides that every public body and its officers acting within the scope of their employment are immune from liability for any claim arising out of riots, civil commotion or mob actions. The immunity further extends to any act or omission in connection with the prevention of riots.

*Albers,* 546 F. Supp. at 738. In affirming the decision by the trial court, the Ninth Circuit held, "[t]he district court correctly dismissed Albers' pendent state tort claims because recovery is barred by the Oregon Tort Claims Act." *Albers v. Whitley,* 743 F.2d 1372, 1377 (9th Cir. 1984) *citing the then-version of* ORS 30.265(6)(e), *reversed on other grounds* 475 U.S. 312 (1986).[3]

More recently, Judge Mosman applied ORS 30.265(3)(e) to bar a state law false arrest claim where the arrest occurred several minutes after the police had quelled a civil disturbance. *See Hicks v. City of Portland,* 2006 WL 3311552 (D. Or. Nov. 8, 2006). In that case, Judge Mosman adopted Magistrate Judge Ashmanskas' Opinion granting summary judgment for defendants noting, "[a]lternatively, Defendants may rely on [ORS] 30.265(3)(e), which insulates public officers and bodies from liability under State law for '[a]ny claim arising out of riot, civil commotion, or mob action or out of any act or omission in connection with the prevention of any of the foregoing.'" *Id.,* at *16. *Hicks* involved an arrest after riot police had resolved a surging crowd, and had departed. "At least fifteen minutes later—after the last police announcement can be heard over the loudspeakers, after riot police left the scene, and after police reopened the street to allow limited pedestrian traffic—Plaintiff entered the street." *Id.,* at *2. Thereafter, the defendant- officer arrest her. *Id.,* at *3. *Hicks* illustrates the temporal reach of ORS 30.265(6)(e), and reflects the ebb and flow involved with police management of any civil disturbance arising from a riot, civil commotion or mob action. In any event, in the present case, the Twitch.TV video shows Plaintiff suffering her apparent injuries while the police were actively ordering and

---

[3] Initially, the Ninth Circuit reversed the district court's application of qualified immunity but affirmed its application of the OTCA. *Albers v. Whitley,* 743 F.2d 1372 (9th Cir. 1984). The Supreme Court then reversed the Ninth Circuit as to qualified immunity, only. *Albers v. Whitley,* 475 U.S. 312 (1986). On remand, the Ninth Circuit affirmed the district court completely, dismissing all federal claims on the basis of qualified immunity and state claims on the basis of OTCA-based immunity. *Albers v. Whitley,* 788 F.2d 650 (9th Cir. 1986).

physically moving the crowd of protestors around the barricades and burning dumpsters in the street, north on MLK, away from PPB's North Precinct.

### III.  CONCLUSION

Based on the allegations in the FAC and other materials submitted with Defendant City's motion, ORS 30.265(6)(e) strips the Court of subject matter jurisdiction for any state law claims against Defendant City. Fed. R. Civ. P. 12(b)(1).  Put differently, the government has retained its historical sovereign immunity for such claims.

Therefore, Defendant City respectfully moves for an order dismissing all of Plaintiff's state law claims with prejudice.

Dated:  June 22, 2022

Respectfully submitted,

*/s/ William W. Manlove*
WILLIAM W. MANLOVE, OSB #891607
Senior Deputy City Attorney
Telephone: (503) 823-4047
*Of Attorneys for Defendant City of Portland*
