Washington and Lee Law Review

Volume 28 | Issue 1                                                Article 4

Spring 3-1-1971

# Municipal Liability For Riot Damage Under Eminent Domain

Follow this and additional works at: https://scholarlycommons.law.wlu.edu/wlulr

Part of the Property Law and Real Estate Commons, and the State and Local Government Law Commons

Recommended Citation

*Municipal Liability For Riot Damage Under Eminent Domain*, 28 Wash. & Lee L. Rev. 103 (1971).
Available at: https://scholarlycommons.law.wlu.edu/wlulr/vol28/iss1/4

This Note is brought to you for free and open access by the Washington and Lee Law Review at Washington & Lee University School of Law Scholarly Commons. It has been accepted for inclusion in Washington and Lee Law Review by an authorized editor of Washington & Lee University School of Law Scholarly Commons. For more information, please contact christensena@wlu.edu.

Exhibit 3
Page 1 of 18

## MUNICIPAL LIABILITY FOR RIOT DAMAGE
## UNDER EMINENT DOMAIN

The severe confrontations of 1967, the civil disorders attending the assassination of Martin Luther King, Jr., and the violent demonstrations accompanying the major political conventions during the summer of 1968 resulted in substantial damage to private property.[1] Even where it can be established that the municipal authorities involved in riot control were negligent, the burden of the property losses has fallen rather heavily upon the citizens and firms located within the riot affected areas. This financial burden is in part a result of the doctrine of sovereign immunity which has historically foreclosed any private citizen from bringing a tort action for damages as a consequence of governmental negligence. Neither the federal government nor any of the states or their political subdivisions may be sued by a private citizen unless the government or its instrumentality consents to the suit.[2]

Sovereign immunity has been modified to a degree by statutes[3] which provide for compensation to victims of riot violence. These statutes, while remedial to a certain degree, are not universally available to the damaged property owner because of their sporadic enactment, vague draftsmanship, and lack of uniformity.[4] However, inverse condemnation[5] proceedings based on the principle of eminent domain may aid in avoiding the obstacles to recovery posed by the sovereign immunity doctrine and the present lack of adequate remedial legislation.

In recent riots, most notably in Detroit in 1967 and in the District of Columbia after the King assassination, municipalities decided that official police policy throughout the disorders would be to restrict the areas of stiff police resistance.[6] In an effort to avoid bloodshed and to deescalate riots, selected neighborhoods were designated as areas in which no police action preventing property damage would be initiated.[7]

---

[1] The costs arising out of the 1967 riots to insurers alone was $50 million. Rottman, *Riot Damage, Municipal Liability and Insurance*, 1968 INS. L.J. 597.

[2] *See* Borchard, *Government Liability in Tort*, 34 YALE L.J. 1, 6 (1924).

[3] Notes 18-27 *infra*.

[4] It has been recognized that legislation is probably the most logical and desirable solution to the problems created by the sovereign immunity doctrine. Borchard, *Government Liability in Tort*, 34 YALE L.J. 1, 3 (1924).

[5] "Inverse condemnation" is a term commonly used to represent suits on behalf of property owners claiming that private property has been taken by the government without compensation. Notes 28-29 *infra*.

[6] The general policy reflected restraint on the part of police and a hesitancy to deploy troop support. *See generally* TIME, Apr. 19, 1968 at 15; TIME, Aug. 4, 1967 at 14; U.S. NEWS & WORLD REPORT, Apr. 22, 1968 at 27.

[7] Note 6 *supra*.

Exhibit 3
Page 2 of 18

Police openly permitted looting and destruction in these designated sectors of the community, deliberately deciding to forego crime control for the general public benefit.[8] Inasmuch as the private property destroyed because of police inaction could be said to have been "taken" for the public use, the theory of eminent domain may be applicable.

In the past, the sovereign's immunity to tort actions brought by its citizens has kept property owners from recovering for damages resulting from civil disorders. The doctrine of sovereign immunity originated with the ancient maxim "the king can do no wrong."[9] Immunity to private suit was first extended to a municipality in the English case of *Russell v. Men of Devon*.[10] That decision was based on the ground that the defendent county was unincorporated and had no corporate fund out of which to satisfy a judgment.[11] The first American decision to uphold the sovereign immunity of a municipality was *Mower v. Inhabitants of Leicester*.[12] Although that court's decision was based on *Men of Devon*, the fact that Leicester was a statutorily created corporation with ample resources to satisfy a judgment was not discussed.[13] On the basis of the *Leicester* decision, the theory of sovereign immunity has spread to practically every American jurisdiction.[14]

One of the most widespread aspects of sovereign immunity is the

---

[8]Police restrained from gunplay, heeding the Kerner Commission's warnings against the use of excessive force. TIME, Apr. 19, 1968 at 15; REPORT OF THE NATIONAL ADVISORY COMMISSION ON CIVIL DISORDERS chs. 11-12 (1968) [hereinafter referred to as REPORT OF NAT'L ADVIS. COMM'N].

[9]The rationale for this type of thinking appears to be the King's overwhelming superiority of power. For example:
> For all jurisdiction implies superiority of power...and the sentence of a court would be contemptible, unless that court had power to command the execution of it: but who...shall command the King?

1 W. BLACKSTONE, COMMENTARIES *242.

Modern students have come to the realization that the maxim sprung from the knowledge that holding the King accountable for his wrongs would be impossible. One student writer has said:
> The real basis of the king's immunity from suit was the impossibility of enforcing a judgment against him. Thus, the ancient maxim might more accurately be phrased, "The King cannot be held to account for his wrongs."

Comment, *Ohio Sovereign Immunity: Long Live the King*, 28 OHIO ST. L.J. 75 (1967).

[10]100 Eng. Rep. 359 (1788).

[11]It was also noted that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." 100 Eng. Rep. at 362.

[12]9 Mass. 247 (1812).

[13]*Id.* at 248.

[14]For a representative survey of the status of sovereign immunity in each of the fifty states, see Hamill, *The Changing Concept of Sovereign Immunity*, 13 DEFENSE L.J. 653, 664 (1964).

Exhibit 3
Page 3 of 18

refusal by the courts to impose liability on a municipality for its torts.[15] Even though city officials may have been negligent in performing their governmental duties, the municipality is immune from liability.[16] The control of riots and mob violence is generally recognized as a governmental duty, and consequently municipalities enjoy immunity from damage suits as a result of their failure to exercise adequate riot control.[17]

However, at the present time, many states impose liability by statute against local governments for damage caused by rioting mobs.[18] In addition, five states currently impose personal liability upon city officials who negligently fail to suppress civil disorders.[19] Nevertheless, inconsistent definitions of essential terms such as "riot" and "mob", nonuniformity with respect to damage coverage, and hazily phrased conditions precedent to recovery hamper the uniform administration of the statutes. Moreover, because many state statutes were enacted shortly after the Civil War to provide compensation for personal injury occasioned by the activities of lynch mobs, they are not designed

---

[15] *See* Antieau, *Statutory Expansion of Municipal Tort Liability*, 4 ST. LOUIS U.L.J. 351 (1957); Rottman, *Riot Damage, Municipal Liability and Insurance*, 1968 INS. L.J. 597, 598.

[16] *See, e.g.,* Baily v. Mayor of New York, 3 Hill 531, 539 (N.Y. Sup. Ct. 1842); W. PROSSER, TORTS § 125 (3d ed. 1964).

[17] *See* Campbell v. Montgomery, 53 Ala. 527 (1875) (the duty to enforce laws suppressing unlawful assembly was governmental, not proprietary, and no private action could lie for negligence in exercising this duty). In *Murraine v. Wilson Line, Inc.,* 270 App. Div. 372, 59 N.Y.S.2d 750 (1946) the court stated:
> The law is established that a municipality is answerable for the negligence of its agents in exercising a proprietary function, and at least for their negligence of commission in exercising a governmental function ... but a municipality is not liable for its failure to exercise a governmental function, such as to provide police or fire protection.

59 N.Y.S.2d at 753.

[18] CONN. GEN. STAT. ANN. § 7-108 (1958); KAN. STAT. ANN. §§ 12-203, 12-204 (Supp. 1969); KY. REV. STAT. § 411.100(8) (Supp. 1970); ME. REV. STAT. ANN. tit. 17, § 3354 (1964); MD. ANN CODE art. 82, §§ 1-3 (1969); MASS. ANN. LAWS ch. 269, § 8 (1968); MINN. STAT. ANN. § 373.28 (1968); MO. ANN. STAT. §§ 537.140-537.160 (1953); MONT. REV. CODES ANN. § 11-1503, § 94-5314 (1947); NEB. REV. STAT. §§ 1001-1009 (1943); N.H. REV. STAT. ANN. §§ 31:53-31:55 (1955); N.J. STAT. ANN. §§ 2A:48:1-2A:48:9 (1952); N.Y. GEN. MUNIC. LAW § 71 (McKinney 1965); N.C. GEN. STAT. § 162-23 (1952); OHIO REV. CODE ANN. §§ 3761.01-3761.10 (Baldwin 1964); PA. STAT. tit. 16, §§ 11821-11826 (1956), PA. STAT. tit. 18, § 3765 (1963); R.I. GEN. LAWS ANN. § 45-15-13 (1957); S.C. CODE ANN. 16-103 - 16-108 (1962); W.VA. CODE ANN. § 61-6-12 (1966); WIS. STAT. ANN. § 66.091 (1965).

[19] MONT. REV. CODES ANN. § 94-5314 (1947); N.Y. GEN. MUNIC. LAW § 71 (McKinney 1965); PA. STAT. tit. 16, § 11822 (1956); W. VA. CODE ANN. § 61-6-12 (1966); WIS. STAT. ANN. § 66.091 (1965).

Exhibit 3
Page 4 of 18

to deal with racial or political riots which appear to be directed toward the destruction of property. Unfortunately, most state statutes do not provide comprehensive damage coverage; many deal exclusively with recovery for personal injuries[20] while others deal only with property damage.[21] Some compensation statutes allow recovery only when the municipality has prior notice of the existing riot situation.[22] Because many riots begin suddenly,[23] prior notice statutes appear to preclude the damaged property owner from recovery. Some riot damage statutes also bar recovery if the damaged property owner is contributorily negligent.[24]

---

[20]Many statutes are directed toward allowing recovery by the dependents and representatives of victims of lynch mob activities. For example, "When any person shall be lynched, the county in which the lynching occurred shall be liable in damages to the dependents of the person lynched...." MINN. STAT. ANN. § 373.28 (1968); "The legal representative of a person dying from injuries received from lynching by a mob, may recover from the county in which such injury occurred...." OHIO REV. CODE ANN. § 3761.04 (Baldwin 1954):

[21]Some state statutes make no reference to personal injury. For example, "A city or county shall be liable to a person whose property is destroyed or injured therein by a mob or riot...." N.Y. GEN. MUNIC. LAW § 71 (McKinney 1965). As a further example,

> Whenever any property ... shall be destroyed or be injured ... by any persons to the number of six (6) or more unlawfully, routously, riotously or tumultuously assembled, the town or city within which said property was situated shall be liable to idemnify the owner thereof....

R.I. GEN. LAWS ANN. § 45-15-13 (1956).

[22]Prior notice on the part of municipal officials appears to be a prerequisite to recovery under some statutes. For example,

> Nor shall a recovery be had unless the claimant...shall have, immediately after being apprized of a threat or attempt to destroy or injure his property by a mob or riot, notified the mayor or chief executive officer or chief of police of the municipality or the sheriff of the county, as the case may be, of the facts brought to his knowledge.

N.J. STAT. ANN. § 2A:48-3 (1952).

For an example of notice statutes generally, see N.Y. GEN. MUNIC. LAW § 50g (McKinney 1965).

[23]For example, in Cincinnati, Ohio, police began investigating reports of stone throwing at 7:00 p.m. and rioting broke out only fifteen minutes later. In Tampa, Florida, disruptions starting at 7:00 p.m. were occassioned by an arrest at 5:30 p.m. REPORT OF NAT'L ADVIS. COMM'N, *supra* note 8, at 22-27.

[24]The benefits of statutory relief may be lost if the claimant can be shown to be contributorily negligent during the riot violence. For example, "If it appears at the trial that the destruction of or injury to the property was occasioned or in any manner aided, sanctioned or permitted by the negligence of the claimant, there shall be no recovery." N.J. STAT. ANN. § 2A:48-3 (1952); "No person shall be entitled to the benefits of the foregoing provision [allowing personal action on the case against the town] if it shall appear that the destruction of his property was caused by his illegal or improper conduct...." N.H. REV. STAT. ANN. § 31:54 (1955).

It is difficult to determine the extent and scope of contributory negligence in

Exhibit 3
Page 5 of 18

The difficulty in recovering under riot damage compensation statutes is even further complicated by a clause in many statutes requiring the damaged property owner to use "all reasonable diligence" in preventing property damages.[25] It is not clear to what extent the individual property owner must go while employing "all reasonable diligence" to avoid riot destruction, but it has been held that the property owner need not go so far as to endanger human life.[26] Moreover, the "all reasonable diligence" standard has been satisfied in the absence of prior notice to the municipality because emergency conditions prevented such notice on the part of the property owner.[27]

However, where private property has been "taken" for "public use" absent condemnation, and it appears that the municipality has no intention to bring condemnation proceedings, a suit for just compensation may be initiated by the damaged property owner.[28] This procedure has been called a suit in "inverse condemnation" or "reverse con-

---

a riot context. For example, shop owners may have been contributorily negligent in overcharging local customers, thereby locking them into frustrating ghetto situations that have been one of the major causes of past riots. REPORT OF NAT'L ADVIS. COMM'N, *supra* note 8, at 5.

[25] The "all reasonable diligence" clause appears to be standard in most state recovery statutes. For example, "Nor shall a recovery be had unless the claimant used all reasonable diligence to prevent the destruction or injury...." N.J. STAT. ANN. § 2A:48-3 (1952); ". . . if the owner of such property uses all reasonable diligence to prevent its destruction or injury...." MASS. GEN. LAWS ANN. ch. 269, § 8 (1959); ('. . . and such person shall have used all reasonable diligence to prevent such damage...." N.Y. GEN. MUNIC. LAW § 71 (McKinney 1965); "...provided the owner of such property shall use all reasonable diligence to prevent its destruction or injury by such unlawful assembly...." R.I GEN. LAWS ANN. § 45-15-13 (1956).

[26] Spring Valley Coal Co. v. Spring Valley, 65 Ill. App. 571 (1895); Palmer v. Smith, 147 Wis. 70, 132 N.W. 614 (1911).

[27] *E.g.*, Roy v. Hampton, 108 N.H. 51, 226 A.2d 870 (1967); Feinstein v. City of New York, 157 Misc. 157, 283 N.Y.S. 335 (Mun. Ct. 1935).

[28] Nichols, in his treatise on eminent domain, has described the procedure for a suit by the damaged property owner in the following manner:

> When, however, the award, though absolutely due and payable, is not a judgment, the owner is obliged to institute judicial proceedings to enforce payment. In such a case the common law actions of debt, trover, or assumpsit, or their modern substitutes will lie unless the legislature has provided a specific remedy.... In the event of [statutory] inadequacy, however the owner may pursue his common law remedy.... In the absence of an exclusive statutory remedy, an owner, whose property has been taken for public use without the payment of compensation, may recover the value of the property so appropriated.

NICHOLS, THE LAW OF EMINENT DOMAIN § 28.11 (Rev. 3 Ed. 1965) [hereinafter cited to as NICHOLS].

Exhibit 3
Page 6 of 18

demnation."[29] It is therefore submitted that individuals and businesses which have suffered property damage as a result of a municipal policy permitting looting and destruction during violent civil disorders may bring inverse condemnation suits for damages under the theory of eminent domain. However, because the concepts of "taking" and "public use" are crucial to recovery,[30] these key terms must be afforded rather liberal judicial interpretation if an inverse condemnation suit is to be successful.

It is well established in Anglo-American law that private property shall not be taken for public use without just compensation. This principle has been articulated in the Bill of Rights[31] and in most state constitutions.[32] The traditions protecting the private property owner are found in Roman Law, the Code of Napoleon, and in the legal system of the American colonies.[33] Despite this general agreement as to the "just compensation" principle itself, its application has been historically uncertain.[34] However, the constitutional guarantees which are inherent in the theory of eminent domain—that private property shall not be taken for public use without just compensation—should be applied.

Eminent domain has been defined as

... the power of the nation or a sovereign state to take, or to authorize the taking of, private property for a public use without the owner's consent, conditioned upon the payment to the owner of just compensation.[35]

---

[29]The terms "inverse condemnation" and "reverse condemnation" are commonly employed to represent the suits by property owners based on claims that the government has taken property without compensation. NICHOLS states:
> A taking *in pais* [absent statutory authorization] has been characterized as a *"de facto"* taking or a "common-law" taking and, because of the self-executing character of the constitutional provision with respect to compensation, has given rise to an action which has been variously denominated as a suit in "inverse condemnation" or "reverse condemnation."

NICHOLS, *supra* note 28, at § 25.41 [2].

[30]NICHOLS, *supra* note 28, at § 1.11.

[31]The fifth amendment to the Constitution provides that "...nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V.

[32]All of the states except Kansas, New Hampshire, and North Carolina have constitutional provisions prohibiting the taking of private property without just compensation. NICHOLS, *supra* note 28, at § 1.3.

[33]*See* Cormack, *Legal Concepts in Cases of Eminent Domain*, 41 YALE L.J. 221, 222 (1931).

[34]*Id.*

[35]Ohio Turnpike Comm'n v. Ellis, 164 Ohio St. 377, 131 N.E.2d 397, 401 (1955); NICHOLS, *supra* note 28, at § 1.11.

Exhibit 3
Page 7 of 18

The power of eminent domain is most frequently exercised by a statutorily empowered governmental body, competent to condemn private property for public use.[36] While the general rule in eminent domain cases is that the condemning authority does not become liable for compensation until title to private property is officially (*de jure*) taken,[37] it is well settled that a *de facto* taking does occur when there has been a physical invasion of the condemnee's property or a direct legal restraint placed upon its use.[38] Damage caused by riots is in the nature of physical invasion and examples of physical invasions constituting *de facto* takings are abundant.[39] The physical invasion of property by rioters may well constitute a *de facto* taking and thus satisfy the "taking"[40] requirement of eminent domain.[41]

During a riot, it is not actually the municipality that does the taking—it is the rioters and looters. However, to establish a taking, it is

---

[36] NICHOLS, *supra* note 28, at § 24.2.

[37] *See, e.g.*, N.Y. CONDEMNATION LAW § 4 (McKinney 1950).

[38] *E.g.*, Leeds v. State, 20 N.Y.2d 701, 229 N.E.2d 446, 282 N.Y.S.2d 767 (1967); Keystone Associates v. Moerdler, 19 N.Y.2d 78, 224 N.E.2d 700, 278 N.Y.S.2d 185 (1966).
*De facto* takings have resulted from numerous types of legal restraints. *See, e.g.*, Foster v. City of Detroit, 405 F.2d 138 (6th Cir. 1968) (the filing of a lis pendens); State v. Stefaniak, 250 Ind. 631, 238 NE.2d 451 (1968) (depressed market value as a result of a zoning ordinance); Forster v. Scott, 135 N.Y. 577, 32 N.E. 976 (1893) (filing of a planning map for the city).

[39] *See, e.g.*, United States v. Cress, 243 U.S. 316 (1917) (washing away of riparian land); Richards v. Washington Terminal Co., 233 U.S. 546 (1914) (smoke from nearby railroads); United States v. Lynah, 188 U.S. 445 (1903) (raising groundwater tables); Bauer v. County of Ventura, 45 Cal. 2d 276, 289 P.2d 1 (1955) (pollution resulting from poorly constructed sewage systems and drainage ditches); City of Atlanta v. Kenny, 83 Ga. App. 823, 64 S.E.2d 912 (1951) (removal of lateral support); Renninger v. State, 70 Idaho 170, 213 P.2d 911 (1950) (bridge construction flooded plaintiff's land); Lage v. Pottawattamie County, 232 Iowa 944, 5 N.W.2d 161 (1942) (floods caused by the construction of highways and dams); Cerniglia v. City of New Orleans, 234 La. 730, 101 So. 2d 218 (1958) (eliminating means of ingress and egress); Donaldson v. City of Bismark, 71 N.D. 592, 3 N.W.2d 808 (1942) (causing gas, smoke, and noxious ordors to invade plaintiff's premises); Butler v. Frontier Tel. Co., 186 N.Y. 486, 79 N.E. 716 (1906) (erecting telephone poles over plaintiff's premises).

[40] The commonly accepted concept of "taking" recognizes that "under the constitutional provisions it is not necessary that the land should be absolutely taken." Pumpelly v. Green Bay Co., 80 U.S. (13 Wall.) 166, 179 (1871).

[41] In considering the most likely damages resulting from civil disorders, injury to merchandise, furniture, showcases, and other personal property is readily foreseen. Since this discussion relies heavily upon case law concerning real property, it is pointed out that the theory of eminent domain is applicable to all property, real and personal. *See, e.g.*, United States v. 19.86 Acres, 141 F.2d 344 (7th Cir. 1944) (construction material); Weiner v. Fulton County, 113 Ga. App. 343, 148 S.E.2d 143 (1966) (value of attorney's time); Illinois Cities Water Co. v. City of Mt. Vernon, 11 Ill. App. 2d 547, 144 N.E.2d 729 (1957) (trucks, tools, office furniture, maintenance equipment).

Exhibit 3
Page 8 of 18

not necessary that the taking be performed directly by the municipality.[42] Arguably, the taker must purport to act under some color of public authority. A decision by municipal authorities to allow looting, however, is communicated rapidly, and looters may soon purport to act under consent from the local government—if not with complete authority.[43]

During a riot, the town or country usually asserts no property interests and makes no attempt to actually use private property or to claim the accretion of any legal rights; however, the local government has still "taken" the property.[44] The individual's property has been destroyed as a result of municipal policy and the act of destruction, by itself, usually constitutes a "taking" requiring just compensation.[45] Even in the absence of actual physical destruction, many states have viewed the condemnation process as a deprivation of a property owner's rights, rather than necessarily the acquisition of additional rights by the condemnor.[46] The United States Supreme Court[47] has recognized

---

[42]*E.g.*, Cavanaugh v. Boston, 139 Mass. 426, 1 N.E. 834 (1885); Lovett v. West Virginia Central Gas Co., 65 W. Va. 739, 65 S.E. 196 (1909).

[43]For example, TIME reported the following episode during the Detroit riots of 1967:
> As police gave ground, the number of looters grew. "They won't shoot," an eleven-year-old Negro boy said coolly, as a pack of looters fled at the approach of a busload of police. "The mayor said they aren't supposed to."

TIME, Aug. 4, 1967 at 14.

Additional support for the proposition that the rioters, as indirect instrumentalities, act for the municipal government in "taking" riot-destroyed property is presented in the definition of "eminent domain" found in the text accompanying note 35 *supra*. The sovereign state has not only the power to take, but also "... to *authorize* the taking of . . ." private property. Ohio Turnpike Comm'n v. Ellis. 164 Ohio St. 377, 131 N.E.2d 397, 401 (1955) (emphasis added).

[44]Notes 47-50 *infra*.

[45]*See, e.g.*, Oswego & S.R.R. v. State, 226 N.Y. 351, 124 N.E. 8 (1919) in which the highest court of New York held that the destruction of the plaintiff's bridge by the state constituted a taking requiring payment of just compensation.

[46]*See, e.g.*, Cereghino v. State Highway Comm'n, 230 Ore. 439, 370 P.2d 694 (1962). In *City of Buffalo v. Clement*, 34 App. Div. 2d 24, 311 N.Y.S.2d 98 (1970) in which the court stated:
> ... there was a *de facto* taking ... inasmuch as the City's acts forced [the property owner] to move from its property at that time, rendering the property not only unsalable but unrentable and yielding no income whatever. In so holding, we stress that there is a *de facto* taking absent physical invasion or legal restraint in the instant case only because the condemning authority has so interfered with the use of the subject property that essential elements of ownership have been destroyed and substantial justice cannot otherwise be had.

311 N.Y.S.2d at 106.

[47]United States v. General Motors Corp., 323 U.S. 373 (1945).

Exhibit 3
Page 9 of 18

that "[t]he courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking."[48] In a riot situation, the absence of actual occupation and use of private property by the governing body appears to be of little importance, since it is the loss to the owner, not the gain to the municipality, which is significant when determining whether a "taking" has occurred.

One additional aspect of taking by eminent domain which deserves consideration is the question of governmental intent. The government's intent is a prerequisite to establishing a taking requiring compensation,[49] and during a riot emergency, the municipality might not intend to take any specific private property. However, the intent required to constitute an eminent domain taking is kindred to the tort theory of intent in which intent is said to exist when an individual acts with knowledge that a given result is substantially certain to be produced.[50] In the midst of civil disorder, governmental policy may not be directed toward the acquisition of private property, but the municipality may adopt a course of action, the natural consequence of which is to "take" the property.[51] And even though the municipality may have employed a procedure other than that of eminent domain, as is foreseeable during a civil disturbance, a "taking" is still the result.[52] By allowing the looting of selected areas of the community, the municipality deprives individuals of their interest in private property through physical invasion of the property with the knowledge that destruction is substantially certain to result. Consequently, it is reason-

---

[48]*Id.* at 378. *See, e.g.,* 11,000 Acres v. United States, 152 F.2d 566 (5th Cir. 1945); Trinity River Authority v. Chain, 437 S.W.2d 887 (Tex. Civ. App. 1969).

[49]*Biggs Rental Co. v. United States*, 353 F.2d 1013 (Ct. Cl. 1965), held that "to constitute a taking there must be an intent on the part of the [government] to take the plaintiff's properties, or, at least, an intention to do an act the natural consequences of which was to take the property." 353 F.2d at 1017.

[50]*See, e.g.,* Garratt v. Daily, 46 Wash. 2d 197, 279 P.2d 1091 (1955); W. PROSSER, TORTS § 8 (3d ed. 1964).

[51]This concept of intent is embraced by *Sayre v. United States*, 282 F. Supp. 175 (N.D. Ohio 1967) in which the court stated:
> Yet, as seen, *Biggs Rental Company,* [note 49, *supra*] holds that an intention taking of property occurs if the government intentionally does an act "the natural consequence of which was to take property."

282 F. Supp. at 185.
See B. Amusement Co. v. United States, 180 F. Supp. 386, 389 (Ct. Cl. 1960). *But see* Angelle v. State, 212 La. 1069, 34 So. 2d 321 (1948).

[52]The New York Court of Claims has recognized that "[t]he question of whether there has been an actual appropriation of the land is entirely apart from the procedure ordinarily employed in taking it." Rizzo v. State, 202 Misc. 439, 111 N.Y.S.2d 151, 153 (Ct. Cl. 1951).

Exhibit 3
Page 10 of 18

able to conclude that a "taking," in the eminent domain context, has occurred.

An inverse condemnation suit involves not only the "taking" issue, but also the question of whether the taking has been for a "public use."[53] The preservation of peace and order is the public use to which property damaged by controlled-area riots is dedicated.[54] The government maintains peace and order through police power, a valid exercise of which does not require compensation.[55]

The police power may be explained as the power of the sovereign to prevent persons under its jurisdiction from conducting themselves or using their property to the detriment of the general public welfare.[56] The general welfare parallels what has been included by one authority on eminent domain in his description of "public use"—the preservation of the public's health, safety, and comfort.[57]

Affirmative municipal actions in response to emergencies consistently fall within the general category of an exercise of police power by local government.[58] But damage losses resulting from a policy decision to forego control may, on the other hand, be an act of eminent domain. There are similarities between police power, which imposes no duty to compensate, and eminent domain, which does. There appears to be no

---

[53]Notes 31, 35 *supra*.

[54]Included in the police power are the laws which are necessary to provide for the peace and order of the community and to promote "domestic tranquility" and the "comfort and quiet of all persons." 16 AM. JUR. 2d *Constitutional Law* § 310 (1964), and cases cited therein.

[55]Hinrichs v. Iowa State Highway Comm'n, 260 Iowa 1115, 152 N.W.2d 248, 255 (1967); Waggoner v. Gleghorn, 378 S.W.2d 47, 50 (Tex. Sup. Ct. 1964); NICHOLS, *supra* note 28, at § 1.42.

[56]Fertilizing Co. v. Hyde Park, 97 U.S. 659, 667 (1878); State *ex rel.* Penrose Inv. Co. v. McKelvey, 301 Mo. 1, 256 S.W. 474, 476 (1923). In *Hathorn v. Natural Carbonic Gas Co.*, 194 N.Y. 326, 87 N.E. 504 (1909), the court in quoting Cooley's treatise on constitutional limitations stated:

> The police power of a state, in a comprehensive sense, embraces its whole system of internal regulation, by which the state seeks, not only to preserve the public order and to prevent offenses against the state, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others.

87 N.E. at 510. *See* T. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA, 289 (4th ed. 1931), for substantially the same language.

[57]NICHOLS, *supra* note 28, at § 7.22.

[58]*See* notes 94-98 *infra*. *But cf.* note 99 *infra*.

Exhibit 3
Page 11 of 18

hard and fast standard for distinguishing between them.[59]

In an effort to determine whether police power or eminent domain is involved, some courts have looked toward the "controlling purpose"[60] of the governmental activity. *Conger v. Pierce County*[61] involved an action against a county by a private property owner whose land had been eroded because of public improvements to a nearby navigable stream. In that case, the court emphasized the following rule for distinguishing between police power and eminent domain:

> Eminent domain takes private property for a public use, while the police power regulates its use and enjoyment, or, if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health, and general welfare of the public.[62]

The court, therefore, looked primarily toward the controlling purpose of the public improvement. "Public use," the requisite purpose for taking private property by eminent domain, was distinguished from conserving the "safety, morals, health, and general welfare of the public," the purpose for valid exercises of police power.

However, in *City of Schenectady v. Furman*,[63] a case involving property damage due to a municipal resolution resulting in the appropriation of a portion of Furman's property to provide for a new channel for a waterway flowing over his property, the court recognized that while the purpose of the resolution was to eliminate stagnant deposits ". . . detrimental to [the public] health . . .,"[64] the city's action constituted an exercise of eminent domain.[65] The purpose of the public improvement in this case was the preservation of the health and safety of the community's citizens, a police power purpose under *Conger*, yet the court held that the effects of this improvement resulted in an exercise of eminent domain. The *Furman* decision indicates that the "controlling purpose" test employed in cases such as *Conger* may not lead to consistent results.

---

[59]The fact that "tests" for distinguishing between police power and eminent domain are not to be arbitrarily applied is brought out by the following excerpt: "Many jurists seem to consider that any taking in behalf of the public health and safety is necessarily an exercise of the police power, but this is clearly an error...." NICHOLS, *supra* note 28, at § 7.515.

[60]Conger v. Pierce County, 116 Wash. 27, 198 P. 377, 381 (1921).

[61]116 Wash. 27, 198 P. 377 (1921).

[62]*Id.* at 380.

[63]145 N.Y. 482, 40 N.E. 221 (1895).

[64]*Id.* at 221.

[65]The court held that "the city had no right or power to take and appropriate his lands...without rendering him compensation therefor, either under the constitution or the statutes." 40 N.E. at 222.

Exhibit 3
Page 12 of 18

Since an analysis of "controlling purpose" may not always be useful in distinguishing between police power and eminent domain, another test may be appropriate. It is said that police power is exercised through *regulation* while eminent domain is a *taking*.[66] If municipal policy is based on the police power, regulations formulated under the exercise of that power, so far as they relate to property, are negative in character.[67] A man cannot be compelled under the police power to put his property to any particular use, no matter how beneficial to the public, although he may be compelled to refrain from any particular use which is detrimental to the public.[68] A municipal policy permitting riot damage to private property forces the affected citizens to devote their property to an affirmative use—the preservation of peace and order throughout other areas of the community. Putting private property to this use is thus in the nature of eminent domain and, as such, the municipality is obliged to compensate the property owners for the taking.[69]

In certain instances, the distinction between regulation and taking may be tenuous. For example, in *In re Clinton Water District*,[70] the state took water from a fresh water lake for domestic use by a water district. As a consequence, state legislation required that boating, swimming, and fishing in the lake be discontinued. Although restrictions on the harmful use of property are usually held to be valid exercises of police power,[71] the court found that the effect of these regulations was a material depreciation in the value of the riparian landowner's property and awarded compensation. This case involved a regulation of property benefiting the public safety and health that nevertheless was found to constitute a taking under eminent domain.[72] If restrictions

---

[66]The "taking/regulation" distinction is commonly used when the courts attempt to distinguish between police power and eminent domain. For example:
> The distinguishing characteristic between eminent domain and the police power is that the former involves the *taking* of property because of its need for the public use while the latter involves the *regulation* of such property to prevent the use thereof in a manner that is detrimental to the public interest.

NICHOLS, *supra* note 28, at § 1.42.
[67]16 AM. JUR. 2d *Constitutional Law* § 290 (1964).
[68]*See* Bowes v. City of Aberdeen, 58 Wash. 535, 109 P. 369, 372 (1910).
[69]Notes 31-33 *supra*.
[70]36 Wash. 2d 284, 218 P.2d 309 (1950).
[71]*E.g., St.* Louis & San Francisco Ry. v. Mathews, 165 U.S. 1, 23-27 (1897); Crowley v. Christensen, 137 U.S. 86, 90 (1890).
[72]Note 74 *infra*. It may be argued that a particular infringment might be considered an exercise of police power to one group of people and an exercise of eminent domain as to another group. For example, in *In re Clinton Water Dist.*, 36 Wash. 2d 284, 218 P.2d 309 (1950), the state regulations may have been a valid

Exhibit 3
Page 13 of 18

upon the use of property actually deprive an individual of the beneficial use and enjoyment of his private property or materially depress its value,[73] such regulations will usually be considered by the courts as an eminent domain taking rather than a valid exercise of police power.[74]

Even if such tests as the "controlling purpose" or the regulation/taking distinction were consistently accurate indications of whether police power or eminent domain has been exercised, the government, even under the police power, cannot actually take property for public use without compensation. Such action is repugnant to the Constitutional guarantee that private property shall not be taken without just compensation.[75]

> [W]hen land or other property is actually taken from the owner
> ... by the public authorities, the constitutional obligation to

---

exercise of police power as to the members of the public who wished to swim and fish in the lake and also an equally valid expression of the power of eminent domain as to the riparian landowner. Consequently, there may be precedent for a theory calling for evaluation of each governmental action with respect to its effect on a particular plaintiff. In a controlled-riot situation, the municipality's policy may be a valid exercise of police power as to those citizens residing in areas of the community not endangered by the disorders and also an act of eminent domain as to those citizens located within the riot area whose property has been destroyed.

[73] In *United States v. Central Eureka Mining Co.*, 357 U.S. 155 (1958), the Supreme Court recognized that "action in the form of a regulation can so diminish the value of property as to constitute a taking." 357 U.S. at 168. State courts have also recognized that property owners have a right to compensation if regulations significantly diminish property values. For instance,

> ... zoning cannot be used as a substitute for eminent domain proceedings so as to defeat the constitutional requirement for the payment of just compensation in the case of the taking of private property for public use by depressing values and so reducing the amount of damages to be paid.

Congressional School of Aeronautics v. State Roads Comm'n, 218 Md. 236, 146 A.2d 558, 560 (Ct. App. 1958); *see, e.g.*, City of Scotsbluff v. Winters Creek Canal Co., 155 Neb. 723, 53 N.W.2d 543 (1952); Ackerman v. Port of Seattle, 55 Wash. 2d 400, 348 P.2d 664 (1960).

[74] *See, e.g.*, Treigle v. Acme Homestead Ass'n, 297 U.S. 189 (1936); Mid-Way Cabinet Fixture Mfg. v. County of San Joaquin, 257 Cal. App. 2d 181, 65 Cal. Rptr. 37 (1968); Cleaver v. Board of Adjustment, 414 Pa. 367, 200 A.2d 408 (1964).

A 1906 opinion of the United States Supreme Court points toward the limitations on police power regulations by stating:

> Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare.

Chicago B. & Q. Ry. v. Illinois *ex rel.* State Drainage Comm'rs, 200 U.S. 561, 592-93 (1906).

[75] U.S. CONST. amend. V, *supra* note 31.

Exhibit 3
Page 14 of 18

make just compensation arises, however much the use to which the property is put may enhance the public health, morals or safety.[76]

The construction of hospitals,[77] the building of fire houses,[78] and the abolition of hazardous grade crossings[79] are all clearly in the interest of public health and safety, but private land and buildings may not be taken without liability upon the taker for compensation. Even though the municipality allows the taking of private property during civil disorders as an exercise of police power to preserve the health, safety, and welfare of its citizens, the court should not be required to reach a finding which denies compensation. An eminent domain decision may result.[80]

The property rights of individuals are subordinate to valid exercises of police power.[81] A basic standard which limits all exercises of the police power is the requirement that the power should extend only to such measures as are reasonable.[82] In order for a police measure to be reasonable, the means adopted must be reasonably necessary and appropriate for the accomplishment of objectives that fall within the scope of the power.[83] However, there is no certain test which can be applied to determine whether any particular act is reasonable,[84] because questions of reasonableness are usually matters of degree. If a governmental action based on the police power is challenged as an unreasonable invasion of rights guaranteed by the constitution, it is the

---

[76]NICHOLS, *supra* note 28, at § 1.42[1].
[77]Manning v. Bruce, 186 Mass. 282, 71 N.E. 537 (1904).
[78]Allen v. City of Detroit, 167 Mich. 464, 133 N.W. 317 (1911).
[79]City of Chicago v. Jackson, 196 Ill. 496, 63 N.E. 1013 (1902); Illinois Cent. R.R. v. Moriarity, 135 Tenn. 446, 186 S.W. 1053 (1916).
[80]For additional examples of taking for purposes akin to the public welfare category, see City of Chicago v. Le Moyne, 119 F. 662 (7th Cir. 1902) (involving the construction of a viaduct); Bernard v. State Dept. of Public Works, 127 So. 2d 774 (La. Ct. App. 1961) (a drainage project).
[81]*E.g.*, Eiger v. Garrity, 246 U.S. 97, 102 (1918); Munn v. Illinois, 94 U.S. 113, 125 (1876).
[82]*See, e.g.*, Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405 (1935); Marrs v. City of Oxford, 32 F.2d 134 (8th Cir. 1929); Miller v. Bd. of Public Works, 195 Cal. 477, 234 P. 381 (1925); East Side Levee & San. Dist. v. East St. L. & C. Ry., 279 Ill. 123, 116 N.E. 720 (1917); People v. Perretta, 253 N.Y. 305, 171 N.E. 72 (1930).
[83]*See, e.g.*, Froelich v. City of Cleveland, 99 Ohio St 376, 124 N.E. 212 (1919).
[84]*See, e.g.*, Lemieux v. Young, 211 U.S. 489 (1909). When considering the reasonableness of any exercise of police power, the circumstances surrounding the exercise are important and there is no abstract test which is easily applied. "There is no certain test of what is a reasonable interference with the enjoyment of the rights of property or the personal rights guaranteed by the Constitution." Board of Zoning App. v. Decatur Ind. Co. of Jehovah's Witnessess, 233 Ind. 83, 117 N.E.2d 115, 118 (1954).

Exhibit 3
Page 15 of 18

duty of the courts to determine whether the exercise is necessary for the public good.[85] When determining the degree of reasonableness of an exercise of police power, the courts use a balancing process to weigh the public benefit against the burden placed upon the private property owner.[86]

The theory of balancing benefits against burdens has been commonly applied to cases concerning zoning ordinances.[87] The courts determine first whether the property infringement is a valid exercise of police power[88] or, in the alternative, whether the action can be sustained as an exercise of eminent domain. In making their decision, the courts usually decide whether the benefit to the public health and safety as a result of municipal policy is very great, while, on the other hand, the corresponding burden on the individual constitutes a reasonable interference with private property.[89] Such a conclusion usually leads to a finding of a valid exercise of police power.[90] The destruction of property however, is the most extreme exercise of police power and is justified only with in the narrowest limits of actual necessity unless the municipality chooses to pay compensation.[91] If municipal policy results in interference with property causing a substantial burden to the

---

[85]Alabama State Fed. of Labor v. McAdory, 246 Ala. 1, 18 So. 2d 810 (1944), cert. denied, 325 U.S. 450 (1945); Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., 11 Cal. 2d 634, 82 P.2d 3 (1938).

[86]The United States Supreme Court has implied that a balancing of benefits and burdens test is applicable when determining the reasonableness of zoning ordinances. The court has said:
> To justify the State in ... interposing its authority in behalf of the public, it must appear, first, that the interests of the public ... require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

Goldblatt v. Town of Hempstead, 369 U.S. 590, 595 (1962), quoting Lauton v. Steele, 152 U.S. 133, 137 (1894).

[87]Case law has generally held a zoning ordinance unreasonable and therefore, an invalid exercise of police power requiring compensation, if the ordinance appears manifestly unjust. See State Bank & Trust Co. v. Village of Wilmette, 358 Ill. 311, 193 N.E. 131 (1934); Daniels v. City of Portland, 124 Ore. 677, 265 P. 790 (1928).

[88]Police power prevents the owner from using his property in a way that is injurious to the general public, while eminent domain uses the owner's property to the benefit of the general public. See Moton v. City of Phoenix, 100 Ariz. 23, 410 P.2d 93 (1966).

[89]See notes 86-87 supra.

[90]Id.

[91]See, e.g., Corneal v. State Plant Bd., 95 So. 2d 1 (Fla. 1957); E. FREUND, THE POLICE POWER, § 520 at 554 (1904).

Exhibit 3
Page 16 of 18

individual in relation to the public benefit, the courts usually arrive at a decision requiring compensation.[92]

Compensation is required if the government actually takes private property, even if the basis for such action involves an exercise of the police power.[93] However, there is one exception to this general postulate. Affirmative municipal action necessitated by natural disasters and "eminent peril" emergencies other than riots and civil disorders, has been consistently classified as a valid exercise of police power not requiring compensation.[94] These actions, which are intended to circumvent certain disaster, are authorized by specific statutory grants.[95] In the absence of such grants, the degree of necessity occasioning property destruction is a question of fact and it must be proven that the property owners suffered no destruction than would otherwise have occurred.[96] The property cannot be destroyed if the conditions which made it a menace can be abated in any other recognized way.[97] In emergencies necessitating property destruction such as fires, infected livestock, and property certain to fall into enemy hands, it is the property which is a menace to the public welfare. The property itself is an indispensible element of the danger to safety and health. The private building in the path of a raging conflagration is fuel for the fire, the livestock herds provide life for infectious virus, and a munitions factory provides strength for the enemy. The property itself presents a danger to the public. In such cases, destruction without compensation is permitted.[98] However, in the case of violent disorders the structures in the riot affected area are not in themselves indispensible elements of the danger to the safety of citizens or their property. The menace created by rioters is not dependent on the continued existence of the surrounding private

---

[92]See text accompanying notes 86-90 *supra*.

[93]See text accompanying notes 75-80 *supra*.

[94]Examples of these emergency acts are destroying property to keep it from falling into the hands of an advancing enemy, *United States v. Caltex*, 344 U.S. 149 (1952), destroying a building to prevent the advance of a spreading fire, *Bowditch v. Boston*, 101 U.S. 16 (1879), and draining a private pond in an effort to locate a murdered body, *McCoy v. Sanders*, 113 Ga. App. 565, 148 S.E.2d 902 (1966).

[95]*See, e.g.,* Dudley v. Orange County, 137 So. 2d 859 (Fla. Dist. Ct. App. 1962) (civil defense statute providing for temporary damming to prevent extensive floods); Jackson v. Bell, 143 Tenn. 452, 226 S.W. 207 (1920) (statute providing for destruction of property by fire commissioner for purpose of preventing spread of conflagration to other buildings).

[96]To justify the destruction of property by necessity, it must be proven that the necessity was inevitable, or that the plaintiff suffered no loss by the destruction than would otherwise have occurred. Hale v. Lawrence, 21 N.J.L. 714 (1848). *See also* Sentell v. New Orleans & C.R. Co., 166 U.S. 698 (1896); Bishop v. Mayor of Macon, 7 Ga. 200, 50 Am. Dec. 400 (1849).

[97]*See, e.g.,* City of Houston v. Lurie, 148 Tex. 391, 244 S.W.2d 871, 879 (1949).

[98]Note 94 *supra*.

Exhibit 3
Page 17 of 18

property. Consequently, the power to destroy property out of necessity may not be applicable in a riot situation, and consequently compensation is required.[99]

It is arguable, therefore, that when a municipality is presented with the choice of whether to exercise the police power to avert damage or to allow destruction by rioters and the municipality chooses the latter course in the public interest, it should be responsible to the private

---

[99] Even if the theory of destruction out of necessity is applicable to a controlled riot situation, the doctrine itself may be due for a reevaluation. The origin of the theory is found in *The Case of the King's Prerogative in Saltpetre*, 77 Eng. Rep. 1294. That case held that an owner of land was not entitled to compensation from the King for saltpetre mined from his property and later used in the manufacture of gunpowder. Although the court's language indicated that the confiscated material was necessary for the defense and safety of the realm, the powerful position of the King was probably also a factor. An early American case which adopted the necessity doctrine was *Respublica v. Sparhawk*, 1 Dall. 357 (Pa. 1788), a case involving the destruction of a building to prevent the spread of an approaching fire. The court stated that, "[i]t is a rule, however, that it is better to suffer a private mischief, than a public inconvenience; and *the rights of necessity*, form a part of our law." 1 Dall. at 362. The United States Supreme Court, in *Bowditch v. Boston*, 101 U.S. 16 (1879), later recognized the rule of necessity by accepting the English common law precedent established in *Saltpetre* and *Respublica*. However, precedents should always be subject to reevaluation by the courts. As Justice Holmes stated in HOLMES, THE COMMON LAW (1881),

> The official theory is that each new decision follows syllogistically from existing precedents. But just as the clavacle in the cat only tells of the existence of some earlier creature to which a collar-bone was useful, precedents survive in the law long after the use they once served is at an end and the reason for them has been forgotten. The result of following them must often be failure and confusion from the merely logical point of view.

HOLMES at 35. In addition, one American jurist, while commenting upon the English common law background of the rule of necessity, has stated,

> The abuse of the admitted rights which inevitable necessity confers, and the habit of confounding these rights with the doctrines of prerogative, disregarding the just distinction between them, probably led to the provision in our constitution forbidding private property from being taken for the public use without just compensation.

*Russell v. The Mayor of New York*, 2 Denio 461, 487 (N.Y. 1845). Early American jurists have warned against the blind adherence to precedent and have raised questions as to the propriety of the destruction by necessity doctrine. At least one modern jurist has criticized the doctrine on the basis of a shift in the emphasis of public policy in America. Justice Douglas, in his dissenting opinion in *United States v. Caltex*, 344 U.S. 149 (1952), stated,

> It seems to me that the guiding principle should be this: Whenever the Government determines that one person's property—whatever it may be—is essential to the [public good] and appropriates it for the common good, the public purse, rather than the individual, should bear the loss.

344 U.S. at 156

Exhibit 3
Page 18 of 18