# HARVARD LAW REVIEW

Municipal Liability for Riot Damage

Source: *Harvard Law Review*, Jan., 1968, Vol. 81, No. 3 (Jan., 1968), pp. 653-656

Published by: The Harvard Law Review Association

Stable URL: https://www.jstor.org/stable/1339512

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*The Harvard Law Review Association* is collaborating with JSTOR to digitize, preserve and extend access to *Harvard Law Review*

This content downloaded from
52.34.167.83 on Fri, 08 Jul 2022 19:10:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 4
Page 1 of 5

## MUNICIPAL LIABILITY FOR RIOT DAMAGE

In light of the large-scale civil disturbances occurring in recent years, it is interesting that fifteen states have statutes providing that municipalities are liable for losses resulting from mob violence.[1] With a few exceptions [2] the liability is absolute, though there are various defenses available to the city. For example, nine of the statutes bar recovery if the plaintiff was contributorially negligent.[3] And in eight of the states a successful action is contingent on public officials having knowledge that the violence was in progress.[4] Enacted in the nineteenth century,[5] and modeled after the English Riot Act of 1714,[6] these statutes were obviously in response to far different conditions than those now present in American cities.[7] Reevaluation of the earlier justifications is therefore required.

There were several rationales for these statutes. It was thought that municipal liability would deter local citizens from participating in riots [8] and provide an incentive to local officials to prevent disturbances or to quell them if started.[9] It was also considered more equitable

---

[1] Included is New Jersey where approximately 3,000 plaintiffs have brought suit against the city of Newark in the aftermath of last summer's disturbances. The aggregate of the claims is approximately $6,000,000. Telephone conversation with Norman N. Schiff, Corporation Counsel of the City of Newark, Dec. 1, 1967. The statutes are:
CONN. GEN. STAT. REV. § 7-108 (1958); ILL. REV. STAT. ch. 38, § 25-3 (1965); Liabilities of Cities for Mob Actions, ch. 80, §§ 1-2, [1967] Kan. Laws 212; KY. REV. STAT. § 411.100 (1962); ME. REV. STAT. ANN. tit. 17, § 3354 (1964); MD. ANN. CODE art. 82, §§ 1-3 (1965); MASS. GEN. LAWS ANN. ch. 269, § 8 (1959); MO. REV. STAT. §§ 537.140-.160 (1959); MONT. REV. CODES ANN. §§ 11-1530, 94-5314 (1947); N.H. REV. STAT. ANN. §§ 31:53-55 (1955); N.J. REV. STAT. §§ 2A:48-1 to :48-7 (1951); PA. STAT. ANN. tit. 16, §§ 11821-26 (1956); R.I. GEN. LAWS ANN. §§ 45-15-13 to -14 (1956); S.C. CODE ANN. §§ 16-107 to -111 (1962); WIS. STAT. § 66.091 (1961). New York also has a similar statute, N.Y. GEN. MUNIC. LAW § 71 (McKinney 1965), but it has been made inoperative. N.Y. UNCONSOL. LAWS § 9193(3) (McKinney 1965). The statutes of California and Louisiana have been recently repealed. Ch. 1681, § 17, [1963] Cal. Stat. 3286; No. 458, § 1, [1966] La. Acts 975.
[2] Connecticut, Kansas, Kentucky, and Maryland.
[3] Kentucky, Maine, Massachusetts, New Hampshire, New Jersey, Pennsylvania, Rhode Island, South Carolina, and Wisconsin.
[4] Kentucky, Maryland, New Hampshire, New Jersey, New York, Pennsylvania, South Carolina, and Wisconsin.
[5] E.g., Ch. 1519, §§ 1-5, [1854] N.H. Laws 1416; Ch. 150, §§ 1-8, [1864] N.J. Laws 237; No. 144, §§ 7-11, [1841] Pa. Laws 416.
[6] An Act for Preventing Tumults and Riotous Assemblies, and for the More Speedy and Effectual Punishing the Rioters, 1 Geo. 1, stat. 2, c. 5. This statute succeeded an earlier statute which made a "hundred" (a social unit) liable for property damages caused by felonies if the felon was not presented within forty days. Statute of Winchester, 13 Edw. 1, stat. 2, c. 2-3 (1285). See Feinstein v. City of New York, 157 Misc. 157, 161, 283 N.Y.S. 335, 338 (New York City Mun. Ct. 1935).
[7] In four states, for example, the city is liable only for damages caused by a lynching mob. MINN. STAT. § 373.28 (1965); NEB. REV. STAT. §§ 23-1001 to -1009 (1954); N.C. GEN. STAT. § 162-23 (1964); OHIO REV. CODE ANN. §§ 3761.01-.05 (Page 1954). See also S.C. CONST. art. VI, § 6.
[8] See Ratcliffe v. Eden, 98 Eng. Rep. 1200 (K.B. 1776) (Lord Mansfield, J.); Legislation, *Liability of the Municipality for Mob Violence*, 6 FORD. L. REV. 270, 273 (1937).
[9] Note, *Communal Liability for Mob Violence*, 49 HARV. L. REV. 1362 (1936);

This content downloaded from
52.34.167.83 on Fri, 08 Jul 2022 19:10:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 4
Page 2 of 5

for the cost of a riot to be imposed on the entire community instead of often random victims.[10] In light of the proven inadequacy of criminal sanctions as deterrents to participation in riots, municipal liability seems unlikely to have a significant impact upon individual behavior. The dissatisfactions underlying recent disturbances are simply too great to attribute any dampening effect to the tax increases which might follow extensive judgments against a city. Moreover, the impact of tax increases would fall more on those affluent property owners and high income recipients who are least likely to be the instigators of riots. It is possible, however, that if the affluent classes must bear the costs of riots, they will be more likely to bend their efforts to improving ghetto conditions in order to remove the riots' underlying causes.

Increasing the motivation of city officials to prevent riots seems an unlikely result of municipal liability; the property destruction and personal injury attendant to a Watts-type riot seem more than adequate as incentives.[11] The statutes might, however, influence the strategy of local governments with respect to combating an existent disturbance. Liability for all losses would discourage any tendency simply to contain the rioting within the slum area without serious effort either to end it or to render aid to those in the riot zone.[12]

Cost allocation as a rationale for municipal liability was dependent upon the notion that the entire population of a city is responsible for riot losses.[13] In modern context, the premise must be that the factors underlying disturbances are the direct result of society's choices about resource allocation. Presumably, any riot can be prevented if society were willing to expend the funds necessary to alleviate conditions conducive to riots. The obvious difficulty is distinguishing riot losses from other losses incurred because of societal decisions about the utilization of resources. Automobile accidents, for example, could be reduced greatly if substantial expenditures were made on roads, vehicle safety research, and driver training; yet, accident victims are not generally compensated.

On the other hand, a difference between riots and other sources of loss can be identified in the disproportionate impact that civil disturbances have upon the economically deprived. For while other sources of loss are usually indiscriminate in their effect upon the various economic classes, the majority of those incurring losses due to riots are of the lower economic levels. Moreover, the selectivity of riot loss is

---

see Roy v. Hampton, 108 N.H. 51, 53, 226 A.2d 870, 872 (1967). Indeed, several of the statutes make municipal officials *personally* liable for riot damage if they neglect their duty to suppress a riot. *See, e.g.,* MONT. REV. CODES ANN. § 94-5314 (1947); N.Y. GEN. MUNIC. LAW § 71 (McKinney 1965); WIS. STAT. § 66.091(4) (1961).

[10] *See* Slaton v. City of Chicago, 8 Ill. App. 2d 47, 58–59, 130 N.E.2d 205, 211 (1955); Note, *Municipal Liability for Riot Damage*, 16 HAST. L. REV. 459, 461 (1965).

[11] *See* Note, *Municipal Tort Liability: Statutory Liability of Municipalities for Damage Caused by Mobs and Riots: New York General Municipal Law Section 71: Suspension of the Statute*, 50 CORNELL L.Q. 699, 705 (1965).

[12] During a riot in Cambridge, Maryland, in July, 1967, firemen refused for several hours to enter the slum district. Instead, fire trucks were dispatched to "water down" the business district, adjacent to the burning slum area. *See* N.Y. Times, July 26, 1967, at 18, col. 4.

[13] *See* 22 EARL OF HALSBURY, LAWS OF ENGLAND 507 (1st ed. 1912).

This content downloaded from
52.34.167.83 on Fri, 08 Jul 2022 19:10:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 4
Page 3 of 5

Case 3:22-cv-00610-JR    Document 65-4    Filed 12/02/22    Page 4 of 5

exacerbated by the general inability of potential riot victims to protect themselves against the risk of such loss. Insurance at reasonable rates is becoming far less available for the protection of property, real or personal, in riot-prone areas.[14] And even if moderately priced insurance could be purchased,[15] the slum dweller is unlikely to divert any of his meager income to such protection. This discriminatory aspect of riot losses may not suffice to make them inherently deserving of compensation, but the distinction does suggest that in a society where, as a practical matter, resources available are limited, riot losses should come high in any scale of priorities.[16]

If, however, equity is the controlling rationale for allocation of riot cost, most of the statutes have an unwarranted limitation upon compensation. While all the statutes provide recovery for property damages, in only four states does liability encompass personal injuries.[17] But those incurring personal injury are the class most likely to be indigenous to the slum. In contrast, property owners, at least of businesses and apartment houses, not only are often absentee owners [18] but generally are in a better position to bear losses or to purchase insurance. Though the risk of riots may be a cost of doing business in these areas, if society bears the cost, the private owner may be somewhat more able, and hopefully willing, to provide better services. In any event, the cost of personal injury is so low when compared with property losses caused by recent disturbances [19] that the additional burden of making them compensable will be slight.

On the other hand, the dichotomy between property damage and personal injury may be justified if the purposes of compensation extend beyond amorphous notions of equity. Municipal liability may be intended, for example, to effectuate affirmative societal interests. The aftermath of a serious disturbance cannot be disregarded, as a failure to take restorative steps may only encourage further violence. Compensation thus may be one means by which partial renewal of a riot area can be facilitated. If restoration is the controlling rationale, there is logic to compensating only property damage.[20] Revitalization of a slum depends ultimately upon economic revival, not the compensation

---

[14] *See* National Advisory Commission on Civil Disorders Release of Oct. 26, 1967, at 2.

[15] The federal government is investigating methods of making available insurance against riot damage at reasonable costs. *Id.* 1–9.

[16] Support for the equity rationale may also be derived from the recent legislation in a few states providing for the compensation of victims of violent crime. CAL. WELF. & INST'NS CODE § 11211 (West 1966); N.Y. EXEC. LAW §§ 620–35 (McKinney Supp. 1967). *See generally* Comment, *Compensation for Victims of Crime: Some Practical Considerations*, 15 BUFF. L. REV. 645 (1966).

[17] CONN. GEN. STAT. ANN. § 7–108 (1958); ILL. REV. STAT. ch. 38, § 25-3 (1965); Liabilities of Cities for Mob Actions, ch. 80, §§ 1–2, [1967] Kan. Laws 212; WIS. STAT. § 66.091(1) (1961).

[18] *See* Powers, *Age and Space Aspects of City and Suburban Housing*, 40 LAND ECON. 381, 384 (1964).

[19] The total property losses from the Detroit riots in the summer of 1967 were close to $100 million. Statement by Governor Richard Hughes, Press Conference on Work of Advisory Panel on Insurance in Riot-Affected Areas, Sept. 15, 1967.

[20] To ensure that awards are utilized for restorative purposes, compensation might be made contingent upon reinvestment in the riot area.

This content downloaded from
52.34.167.83 on Fri, 08 Jul 2022 19:10:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 4
Page 4 of 5

of the relatively few who suffer significant personal injury. A possible objection to such a rationale is the indirectness of compensation for restoring a slum. Urban renewal and job training, for example, are more efficient means of attacking the underlying causes of disturbances. Compensation, however, must be considered merely one of many methods for solving the problems of the city.

A more serious criticism is that municipal liability may divert resources from other urgent uses. Local officials may find it politically more expedient to utilize funds already available, and budgeted for other purposes, than to levy increased taxes.[21] On the other hand, large-scale disturbances presumably will not be regular occurrences in most cities, and long term cutbacks in other programs should not be necessary to cover liabilities. Moreover, the issuance of bonds can spread the costs over an extended period.[22]

The potential that municipal liability may have adverse effects suggests, however, that state or federal compensation may be preferable. A larger tax base might reduce the possibility that other important programs would be sacrificed. And the danger that tax increases might aggravate the already serious problems of migration to the suburbs of people and businesses [23] also would be alleviated.[24] If liability is founded ultimately upon notions of societal responsibility, there is little reason to include only the municipality within the description of the relevant society. The allocative decisions creating the conditions underlying riots are made by a much broader constituency. Political realities, however, may preclude such a substitute for municipal liability.

---

[21] If the city does not make funds available for the judgments against it, mandamus will lie against city officials to compel the levying of a tax. *See, e.g.,* Moore v. Town of Browning, 373 Ill. 583, 27 N.E.2d 533 (1940); Skaer v. Feurer, 349 Ill. App. 321, 325, 110 N.E.2d 646, 648 (4th Dist. 1953); McCullough v. Camden County, 126 N.J.L. 232, 19 A.2d 326 (1941). The size of the required levy may be limited by provisions in the state's constitution which restrict the taxing power of municipal corporations. *See, e.g.,* ALA. CONST. art. 11, § 216; MO. CONST. art. 10, § 11(b); N.Y. CONST. art. 8, § 10; *cf.* State *ex rel.* Emerson v. City of Mound City, 335 Mo. 702, 73 S.W.2d 1017 (1934) (decided under prior constitution).

[22] Of course, a city's credit may be limited by the market for bonds or by the state's constitution. *See, e.g.,* CAL. CONST. art. 11, § 18; UTAH CONST. art. 14, § 3; WIS. CONST. art. 11, § 3.

[23] *See generally* A. HAWLEY, THE CHANGING SHAPE OF METROPOLITAN AMERICA (1956); R. VERNON, THE CHANGING ECONOMIC FUNCTION OF THE CENTRAL CITY 41–62 (1959).

[24] In Illinois, ILL. REV. STAT. ch. 38, § 25–3 (1965), and Pennsylvania, PA. STAT. ANN. tit. 16, §§ 11821–26 (1956), the county is the governmental unit liable. Pennsylvania's statute, however, applies only to the counties surrounding Philadelphia, Pittsburgh, and Easton.

This content downloaded from
52.34.167.83 on Fri, 08 Jul 2022 19:10:39 UTC
All use subject to https://about.jstor.org/terms

Exhibit 4
Page 5 of 5