Exhibit 1

**SCOTT ERIK ASPHAUG, OSB #833674**
United States Attorney
**RENATA A. GOWIE, OSB #175273**
Civil Division Chief
**JARED D. HAGER, WSB #38961**
Assistant United States Attorney
U.S. Attorney's Office for the District of Oregon
1000 SW Third Ave., Suite 600
Portland, Oregon 97204-2936
Phone:  503.727.1120
Email:  jared.hager@usdoj.gov


**KRISTEN CLARKE**
Assistant Attorney General
Civil Rights Division
**STEVEN H. ROSENBAUM**
Chief
**LAURA L. COWALL**
Deputy Chief
**R. JONAS GEISSLER**
Trial Attorney
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C.  20530
Phone:  202.514.6255
Fax:  202.514.4883
    Attorneys for Plaintiff United States

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON


| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:12-cv-02265-SI |
| Plaintiff, | PLAINTIFF'S NOTICE OF SIXTH PERIODIC COMPLIANCE ASSESSMENT REPORT |
| v. | |
| **THE CITY OF PORTLAND**, | |
| Defendant. | |

Plaintiff United States of America (United States) submits this Notice of Sixth Periodic Compliance Assessment Report in advance of the Status Conference set for July 27, 2022. The Report, attached as Exhibit 1, focuses on Defendant the City of Portland's (City) compliance activity from January 10, 2021, to March 31, 2022, as relevant to seven sections of the Amended Settlement Agreement (Agreement)—Use of Force (Section III, ¶¶ 66–77); Training (Section IV, ¶¶ 78–87); Community-Based Mental Health Services (Section V, ¶¶ 88–90); Crisis Intervention (Section VI, ¶¶ 91–115); Employee Information System (EIS) (Section VII, ¶¶ 116–120); Accountability (Section VIII, ¶¶ 121–140); and Community Engagement and Creation of Portland Committee on Community Engaged Policing (PCCEP) (Section IX, ¶¶ 141–152). ECF 276-1, Am. Settlement Agreement.[1]

We assess the City's compliance using the following color-coded rating levels:

- Green: substantial compliance with an ongoing obligation. This level indicates that the City has implemented the provision as required by the Agreement, and must continue implementing the provision to remain in substantial compliance.

- Yellow: partial compliance with an ongoing obligation. This level indicates that the City has made progress with implementation, but has specific concerns it must address to reach substantial compliance.

- Red: noncompliance. This level indicates that we have identified barriers to the City implementing a provision that the Parties must address by devising an appropriate remedy or modifying the Agreement to accomplish the same result as that intended by the provision in noncompliance.

---

[1] On April 29, 2022, this Court approved the operative version of the Agreement after the United States and City (collectively, the Parties) agreed to add a new section with additional remedies (Section XI, ¶¶ 186–195) to resolve a notice of noncompliance. ECF 290, Order; ECF 276, Mot. to Amend Agreement. This Court previously entered the Agreement as a court order. ECF 99, Order (approving the original Agreement); ECF 262, Order (approving amendments to the Agreement).

The City has earned mixed results in recent years.  In 2019-2020, the Department of Justice (DOJ) found that as of January 10, 2020, the City had achieved substantial compliance with all paragraphs of the Agreement.  ECF 212, DOJ Interim Compliance Assessment Report, at 2; ECF 195, DOJ 4th Periodic Compliance Assessment Report, at 2.  However, in 2021, we reported that the City did not meet the standard for terminating the Agreement because the City did not maintain substantial compliance with 11 paragraphs among four sections, owing largely to the Portland Police Bureau (PPB)'s response to the 2020 demonstrations for racial justice and police accountability.  ECF 236, DOJ 5th Periodic Compliance Assessment Report, at 2.  On April 2, 2021, after the Parties could not informally resolve the compliance concerns, DOJ issued a notice of noncompliance.[2]  ECF 286-1, DOJ Notice.

The City lost more progress last year.  In this Report, we find that the City is not in substantial compliance with 30 paragraphs among six sections.  Our findings are mostly consistent with the Compliance Officer's findings from the fourth quarter of 2021 and first quarter of 2022.  *See* ECF 291-1, COCL Q4 2021 Report (rating partial compliance for 17 paragraphs among five sections); COCL Q1 2022 Report (draft) (rating partial compliance for 23 paragraphs among six sections).

Despite the City's recent further backsliding, we have considerable cause for optimism going forward.  First, in the last year, the City maintained or re-achieved substantial compliance with 57 paragraphs.  That is a noteworthy accomplishment.  Substantial compliance is not a given, but reflects hard work and consistent performance over time.  Second, the City made tremendous commitments to resolve DOJ's notice of noncompliance, agreeing to eight new remedies (Section XI, ¶¶ 188–195), including a civilian leader for PPB's Training Division, body-worn cameras (BWCs) for officers, and

---

[2] The notice of noncompliance resulted in the Parties, Portland Police Association (PPA), Albina Ministerial Alliance for Justice and Police Reform (AMAC), and Mental Health Alliance (MHA) participating in several mediation sessions that United States Magistrate Judge Stacie Beckerman facilitated between September and December 2021.  *See* ECF 256, 263, 266, 267, 268, 272.

a new structure for civilian oversight and police accountability. ECF 283, City Mem. We are now monitoring the City's compliance with Section XI and will report our assessment next year. Third, the City continues to build on its innovative approach to crisis triage by enhancing first responder options available to 911 operators. We commend the City for expanding Portland Street Response (PSR) based on reliable data showing positive outcomes for community members and the public safety system.[3] Indeed, the City has invested significant resources to create new unarmed public safety support specialist positions, fund more Behavioral Health Response Teams (BHRTs), and re-constitute a specialty unit to abate gun violence subject to enhanced community oversight. PPB also provided all officers with new Active Bystandership for Law Enforcement (ABLE) training, which reflects a best practice. We appreciate the City's efforts to comply with the Agreement while undertaking reforms that go beyond its minimum requirements. Fourth, the City and Defendant-Intervenor PPA negotiated a four-year contract with massive support from elected officials and rank-and-file officers. The contract provides officers various financial incentives, allows PSR to expand, and includes a Corrective Action Guide (CAG) to ensure more transparent and consistent accountability for misconduct.[4]

---

[3] In the 2021 fall budget, the City substantially increased PSR's funding to $2.98 million based on initial data analysis. *See* Greg Townley & Emily Leickly, *Portland Street Response: Six-Month Evaluation*, PSU Homelessness Research & Action Collaborative, Oct. 2021, available at www.portland.gov/sites/default/files/2021/psu-portland-street-response-six-month-evaluation-final.pdf. In March 2022, PSR expanded again; it now has 20 full-time staff and covers all 145 square miles of the city of Portland. *See* PSR, News Article, Mar. 27, 2022, available at www.portland.gov/streetresponse/news/2022/3/27/portland-street-response-expands-service-citywide. Recent analysis confirms that PSR continues to achieve good outcomes. *See* Greg Townley & Emily Leickly, *Portland Street Response: Year One Evaluation*, PSU Homelessness Research & Action Collaborative, Apr. 2022, available at www.portland.gov/streetresponse/portland-state-evaluation.

[4] The PPA contract did not resolve BWC issues, which remain subject to bargaining. If the City does not complete bargaining by August 29, 2022, the Court may hold periodic status conferences every 60 days to receive an update on the procedural status of bargaining related to BWCs. ECF 276-1, Am. Settlement Agreement, ¶ 184(c).

But serious compliance concerns remain and new ones surfaced during this reporting period. The City must correct course to resolve these issues, as spelled out in more detail in the Report. The Parties have discussed the issues and, in some cases, the City has already taken meaningful steps to remedy our concerns. The City should be able to resolve many issues within 6 to 12 months.

Our executive summary of the Report by section follows. At the status conference scheduled for July 27, 2022, we anticipate presenting an overview of our compliance findings and answering any questions the Court may have.

**Force (Section III)**: The City continues to face significant compliance challenges related to reporting force, investigating force reports, and evaluating whether force and force investigations comply with policy. (Pars. 66–67, 69–70, 72–73). We are confident these challenges will be resolved when PPB adopts revised force policies and the City implements the new Section XI remedies, including BWCs. Separately, on December 15, 2021, PPB produced to us its internal audit of force used during the 2020 protests. The audit was deficient in two significant ways: (1) not consulting with the Compliance Officer on scope and content; and (2) omitting parts required by the Agreement. (Pars. 74–77). The audit was a missed opportunity that negatively impacts other compliance areas. (Pars. 79, 117).

**Training (Section IV)**: Training reflects the City's recent uneven performance. Positive developments include PPB providing ABLE training and the City funding a civilian to lead the Training Division. Conversely, the City and PPB belatedly discovered training materials used by the Rapid Response Team (RRT) without the Training Division's knowledge, review, or approval, in violation of Directive 1500.00. The materials contain varying degrees of offensive content, incorrect guidance, and false or misleading information related to PPB's crowd management policies and practices. The RRT training fails to comply with the Agreement, and negatively impacts compliance with other provisions about assessing training needs, preparing training plans, and conducting training

audits. (Pars. 78–79, 81, 84–86). Moreover, the process by which the City provided the RRT materials to DOJ and the Compliance Officer continues a concerning pattern of untimely and incomplete production of information in this case. *See* ECF 286-2, DOJ Letter, at 2–3.

**Community-Based Mental Health Services (Section V)**: The City remains in substantial compliance with this section. In 2021, the City significantly expanded capacity for the Bureau of Emergency Communications (BOEC) to divert 911 calls from PPB to qualified mental health providers as first responders by: (1) funding a 10% increase in BOEC staffing to 131 call takers and dispatchers; and (2) launching and then expanding PSR to respond to certain non-emergency calls involving a person experiencing homelessness, a mental health crisis, or intoxication. (Par. 90).

**Crisis Intervention (Section VI)**: The City's multifaceted approach to crisis intervention mostly remains in substantial compliance with the Agreement. PPB's crisis intervention training and the Behavioral Health Unit's (BHU) structure and operations continue to meet requirements. (Pars. 91–93, 97–112). BOEC continues to provide training, perform operations, and conduct quality assurance as required. (Pars. 113–115). However, PPB has not adequately enabled the BHU Advisory Committee (BHUAC) to perform its mission of decreasing the potential for violent encounters between officers and those who may have a mental illness or be experiencing a mental health crisis. (Par. 95). The BHUAC can and should look at past violent encounters to inform recommendations for reducing future violent encounters. Given recent data indicating increased rate and severity of force against those in crisis, the impending rollout of BWCs, and legitimate community concerns about the BHUAC's ability to reduce potential violence without reviewing real events, we agree with the Compliance Officer that the City must do more to empower the BHUAC to fulfill its obligations under this Agreement. *See* ECF 291-1, COCL Q4 2021 Report, at 81–82, 155–59, 164–67.

**EIS (Section VII)**: The City did not maintain substantial compliance with the EIS provisions for three reasons: (1) EIS data is incomplete and inaccessible; (2) reduced staffing has impacted the

EIS team's ability to ensure supervisors conduct meaningful officer reviews; and (3) PPB needs "to more effectively identify at-risk employees, supervisors and teams to address potentially problematic trends in a timely fashion." (Pars. 116–117). The Compliance Office offered its technical assistance, which the City has not yet accepted.

**Accountability (Section VIII)**: The City continues to struggle with its obligation to ensure PPB applies policies uniformly and holds officers accountable for complying with training and procedure. (Pars. 137, 169). In this compliance period, the City did not adequately implement Police Review Board (PRB) procedures, identify and investigate collateral misconduct, or enable the Independent Police Review (IPR) to conduct meaningful investigations by, for example, timely disclosing and resolving a backlog of processing PPB records, totaling tens of thousands of documents, some of which are needed for investigations. (Pars. 129, 131). The City also did not meet timelines for completing IPR investigations and resolving Citizen Review Committee (CRC) appeals. (Pars. 121, 123). In addition, the City did not consistently ensure compliance with Directive 1010.10 as it relates to communication restriction orders and obtaining officer interviews in deadly force events. (Pars. 125–126).

**Community Engagement and Creation of PCCEP (Section IX)**: The City re-achieved substantial compliance with its obligations to prepare and present PPB's Annual Report. (Par. 150). However, citywide staffing challenges negatively impacted compliance in several areas, including the PCCEP and EIS. In particular, the City did not promptly hire replacement staff or appoint new PCCEP members to fill vacancies, substantially increasing burdens on the PCCEP and its volunteer members. (Pars. 143–144). The City also did not provide appropriate supervision, consistent support, or necessary data for the PCCEP to accomplish the objectives laid out in the Agreement and the PCCEP Plan. (Par. 151). The City has a framework to get the PCCEP back on track and we are confident the City can re-achieve substantial compliance with Section IX by the end of the year.

**Addendum of Additional Remedies (Section XI)**: These remedies were added to the Agreement on April 29, 2022.  ECF 290, Order.  We will assess the City's performance and issue a compliance rating in next year's report.

Finally, although not separately addressed in this Report, we have concerns with the City's performance of some of its obligations in Section X – Agreement Implementation and Enforcement.[5] Most significantly, the untimely discovery and even later production of RRT training materials continue a pattern of the City not timely providing complete information to DOJ and the Compliance Officer, as required by Paragraphs 156, 162–164, 166, and 174.[6]  The City's obligation to collect and maintain accurate data is essential for proper audits, the outcome assessments required by Paragraph 170, and demonstrating implementation sufficient to achieve substantial compliance as required by Paragraphs 153 and 175.[7]

The City cannot meet its burden to show compliance without providing complete and accurate data.  We will carefully assess the City's compliance with the applicable terms of Section X and continue to report our findings next year.

*      *      *

---

[5] We have at times separately assessed the City's compliance with applicable paragraphs of Section X. *See, e.g.*, ECF 105-1, DOJ 1st Periodic Compliance Assessment Report, at 86–93; ECF 124-1, DOJ 2nd Periodic Compliance Assessment Report, at 125–132.  We have always assessed compliance with Paragraph 169 as part of Section VIII – Accountability.  *E.g.*, ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 50–52.

[6] The City also did not disclose a PPB armorer's class, as required by Paragraph 162.  We have recently had to spend significant time working with the City to ensure DOJ has direct access to City employees and information, consistent with Paragraphs 164 and 165.

[7] The City also did not post all PPB audits on its website, as required by Paragraph 155.  And throughout 2021, the City had posted the original version of the Agreement (ECF 4-1), and had not provided the then current, amended version (ECF 262-1) to PPB officers to read and acknowledge, as required by Paragraph 187.

In sum, we saw the City backslide on compliance, but we are hopeful that the City will correct course.  Yet we remain mindful of the Court's direction to consider whether now a Court-appointed monitor may be appropriate "at least to protect the progress that has been made and prevent further slippage."  ECF 249, Hr'g Tr. at 196 (Aug. 24, 2021).  The Parties continue to discuss a Court-appointed Monitor and remain open to exploring ways to improve the City's progress toward re-achieving substantial compliance.  We will keep the Court apprised of developments.


DATED: June 30, 2022.

FOR THE UNITED STATES:

SCOTT ERIK ASPHAUG
United States Attorney
District of Oregon

RENATA A. GOWIE
Civil Division Chief

/s/ Jared D. Hager
JARED D. HAGER
Assistant U.S. Attorney

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Special Litigation Section Chief

/s/ Laura L. Cowall
LAURA L. COWALL
Deputy Chief

/s/ R. Jonas Geissler
R. JONAS GEISSLER
Trial Attorney

**United States v. City of Portland**

**DOJ's Sixth Periodic Compliance Assessment Report**

| | |
|---|---|
| III. USE OF FORCE | **Partial Compliance** |
| IV. TRAINING | **Partial Compliance** |
| V. COMMUNITY-BASED MENTAL HEALTH SERVICES | **Substantial Compliance** |
| VI. CRISIS INTERVENTION | **Partial Compliance** |
| A. Addictions and Behavioral Health Unit and Advisory Committee | **Partial Compliance** |
| B. Continuation of Crisis Intervention (C-I) Program | **Substantial Compliance** |
| C. Establishing "Memphis Model" Crisis Intervention Team | **Substantial Compliance** |
| D. Mobile Crisis Prevention Team | **Substantial Compliance** |
| E. Service Coordination Team | **Substantial Compliance** |
| F. Bureau of Emergency Communications | **Substantial Compliance** |
| VII. EMPLOYEE INFORMATION SYSTEM | **Partial Compliance** |
| VIII. OFFICER ACCOUNTABILITY | **Partial Compliance** |
| IX. COMMUNITY ENGAGEMENT AND CREATION OF PORTLAND COMMITTEE ON COMMUNITY ENGAGED POLICING | **Partial Compliance** |

## III.    USE OF FORCE

PPB shall revise its existing use of force policy and force reporting requirements to ensure that all force, particularly force involving persons with actual or perceived mental illness:  (a) is used only in accordance with the Constitution and laws of the United States; (b) is no greater than necessary to accomplish a lawful objective; (c) is properly documented, reported, and accounted for; and (d) is properly investigated, reviewed, evaluated, and, if necessary, remedied.  PPB shall attempt to avoid or minimize the use of force against individuals in perceived behavioral or mental health crisis, or those with mental illness and direct such individuals to the appropriate services where possible. In addition, PPB shall ensure that officers use non-force and verbal techniques to effect compliance with police orders whenever feasible, especially in the course of conducting welfare checks or effecting arrests for minor offenses or for persons whom officers have reason to believe are experiencing a mental health crisis; de-escalate the use of force at the earliest possible moment; only resort to those use of force weapons, including less-lethal weapons, as necessary; and refrain from the use of force against individuals who are already under control by officers, or who may express verbal discontent with officers but do not otherwise pose a threat to officers or others, or impede a valid law enforcement function.  To achieve these outcomes, PPB shall implement the requirements set out below.

| Status | Partial Compliance |
|---|---|

The City remains in partial compliance with Section III because PPB has not fully implemented the requirements.

The City and the United States agreed to additional remedies laid out in new Section XI, ECF 275-1, to resolve a notice of noncompliance based on our Fifth Periodic Compliance Assessment Report covering January 20, 2020, to January 10, 2021, ECF 236-1, and a letter critiquing the Police Review Boards, ECF 286-3.  Implementing Section XI will address, in part, the specific actions we recommended for Section III in our prior report.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 3.[1]  The new Section XI, however, does not alter the City's ongoing obligations to comply with the Agreement.  Accordingly, we assess the City's compliance with

---

[1] We said that the City should:

(a) Complete the City's planned comprehensive master after action review of crowd-control events from May 29 to November 15, 2020, including a critical assessment of supervisory force investigations and command reviews of Force Data Collection Reports (FDCRs) and After Action Reports (AARs);

(b) Identify force events that require administrative investigation, but have not yet had investigations opened, including, where appropriate, referral for investigation consistent with Section VIII-Accountability;

(c) Develop and implement a method to investigate uses of force in chaotic crowd-control events;

(d) Implement additional crowd-control training for both Rapid Response Team (RRT) and Mobile Field Force (MFF), including analysis of need for additional members of these and supporting groups in order to [] handle crowd control without overreliance on a small group of individuals; and

(e) Fully implement approved force use and reporting policies going forward.

Not all of these topics are covered within Section XI.  But, Section XI should facilitate compliance with all of these topics.

Section III during the period covering January 2021 to March 2022, when the City completed its production of information in response to our force-related requests.

## A.    Use of Force Policy

66. PPB shall maintain the following principles in its existing use of force policies:

a. PPB shall use only the force reasonably necessary under the totality of circumstances to lawfully perform its duties and to resolve confrontations effectively and safely; and

b. PPB expects officers to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to force or the least amount of appropriate force.

67. PPB shall add to its use of force policy and procedures the following use of force principles:

a. Officers shall use disengagement and de-escalation techniques, when possible, and/or call in specialized units when practical, in order to reduce the need for force and increase officer and civilian safety;

b. In determining whether to use force, officers will take into account all information, when feasible, including behavior, reports, and known history as conveyed to or learned by the officer by any means, indicating that a person has, or is perceived to have, mental illness;

c. The use of force shall be de-escalated as resistance decreases and the amount of force used, including the number of officers who use force, shall de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force; and

d. Objectively unreasonable uses of force shall result in corrective action and/or discipline, up to and including termination.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraphs 66 and 67 because PPB has not consistently verified performance of the policies governing force. Four areas of particular concern are: (1) PPB produced a master after action report (MAAR) during this compliance period that validated out-of-policy conduct from the 2020 protests; (2) PPB's administrative investigations excused out-of-policy conduct by the Rapid Response Team (RRT) because they trained themselves incorrectly; (3) PPB failed to enforce its policies to address collateral misconduct, to address faulty Police Review Board (PRB) analysis, or to properly and timely apply policy in a couple of Level 1 force events (i.e., officer-involved shootings); and (4) PPB did not properly apply policy to problematic uses of canine and crowd control force during this compliance period. We are hopeful that a revised force policy, properly applied, will address many of these concerns.

PPB reports it is complying with these paragraphs. PPB 2022 Q1 Update Report, at 1–4, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. But PPB does not assess its implementation of the approved force policy. *See id.* (reporting from 2017 onward that the relevant "principles remain in effect and are at the core of the force policy," in reference to PPB training on approved Directive 1010.00 – Use of Force). To achieve substantial compliance, PPB must implement its approved force policy consistently and fully. Paragraph 153 (requiring PPB to "implement" "all provisions of this Agreement"); *see* Paragraph 33 (defining "implement" or "implementation" as the "development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and

verified performance of that policy or procedure in actual practice through the regular use of audit tools"). Accordingly, we share the Compliance Officer's assessment that PPB is in partial compliance with these paragraphs. ECF 291-1, COCL Q4 2021 Report, at 24–25.

Since August 19, 2017, PPB Directive 1010.00 has governed when officers may use force and when officers must attempt to de-escalate encounters, and the requirements to report and investigate uses of force. *See* ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 4. In January 2020, PPB promulgated a revised force mental health crisis policy with approval from the Compliance Officer and DOJ. *See* Dir. 1010.00 – Use of Force, available at www.portlandoregon.gov/police/article/751998. Many FDCRs and associated AARs generated during this compliance period appear to show PPB's adherence to much of the approved policy. Several of the FDCRs and AARs for uses of force against persons in a perceived mental health crisis note de-escalation efforts, issuance of warnings, and use of low levels of force. However, PPB did not consistently or verifiably implement the required policies in several important ways, including with respect to some force events during this period and older force events whose review by the City stretched into this period.

**PPB Management Review of the Response to 2020 Crowd Control Events:** During the rating period, we evaluated two aspects of PPB's use of force and review of force from the 2020 crowd control events. First, we reviewed PPB management's master after action report of 2020 events, which the City completed during this compliance period. Second, we considered administrative investigations of 2020 actions that are still working through the City's systems.

**Master After Action Report (MAAR):** On March 29, 2021, PPB emailed us three documents that it described as a Master After Action Report for the 2020 crowd control events. The City added a fourth document on April 12, 2021. On May 5, 2021, we provided the City with detailed comments. ECF 286-2, MAAR Letter. We explained that the MAAR was not sufficiently comprehensive and lacked critical self-assessment. ECF 286-2, MAAR Letter, at 1. The MAAR also did not sufficiently address violations of either the force policy, Directive 1010.00, Procedure Par. 13.4.10, or the crowd control policy, Directive 635.10, Procedure Par. 13.1.1.

**Administrative Investigations:** In this compliance assessment period, the City has either begun or continued numerous administrative investigations of alleged officer misconduct stemming from PPB's response to the 2020 crowd control events. Our review of those administrative investigations indicate that PPB inconsistently enforces Directive 1010.00 (and the constitutional requirement) that all force must be objectively reasonable. PPB also failed to consistently enforce the policy requirement to de-escalate. PPB must demonstrate consistent and verified performance of the force policy requirements to re-achieve substantial compliance.

In force reviews covered by these investigations, PPB officers and executives repeatedly noted that PPB's Rapid Response Team (RRT) members were trained that they need not follow Directive 1010.00, because they were authorized to use greater force under Directive 635.10. We found substantial evidence that RRT members were in fact instructed to follow Directive 1010.00:

1. The very first procedure within the crowd control directive clearly states the supremacy of the force directive: "Directive 1010.00, Use of Force, governs all uses of force, including in crowd management and crowd control situations." *See* Dir. 635.10 – Crowd Management/Crowd Control, Procedure Par. 1, available at www.portlandoregon.gov/police/article/649358.

2. All PPB members previously received in-service training on Directive 1010.00, which the Compliance Officer and DOJ approved. The training made clear that all force is

subject to Directive 1010.00, which, among other things, forbids unconstitutional uses of force. Thus, all members—RRT and non RRT—received notice during in-service training that all force must comply with the force policy.

3. Some RRT training materials specifically list Directive 1010.00 as applicable during crowd control events. Thus, it appears that RRT properly trained RRT members to use force consistent with Directive 1010.00.

4. In September 2019, the City produced to us RRT training materials for a planned Fall 2019 RRT training.[2] We reviewed these on a short timeframe. We stated, among many other things: "Both the lesson and the demonstrations must refer to and incorporate the approved use-of-force policy and the crowd-control policy. The lesson plan should set forth this performance standard. This lesson plan implicates 1010.00 and 1010.10 for reporting requirements." PPB revised the lesson plans in response and incorporated Directive 1010.00. Thus, the comprehensive RRT training shortly before the 2020 crowd control events reflected the requirements of Directive 1010.00.

**Collateral Misconduct:** PPB has not consistently enforced the force policy in two types of collateral misconduct. First, the investigation of some uses of force in an event uncovered misconduct in other uses of force around the same event. PPB declined to pursue enforcement of the force policy with respect to these discovered collateral misconduct issues. Second, the investigation of these and some other force allegations revealed that supervisors and executives sometimes did not appropriately apply Directive 1010.00 in the command chain reviews of the underlying uses of force. But for these reviews, PPB did not pursue the enforcement of the force policy to the chain of command as required. *See* Dir. 1010.00, Procedure Par. 13.7.

A September 28, 2020 force interaction that PPB reviewed during this compliance period is emblematic of both of these issues. A protestor was in a park holding a register-to-vote sign. A Sergeant directed officers to take the sign under the theory that it *could* be used as a weapon. The protestor was not using or threatening to use the sign as a weapon. The order led to a cascading, domino effect of out-of-policy force: the grabbing of the protestor to seize the sign, a chemical restraint on the protestor, a late knee strike after the protestor was detained by other officers, and the same Sergeant's push of a bystander attempting to video record the interaction. The bystander reportedly resisted by grabbing the Sergeant's hand and as a result was sprayed with chemical restraint. The City posted three videos of the interaction on its own website as part of a consideration of a $100,000 settlement to the protestor based on this interaction. *See* City Council hearing Dec. 22, 2021, available at www.youtube.com/watch?v=aXKE2u24WKg&t=6106s (1:26:48 to 1:58:11). In June 2021, we reviewed the case file as part of an administrative investigation. PPB sustained a force policy violation against only the officer who used the knee strike and only for that strike. We raised with PPB the collateral misconduct of the other officers and the Sergeant. PPB "saw no misconduct."

PPB asserted that a City Attorney advice memo permitted them to seize anything that could be a weapon—omitting from their consideration whether such item is actually being used as a weapon or threatened to be used as a weapon. PPB did not include this memo in the force review file provided to us. Instead, during this compliance period, the City stuck to the justification of

---

[2] This production did not include the RRT slides containing the "Prayer of the Alt Right." We discuss the slides in Section IV of this report.

forcefully taking the sign.  A July 29, 2021 memo provided to us conveyed a direction from the then Deputy Chief that all officers involved in the interaction receive a debrief covering three topics:

1. More clearly articulating, in non-hypothetical terms, how the pole meets the definition of a "weapon" under the City Code.

2. Whether, in hindsight, the decision to take the pole tended to make the overall situation better or worse.

3. Reinforcing [the Officers'] attempt at de-escalation by explaining the need to take the pole and not the sign to [the subject], and their calm demeanor in a fairly hostile crowd.

Memo from CAPT Chris Gjovik, July 29, 2021.  After PPB failed to ensure compliance with its force policies, the City paid $100,000 to settle one of the claims arising from this incident.  *See* Maxine Bernstein, "City of Portland set to pay $100K to settle suit filed by man arrested after refusing to relinquish sign during protest," Oregonian, Dec. 20, 2021, available at www.oregonlive.com/crime/2021/12/city-of-portland-set-to-pay-100k-to-settle-suit-filed-by-man-arrested-after-refusing-to-relinquish-sign-during-protest.html.

**Police Review Board (PRB) Observations:**  Though the Parties agreed to remedies to resolve concerns we raised about PRB operations in a letter dated March 23, 2021, ECF 286-3, we have identified new concerns and are working with the City to address ongoing concerns with PPB's accountability process.  On December 14, 2021, in connection with our data request for this assessment period, we asked the City for any documents demonstrating substantive response to the action items raised in the PRB letter.  We have not yet received a substantive response and continue to evaluate PRB meetings to ascertain if our concerns have been addressed.

Our observations of more recent PRBs and review of case materials since March 23, 2021 indicate ongoing issues, including management justifying force based on the actions of a crowd rather than individuals; inadequate enforcement of the requirement to attempt to de-escalate encounters before and during force applications; and interference by officer's representatives during administrative interviews, in some cases substantively changing the outcomes of those interviews.

**Level 1 Uses of Force:**  In some of the Level 1 force events we reviewed during this compliance period, PPB did not enforce the requirements of Directive 1010.00.  In one instance, PPB did not investigate the policy prohibition on a member placing themselves "in a location that is clearly vulnerable to vehicular attack" when that was a central element of the incident.  Dir. 1010.00, Procedure Sec. 8.5.3.  In another, PPB's assessment failed to adequately investigate and enforce the fundamental requirements for de-escalation and using only the force reasonably necessary.  Dir. 1010.00, Procedure Sec. 1.

Also, there was a substantial delay in PPB's process to assess Level 1 uses of force.  We asked the City to explain why the City has not completed PRBs as of December 14, 2021 (the date of a large data request we sent to the City) for six separate Level 1 uses of force, including fatal shootings.  For all six, PPB responded, "Date of completion to be determined."  Only one was still awaiting a grand jury transcript.  This provides insufficient information to identify gaps in meeting the 180-day deadline as required by Paragraph 123 ("If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them").  Delays in Level 1 reviews may hinder PPB's ability to address any policy or tactical issues in a timely fashion, leaving involved members

in a state of limbo, i.e., not knowing if they will be subject to discipline or not.  Delays also deprive PPB of notice of immediate training needs to correct tactical issues as quickly as possible.

**Canine Issues:**  Two separate canine force events show that PPB has a find-and-bite practice.  The preferred professional standard is find-and-bark.  A find-and-bite practice fails to ensure force "is no greater than necessary to accomplish a lawful objective," in violation of Section III.

In the first case (21-122336), a management review substantively changed the facts as reported in the canine officer's FDCR.  In that incident, the canine handler reported that he sent the canine over a fence "on a search and take," meaning "search and bite," whereupon the canine landed on the subject and immediately bit him.  The handler wrote that he could not see the subject who was hiding under a tarp, yelling that the dog was biting him.  The interaction caused a serious injury, which triggered a notification to PPB's Professional Standards Division.  In that notice, the PPB supervisor added a causal justification inconsistent with the reported facts:  "The dog eventually located the suspect hiding under a tarp in a backyard and *bit the suspect* **when** *the suspect refused to surrender*."  May 7, 2021 email "Fw:  K9 Bite Force Notification PPB #21-122336 – Allegation of Officer criminal misconduct" (emphasis added).  A force policy is not implemented when there is insufficient justification for a find-and-bite practice, and the supervisor who should serve as a check on the reasonableness of force application instead changes the justification.  The subject alleged that he raised his hands in surrender when he heard the handler warn of the use of canine, but the involved officer reported not hearing a response from the subject.  In response to the subject's statement, the supervisor reported a need for body-worn camera recordings:

> This type of allegation could be immediately proven or disproved if the Police Bureau had Body Worn Camera technology and made officers deploy with the technology.  Because officers do not have access to Body Worn Camera technology, audio and/or video of force deployments is rare and often incomplete when a residential / commercial surveillance camera films police force contacts.  Because of this, investigating supervisors at the scene and IAD personnel have to spend additional time investigating these types of allegations. For these reasons, I would recommend that the Police Bureau explore the purchase and use of a Body Worn Camera system in the future.

We agree.  New Paragraph 194 is designed to remedy this concern.

In the second canine case (21-40950), PPB attempted to arrest a burglary subject barricaded in a utility room.  After breaking the door, the handler gave the canine a "bite command and then deployed him into the utility room," i.e., another example of find-and-bite practice.  Even after the two officers grabbed the subject to pull him out, the handler reported that he deliberately left the canine "on bite."  While the other officers were pulling the subject out, one officer "could feel the tugs from the K9 which was biting at [the subject's] lower legs," i.e., the dog and the officers were in a tug of war with the subject's body.  This resulted in serious injury requiring hospital treatment.  PPB did not provide us with the harness-mounted video recording of the interaction, though reports indicate it exists.  In any event, the continued use of a canine bite after seizure indicates greater force than necessary contrary to the requirements of this Agreement.  However, PPB found the use of force within policy.

PPB did provide photos of the significant injuries in both of these canine cases.[3]

**Recent Crowd Control Responses:**  We reviewed several of PPB's crowd control response AARs and FDCRs for this compliance period.  We saw one example of PPB successfully implementing force use and reporting policies.  Some others showed deficiencies, including similar issues to those we identified in PPB's response to 2020 crowd control events.

In the reporting of Case 21-96526, from an April 11, 2021 event, the supervisor responded to the scene and completed interviews of officers and asked the crowd what happened.  The officer who used force was able to articulate an objectively reasonable basis for deploying a 40mm round against a subject who punched an officer in the face.  The FDCR still lacked a timed and dated signature,[4] but the AAR reportedly was done within 72 hours.  And, the chain of command corrected the level of force categorization in its review.

In contrast to this success, some other crowd control reports in which force was used were not as successful.  As with the AARs and FDCRs for other force events, the City did not provide to DOJ the videos and photos with the AARs and FDCRs for crowd-control events even though some reports indicate that videos and photos exist.

A publicly available video of a crowd control situation on June 24, 2021 (Case 21-681074) showed issues with PPB's response.[5]  As our consultant observed in viewing the video, the PPB response led to a "melee."  In response to taunting and shouting, one PPB member first smacked at and then grabbed at a protestor's hand, then pushed him back with a baton, stepping out of the skirmish line.  To be clear, the protestor was not justified in his actions.  PPB's skirmish line broke.  When the skirmish line broke, there were three deployments of aerosol restraint captured on video (and a fourth reported), at least one of which was a larger broadcast spray specifically prohibited by the rules of engagement set that night according to the AAR.  ==In the AAR, the supervisor failed to reconcile the officer's version of events with the depiction in videos.==

---

[3] In most other force cases, the City did not provide photos and videos referenced in FDCRs and AARs.  On March 11, 2022, the City deemed their production to DOJ complete.  PPB has the burden to maintain and provide all records necessary to demonstrate compliance with the Agreement.  Paragraph 174.  This includes complete use-of-force records.  The City's incomplete production of PPB force documents failed to demonstrate compliance.

[4] New Paragraph 188 provides that the City "shall revise Force Data Collection Report (FDCR) and After Action Report (AAR) forms to capture when the forms are edited and completed as part of PPB's implementation of Office365, which is ongoing.  In the interim, pursuant to a process approved by the United States, PPB shall capture in the existing FDCR and AAR forms the author's name and the time and date of initial submission and any subsequent edits, as well as the name, time, and date of each level of review."  This provision was not in effect when the crowd control incident occurred, but the operative policy also required timely reporting.  PPB did not capture the date of initial submission and subsequent edits in the forms.

[5] The City also provided a video attached to a referral to an outside law enforcement agency—not the AAR or FDCR—which corroborated the publicly available video.  [Grace Morgan on Twitter: "A bystander caught the moment PPB assaulted and maced peaceful protesters on scene - this video is very intense, warning. Credit @running_50 https://t.co/TiMmIRSKAG" / Twitter](https://twitter.com/gravemorgan/status/1408313568299130880) (available at twitter.com/gravemorgan/status/1408313568299130880).

Cases 21-102375 and 21-102058, both relate to a crowd control event on April 16, 2021, i.e., the crowd that gathered at Lents Park following an officer-involved shooting there earlier in the day. While most of the force used in this interaction appeared objectively reasonable based on the reporting, a significant use of force that night did not comply with the Settlement.  A Sergeant in that incident deployed what PPB euphemistically calls an "RBDD," a Rubber Ball Distraction Device.  In fact, this is a pellet grenade.  The Sergeant observed a subject kicking a smoke grenade toward them.  The Sergeant threw an RBDD toward the subject.  "The munition successfully went off behind the [subject] in an area *not likely* to cause anyone else to be struck by the payload."  While helpful to report the intent not to hit others, the description of *likeliness* does not comport with the numerous other descriptions of a crowd of 100-200 people gathered.  In review, none of the chain of command sought clarity on this or questioned the inconsistency between the large number of people and the proximity to the subject.  Also, this use and reporting of an RBDD do not comport with PPB's own training on RBDDs.  PPB's training (not provided to us until this year) shows that their RBDD devices have a 50-foot blast radius over a 360-degree range, i.e., in every direction.  The training also instructs never to throw within 5-6 feet of a person and the training illustrates grievous injuries from misfired grenades.  PPB did not address any of the factors in its chain-of-command review.  This indiscriminate use of force does not evidence compliance with the force provisions of this Agreement or PPB's force policies, which require assessment of *individual* threat and resistance and *individual* justification of each *independent* application of force.  *See* Dir. 1010, Procedure, Pars. 5.1.1, 5.1.3, and 5.4.1.

Since the 2020 protests, Oregon state law changed to forbid nearly all kinetic impact munitions (e.g., pellets, 40mm foam rounds, and FN303 bismuth rounds) in crowd control.  Oregon H.B. 2928, "Relating to the use of tools by law enforcement agencies; and declaring an emergency," effective July 19, 2021, available at olis.oregonlegislature.gov/liz/2021R1/Measures/Overview/HB2928; *see also* Oregon H.B. 4008, "Relating to public safety; and declaring an emergency," effective March 23, 2022, available at olis.oregonlegislature.gov/liz/2022R1/Measures/Overview/HB4008.  During the course of policy review meetings to discuss changes to Directive 1010.00, a Deputy Chief advised that PPB currently is not using pellet grenades, has no personnel to train and certify officers for their use, and does not intend to use pellet grenades.  State law would not permit indiscriminate use of impact munitions in response to crowds.  Throughout the policy discussion process, PPB did not articulate a use for pellet grenades that would adhere to this Agreement and PPB policy to use force only where there is legal justification and, even then, only as necessary.  We are open to discussion should the City identify an appropriate use for these devices that can be governed by compliant policy.  In absence of an approved use, we asked whether PPB would decommission all pellet grenades.  PPB has yet to do so.

In Case 21-680063 from a crowd control incident on January 20, 2021, PPB's production excluded one Sergeant's AAR.  A produced AAR contained boilerplate statements for "Time Discrepancies" and "Observation Discrepancies" without reconciling discrepancies as required by policy.  The AAR also included the same boilerplate reason for not conducting interviews that we found throughout 2020 crowd control response AARs:  "As this was an active riot, interviews were not conducted at the location of force. I was also not present in the area of many of the instances. Suspect was interviewed later by detectives."  Also, a Lieutenant involved in that interaction submitted their FDCR for review by a subordinate Sergeant.  And, though the Commander near the top of the review noted seeing a video of interaction, the prior supervisors in the chain did not.  The City did not provide us the video.  This incident represented a repetition of the same type of force management issues that we identified in our review of 2020 crowd control response.

**Flash-Bang Grenades:**  In our collaborative review of Directive 1010.00 with PPA and the City, discussed below, we learned that PPB has not been reporting deployments of flash-bang grenades as uses of force unless an injury or complaint of injury resulted.  Use of the flash-bang grenades like any other force tool must be governed by Directive 1010.00 and meet the constitutional standard for use of force.  *See Boyd* v. *Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004) (assessing the use of a flash bang grenade under the Fourth Amendment's objective reasonableness test).  PPB has now agreed to amend its force reporting directives to include use of flash-bang grenades *within* structures. The Parties have not resolved this issue, however.  In our view, any use in close proximity to a person, even outside, falls within this Agreement's definition of force and must be reported.

**Still Pending Policy Revisions:**  Also contributing to our finding that the City is only in partial compliance with Paragraphs 66 and 67 is the need, but still unresolved revision to Directive 1010.00.  In our prior report, we found that the City attempted to change its force policy first by a press release and then by a subsequent "*nunc pro tunc*" order.  We found this insufficient to provide adequate direction to officers.  During this compliance period, we have worked with the City Attorney's Office, PPB, PPA, PPCOA, and the Compliance Officer, to review PPB's proposed revisions to the force policy.  PPB has made substantial course corrections in this process, and we anticipate that a new suite of force policies—with accompanying SOPs for specialty units and munitions—will better address the need for clear direction that we identified in our prior compliance assessment report.  Until then, PPB is providing officers with conflicting guidance. Officers must always abide by Directive 1010.00.  But, now, officers also must follow interim orders, guidance on new state laws, and applicable temporary restraining orders not yet incorporated into policy.  Accordingly, until the inconsistencies and irregularities of these multiple documents coalesce into final, approved policies, the City cannot re-achieve substantial compliance.

1.    **Electronic Control Weapons**

68. PPB shall revise PPB Directive 1051.00 regarding Taser, Less-Lethal Weapon System to include the following principles:

a. Prohibition against the use of ECWs for pain compliance against those suffering from mental illness or emotional crisis except in exigent circumstances, and then only to avoid the use of a higher level of force;

b. Unless it would present a danger to the officer or others, that officers shall issue a verbal warning, or attempt to utilize hand signals where there is a language barrier or the subject is hearing impaired, prior to deploying their ECW;

c. Officers shall follow protocols developed by PPB in conjunction with medical professionals on their responsibilities following ECW use;

d. Only one ECW at a time may be used on a subject, intentionally, except where lethal force would be permitted;

e. After one standard ECW cycle (5 seconds), the officer shall reevaluate the situation to determine if subsequent cycles are necessary, including waiting for a reasonable amount of time to allow the subject to comply with the warning. Officers shall describe and explain the reasonableness of each ECW cycle in their use of force reports;

f. Officers shall make every reasonable effort to attempt handcuffing during and between each ECW cycle. Officers should avoid deployments of more than three ECW cycles unless exigent circumstances warrant use;

g. ECWs shall not be used on handcuffed or otherwise restrained persons, unless doing so is necessary to prevent them from causing serious physical injury to themselves or others, or if lesser attempts of control have been ineffective and/or to avoid greater application of use of force; and

h. Officers receive annual ECW in service training including proficiency and policy changes, if any.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 68.

Our review of reported ECW use showed that the force appeared justified, and officers provided sufficient warning prior to using the ECW or articulated why a warning was not possible. PPB also utilized its ambulance service, AMR, or Portland Fire Bureau members to remove probes unless the subject removed the probes themselves. Supervisors reported responding to the scene of ECW use. The Compliance Officer's review of force events similarly finds that officers used ECWs in conformance with Paragraph 68. ECF 274-1, COCL Q2 2021 Report, at 13, 20.

Implemented policy and training also continue to support substantial compliance. We previously reported that PPB's revised Directive 1010.00 incorporates all of Paragraph 68's mandates. ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report, at 8. PPB is currently in the process of revising this directive and returning to a format in which PPB will govern less lethal weapons in a policy separate from its general force directive. We do not object to the shift in format provided that the requirements of Paragraph 68 and the current Directive 1010.00 remain in policy and the revised directive is subject to the Paragraph 166 approval process.

Moreover, we again assessed PPB's in-service training for ECWs. We reviewed and approved PPB's ECW training materials before in-service training. PPB's in-service training provided annual recertification and effectively addressed the policy requirements for using ECWs. Additionally, in reviewing force reports related to crowd control in the compliance period we continue to find that PPB maintained its prohibition on using ECWs for crowd control purposes. This prohibition exceeds the requirements of Paragraph 68.

Accordingly, we continue to agree with the Compliance Officer that PPB's written reports demonstrate the City is meeting the obligations in this paragraph. ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 13–14; ECF 291-1, COCL Q4 2021 Report, at 25–26. However, we have reservations about the evidence based on the lack of photos attached to the sample of written reports of ECW use that we reviewed. Directive 1010.10, Section 6.4.4.4.1 requires that, if possible, officers take photos when they use an ECW to capture "the areas of probe strikes, whether probes penetrated the person's skin, left visible marks or only penetrated the person's clothing, before and after probe removal, as well as any marks, or lack of marks, left by drive stun." Even where FDCRs or AARs indicated that PPB's evidence system had photos, photos were not included in the City's production. In the future, PPB's implementation of a body-worn camera program that provides appropriate access to video recordings should address this issue.

## 2.    Use of Force Reporting Policy and Use of Force Report

69. PPB shall revise its policies related to use of force reporting, as necessary, to require that:

a. All PPB officers that use force, including supervisory officers, draft timely use of force reports that include sufficient information to facilitate a thorough review of the incident in question by supervisory officers; and

b. All officers involved or witnesses to a use of force provide a full and candid account to supervisors.

c. In case of an officer involved shooting resulting in death, use of lethal force, or an in-custody death, PPB will fulfill its reporting and review requirements as specified in directive 1010.10, as revised. This will take place of Directive 940.00 reports for purposes of paragraphs 70, and 72-77 of this Agreement.

| Status | Partial Compliance |
|--------|-------------------|

The City remains in partial compliance with Paragraph 69 because PPB has not consistently verified performance of the policies governing timely and thorough force reports.  Four areas of particular concern are:  (1) untimely FDCRs; (2) lack of full and candid accounts; (3) officer incapacitation in Level 1 force cases; and (4) reporting when force is used by an outside law enforcement agency.

**Untimely FDCRs:**   All officers involved in a use of force must timely complete use of force reports.  Paragraph 69(a).  PPB's approved force policy requires that officers complete an FDCR by the end of the shift in which the officer used force, except for Level 1 uses of force like shootings. Dir. 1010.00, Procedure Par. 11.1.4.  We reviewed numerous FDCRs that did not capture the time and date when the form is completed.  New Paragraph 188 requires the City to address this issue. In the interim, the City has not demonstrated compliance with the timeliness requirements of this paragraph; reports that we reviewed did not include a narrative entry in the open text boxes of the existing form to indicate when the FDCR was complete or revised.  Accordingly, the City did not present evidence of compliance with Paragraph 69(a).

**Some FDCRs Lack Full and Candid Accounts:**  Most of the FDCRs that we reviewed for this compliance assessment period appeared to provide more or less fulsome accounts to supervisors.  However, FDCRs from some crowd control events were not complete or candid because they did not accurately or fully describe the force.  In Case 21-34006, two witness officer reports were identical copies, not individual "candid" accounts as required.  Paragraph 69(b).  Additionally, during this compliance period, we observed several FDCRs from 2020 go through the administrative investigation process, which provided less than candid accounts about the conduct of involved officers or collateral uses of force.

**Officer Incapacitation:**  Two of ten officer-involved-shooting incidents that occurred during this compliance assessment period raise questions about the City's compliance with Paragraph 69(c) and Directive 1010.10 – Deadly Force and In-Custody Death Reporting and Investigation Procedures, available at www.portlandoregon.gov/police/article/656780.[6]

On July 20, 2021, a PPB member used lethal-level force in shooting a subject who was in a convenience store (Case 21-199178).  The store clerk had called 911 when the subject ate food without paying and sat down on the floor refusing to leave.  Two PPB officers responded.  The subject broke a wine bottle on the floor.  Armed with the neck of the bottle, the subject approached the officers.  One officer shot his firearm.  The other twice deployed a Taser.  The witness officer (who deployed the Taser but did not fire his gun) refused to provide a witness statement at the time of the incident, citing through his attorney the stress of the incident and off-duty stresses.  The witness officer also should have completed the FDCR for the Taser use before the end of shift.

---

[6] These events also implicate the City's compliance with Paragraph 125.

We asked the City to explain the lack of a timely statement from the witness officer. The City excused the witness officer by reading Directive 1010.10 to give PPB discretion to direct (or not direct) the witness officer to provide a statement. Specifically, the City relied on the "subject to" language:

> 2.1.2.4. Witness officer(s) shall also be subject to on-scene interviews to discuss the incident with detectives. They shall provide a full and candid account of the use of force event.

The City interprets "subject to" as optional, not mandatory. We disagree. Even if the City were correct, and policy permitted the witness officer not to give a full and candid account of the deadly force event while on scene, two other concerns arise. First, the City's response indicates that PPB members discussed the policy requirement for a witness officer interview while on scene. But the City's response omits the fact that the IPR Director was on scene and objected to forgoing the witness officer interview. Second, the detective's report from the night of the shooting records that the witness officer refused through his attorney to submit to an interview, but nonetheless agreed to "a brief walkthrough." We do not know the extent of the discussion on the walkthrough, though, because the detective's report does not report any information gained from the walkthrough.

The second officer-involved shooting occurred on December 24, 2021, when a PPB member used lethal-level force when a stolen pickup truck rammed the officer (2020-B-0066). The involved officer suffered serious injuries that amounted to physical incapacitation at that time and for some time later. However, the documentation provided to us failed to identify the justification for the length of the delay in conducting the interview. PPB did not interview the involved officer until February 10, 2021—a length that limited the utility of the officer's statement as the passage of time clouds recollection . Directive 1010.10 contemplates incapacitation of the involved officer:

> 2.2.5.1. The PSD Captain or designee shall ensure that the involved member(s) provides a compelled statement as soon as practicable, but no later than within 48 hours of the event, unless the member is physically incapacitated and unable to provide a statement.

The file provided to DOJ contained an email which was supposed to have an attached letter from the officer's attorney, but did not. Accordingly, it is unclear why the physical incapacitation to provide a statement lasted for such an extensive period of time.

These two events show the need for PPB to both adhere to existing Directive 1010.10, which is incorporated into the Agreement, and clarify what evidence is necessary to document incapacitation.

**Force Used in Coordination with an Outside Law Enforcement Agency:** An officer-involved shooting with an outside law enforcement agency also implicated the City's compliance with this paragraph. PPB must adhere to this Agreement and its force policies, whether acting on its own or in concert with another agency.

On January 26, 2022, a PPB officer deployed a 40mm round in an incident in which a deputy from a different jurisdiction used deadly force. *See* Ryan Haas, *et al.*, "Clackamas County sheriff's deputy shoots and kills man after traffic pursuit into Portland," Jan. 27, 2022, available at www.opb.org/article/2022/01/27/clackamas-county-sheriffs-office-shoots-and-kills-person-after-traffic-pursuit-into-portland/. On January 29, 2022, we asked the City to produce the AAR for the 40mm use within 72 hours, as required by PPB policy. PPB acknowledged that although a PPB officer did not use deadly force, "this incident was considered a category 1 force event." Email from CMDR J. Bell to J. Geissler, Feb. 2, 2022. As of the release of this report, that investigation is still ongoing. This incident illustrates the need to timely categorize a use of force and promptly apply the appropriate PPB directive. In a Level 1 force event, PPB must comply with all

requirements of Directive 1010.10, e.g., call outs to the scene, communication restriction orders, walk throughs, public safety statements, etc. If PPB did not treat this as a Level 1 use of force, then PPB should have completed the AAR within 72 hours and met the other on-scene investigatory and review requirements of Directive 1010.00.

In sum, we agree with the Compliance Officer's assessment that the City is in partial compliance with this paragraph. ECF 291-1, COCL Q4 2021 Report, at 26–27.

### 3.    Use of Force Supervisory Investigations and Reports

70. PPB shall continue enforcement of Directive 940.00, which requires supervisors who receive notification of a force event to respond to the scene, conduct an administrative review and investigation of the use of force, document their findings in an After Action Report and forward their report through the chain of command. PPB shall revise Directive 940.00 to further require that supervisory officers:

a. Complete After Action Reports within 72 hours of the force event;

b. Immediately notify his or her shift supervisor and PSD regarding all officers['] Serious Use of Force, any Use of Force against persons who have actual or perceived mental illness, or any suspected misconduct. Where the supervisor suspects possible criminal conduct, the supervisor shall notify the PPB Detective Division. Where there is no misconduct, supervisors also shall determine whether additional training or counseling is warranted. PPB shall then provide such counseling or training consistent with this Agreement;

c. Where necessary, ensure that the subject receives medical attention from an appropriate medical provider; and

d. Interview officers individually and not in groups.

| Status | Partial Compliance |
|---|---|

The City remains in partial compliance with Paragraph 70 because PPB has not yet consistently verified performance of the policies governing timely and thorough AARs.

PPB's self-assessment analyzes only the notice requirements of Paragraph 70(b), not the 72-hour requirement of Paragraph 70(a), the medical attention requirement of Paragraph 70(c), or the interview requirements of Paragraph 70(d). PPB 2022 Q1 Update Report, at 10–14, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. Thus, we agree with the Compliance Officer that PPB is in partial compliance with this paragraph. ECF 291-1, COCL Q4 2021 Report, at 27–28.

**Paragraph 70(a):** AAR forms do not indicate date, time, or amendment to the AARs and, therefore, leave uncertain whether and when initial drafts were complete. Also, the AARs we reviewed do not include photographic or video evidence, even when the AAR indicated such information exists. For example, in a serious use of force, the AAR was initially missing. When it was eventually produced, the AAR did not explain why PPB did not secure a video of the event from a civilian witness who reported recording the event. If PPB did secure the video, it neither recorded that in the AAR nor produced it. Based on our review of AARs, it appears that the City is not consistently applying the requirement for supervisors to "ensure that the administrative review includes collecting any physical or photographic/video evidence that may assist other reviewers in the chain of command in understanding the scene and event." Dir. 1010.00, Procedure Par. 12.4.9.

**Paragraph 70(b):**  Overall, PPB's referrals to PSD had mixed results, thus not reaching substantial compliance.  In Case 21-122336, the PPB supervisor's notice to PSD added a causal justification inconsistent with the reported facts of a canine bite.  PPB cannot be said to comply with the notification to PSD in that instance, when the notification minimized the interaction, and the supervisor who should serve as a check on the reasonableness of using force instead supplemented the officer's justification.  As discussed above, the PPB supervisor added a causal justification for force not found in the officer's reported facts, "[The Canine] bit the suspect when the suspect refused to surrender."  May 7, 2021 email "Fw:  K9 Bite Force Notification PPB #21-122336 – Allegation of Officer criminal misconduct."  As another example, PPB reported to their Detective Division possible criminal conduct in member(s)' use of force.  PPB indicated that it would open an administrative investigation of the allegation, but would let that process determine whether to investigate criminally.  Commendably, PPB executives noted that should the administration process lead to a criminal investigation, PPB would "look to have an outside agency take that piece."  AC J. Resch email Dec. 1, 2021.  However, even though a neighbor reportedly recorded the underlying interaction, the PPB file did not include any video.

**Paragraph 70(c):**  We could not fully assess whether PPB adequately secured medical care because in many cases the City did not produce photographs of injuries.  However, based on PPB's written reports that we reviewed, it appears that officers are continuing to secure medical care for the subjects injured during encounters with PPB.

**Paragraph 70(d):**  PPB's AAR form includes checkboxes for a supervisor to affirm individual interviews.  Though the AAR form should ensure this requirement is met, it did not always do so.  For example, in a force event from 2020 that was reviewed this compliance period, the supervisor checked the box for all officers, but a later review showed that the supervisor had not interviewed any of the officers.  As we discuss with respect to Paragraph 72, PPB knew of a systemic failure to interview officers for AARs, but did not revise the checklist to ensure the adequacy of investigation as required by Paragraph 70(d).

71. PPB shall maintain adequate patrol supervision staffing, which at a minimum, means that PPB and the City shall maintain its current sergeant staffing level, including the September 2012 addition of 15 sergeants.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 71.

We agree with the Compliance Officer's assessment that PPB is maintaining adequate patrol supervision staffing.  ECF 291-1, COCL Q4 2021 Report, at 29.  However, we note a potential concern regarding training for officers designated as acting supervisors.  The use of acting supervisors was prevalent in a number of force events that we have reviewed.  Pursuant to Paragraph 158, we will monitor this concern by requesting an analysis of the extent to which PPB relies on acting supervisors and whether such personnel receive adequate training to perform the role.

72. PPB shall develop a supervisor investigation checklist to ensure that supervisors carry out these force investigation responsibilities. PPB shall review and revise the adequacy of this checklist regularly, at least annually.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraph 72 because PPB has not ensured the adequacy of the supervisor investigation checklist.

In 2020, the supervisory checklist proved to be inadequate. PPB policy designates the AAR form as the checklist to ensure supervisors carry out their force investigation responsibilities. Dir. 1010.00, Procedure Par. 13.2. We previously found this sufficient. *See* ECF 158-1, DOJ 3rd Periodic Compliance Assessment Report, at 13–14; ECF 195-1, DOJ 4th Periodic Compliance Assessment Report, at 14. However, we also advised that the checklist did not always result in critical analysis of force or demonstrate that supervisors conducted fulsome investigations of force used during crowd-control events. *Id.* We now know that the City knew the checklist was not and could not be followed in some circumstances. The insufficiency of the checklist is evident in the Force Inspector's July 9, 2020 training—not shared with DOJ until January 14, 2022—that highlighted AARs not adequately assessing the number of rounds used, justification for each round, whether supervisors showed up on the scene, and whether photo or video evidence existed. Still, PPB did not revise the checklist during this compliance period. Accordingly, we disagree with the Compliance Officer's assessment that PPB is in substantial compliance with this paragraph. *See* ECF 291-1, COCL Q4 2021 Report, at 29–30.

PPB is currently exploring revisions to Directive 1010.00. The Parties are discussing the policies governing use of force and force reporting with the PPA and Compliance Officer, and the public will be able to provide input through the Universal Review Process. We anticipate addressing revisions to the AAR form in this process, and the City being able to demonstrate an adequate review and revision of the checklist when the policies are approved pursuant to Paragraph 166.

73. PPB shall revise its policies concerning chain of command reviews of After Action Reports, as necessary, to require that:

    a. EIS tracks all Directive 940.00 comments, findings and corrections;

    b. All supervisors in the chain of command are subject to and receive corrective action or discipline for the accuracy and completeness of After Action Reports completed by supervisors under their command;

    c. All supervisors in the chain of command are accountable for inadequate reports and analysis;

    d. A supervisor receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position when he or she repeatedly conducts deficient investigations. Where a shift commander, or precinct commander, repeatedly permits deficient investigations, the shift commander, or precinct commander, receives the appropriate corrective action, including training, demotion, and/or removal from a supervisory position;

    e. When, after investigation, a use of force is found to be out of policy, PPB shall take appropriate corrective action consistent with the Accountability provisions of this Agreement;

f. Where the use of force indicates policy, training, tactical, or equipment concerns, the immediate supervisor shall notify the Inspector and the Chief, who shall ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns; and

g. The Chief or designee, as well as PSD, has discretion to re-assign a use of force investigation to the Detective Division or any PPB supervisor.

| Status | Partial Compliance |
|---|---|

The City remains in partial compliance with Paragraph 73 for four reasons: (1) PPB is not ensuring the EIS is effective; (2) PPB prepared an inadequate crowd control audit of force during the 2020 protests; (3) PPB has not consistently taken appropriate corrective action in response to sustained policy violations; and (4) PPB did not timely resolve policy, training, tactical, and other concerns arising from the use of force during crowd control events.

We agree with the Compliance Officer's assessment of PPB's failure to meet the requirements of this paragraph. ECF 291-1, COCL Q4 2021 Report, at 30–31. We also agree that PPB must clarify the issues that may be addressed in EIS entries (73(a)) and distinguish those issues from the misconduct that requires investigation and potential discipline (73(b)). ECF 291-1, COCL Q4 2021 Report, at 31–32.

PPB's self-assessment covers quarterly audit reports, but omits the crowd control force audit for 2020, when the lion's share of force occurred. PPB 2021 Q4 Update Report, at 24, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. PPB did not complete the crowd control audit until December 15, 2021, and it still does not track the requirements of Paragraph 73.

**73(a):** On December 15, 2021, PPB produced its audit of crowd control response to the 2020 protests. As discussed below, the audit's design is inadequate because it does not incorporate the Compliance Officer's input and its content is inadequate because it does not assess what is required by Paragraphs 74 to 77. The audit also did not generate data necessary to show that EIS tracks all AAR comments, findings, and corrections.

**73(b)-(d):** We reviewed numerous AARs that either worked their way through PPB or originated in this compliance period. We have not yet seen a concerted effort to hold accountable supervisors in the chain of command for inadequate reports and analysis, including PPB managers who repeatedly justified uses of force against a person based on actions of others. PPB also did not take steps to hold accountable any shift or precinct commander who permitted deficient investigations. Paragraph 74(d). As an example, we identified for the City a PPB supervisor's faulty analysis of the *Graham* and policy standards. ECF 286-3, PRB Letter, Mar. 23, 2021. But the City took no steps to hold the supervisor accountable, a continuing failure to comply with this paragraph. Indeed, another senior supervisor who we identified to the City as conducting objectively deficient investigations received a significant promotion. Our concerns were a basis for our notice of noncompliance, which the City resolved by agreeing to Section XI – Addendum of Additional Remedies. New Paragraph 192 addresses these issues by requiring the City to identify and hold accountable the high-level supervisors—ranked Lieutenant or above—who: (a) trained officers to believe they could use force against individuals during crowd control events without meeting the requirements of PPB's general force policy; (b) served as incident commanders and directed or authorized any officer to use force in violation of PPB policy, or who failed to ensure that FDCRs and AARs were completed as required by policy; and (c) the Commanders and above who failed to

timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020.

**73(e):** PPB has infrequently sustained uses of force as not complying with policy—even when we identified out-of-policy force for PPB. But, applying Paragraph 73(e)'s requirement specifically to the uses of force PPB has sustained during this compliance period, we assess PPB as only partially compliant. In this assessment period, PPB frequently misapplied the current discipline guide during the accountability process, PPB did not apply policies to hold officers accountable as it should, and the City voluntarily expunged the records of officers who were appropriately disciplined. Accordingly, the City has not imposed "appropriate corrective action" required by Paragraph 73(e).

**73(f):** As we described above, supervisors repeatedly asserted that RRT members were trained—incorrectly—to apply PPB's crowd control policy over the requirements of Directive 1010.00. We find this justification inadequate. Training cannot necessarily trump unambiguous policy requirements. Regardless, if PPB supervisors believe RRT was mis-trained, they have a continuing obligation to take corrective action, to notify the Inspector, who must work with the Chief to "ensure that PPB timely conducts necessary training and that PPB timely resolves policy, tactical, or equipment concerns." Paragraph 73(f). None of that happened. *See infra* Section IV. We repeatedly encouraged PPB to train RRT—before RRT members resigned en masse following one member's criminal indictment. Critical policy concerns took more than a year to resolve. Training, tactical and other concerns will be part of the City's implementation of new Paragraph 189.

## B. Compliance Audits Related to Use of Force

74. In consultation with the COCL, the Inspector, as part of PPB's quarterly review of force, will audit force reports and Directive 940.00 Investigation Reports to ensure that:

a. With respect to use of force generally:

i. reports describe the mental health information available to officers and the role of that information in their decision making;

ii. officers do not use force against people who engage in passive resistance that does not impede a lawful objective;

iii. when resistance decreases, officers de-escalate to a level reasonably calculated to maintain control with the least amount of appropriate force;

iv. officers call in specialty units in accordance with procedure;

v. officers routinely procure medical care at the earliest available opportunity when a subject is injured during a force event; and

vi. officers consistently choose options reasonably calculated to establish or maintain control with the least amount of appropriate force.

b. With respect to ECW usages:

i. ECW deployment data and Directive 940.00 reports are consistent, as determined by random and directed audits. Discrepancies within the audit should be appropriately investigated and addressed;

ii. officers evaluate the reasonableness and need for each ECW cycle and justify each cycle; when this standard is not met, this agreement requires supervisor correction;

iii. officers are universally diligent in attempting to use hands-on control when practical during ECW cycles rather than waiting for compliance; and

iv. officers do not attempt to use ECW to achieve pain compliance against subjects who are unable to respond rationally unless doing so is reasonably calculated to prevent the use of a higher level of force.

c. With respect to use of force reporting, the reports:

i. are completed as soon as possible after the force incident occurs, but no later than the timeframes required in policy;

ii. include a detailed description of the unique characteristics of the event, using common everyday language, sufficient to allow supervisors to accurately evaluate the quality of the officer's decision making and performance;

iii. include a decision point description of the force decision making;

iv. include a detailed description of the force used, to include descriptive information regarding the use of any weapon;

v. include a description of any apparent injury to the suspect, any complaint of injury, or the absence of injury (including information regarding any medical aid or on-scene medical evaluation provided);

vi. include the reason for the initial police presence;

vii. include a description of the level of resistance encountered by each officer that led to each separate use of force and, if applicable, injury;

viii. include a description of why de-escalation techniques were not used or whether they were effective;

ix. include whether the individual was known by the officer to be mentally ill or in mental health crisis;

x. include a general description of force an officer observes another officer apply; and

xi. demonstrate that officers consistently make diligent efforts to document witness observations and explain when circumstances prevent them from identifying witnesses or obtaining contact information. Reports will include all available identifying information for anyone who refuses to provide a statement.

75. In consultation with the COCL, the Inspector shall audit force reports and Directive 940.00 investigations to determine whether supervisors consistently:

a. Complete a Supervisor's After Action Report within 72 hours of notification;

b. Review all use of force reports to ensure they include the information required by this Agreement and PPB policy;

c. Evaluate the weight of the evidence;

d. Use a "decision-point" approach to analyze each use of force;

e. Determine whether the officer's actions appear consistent with PPB policy, this Agreement, and best practices;

f. Determine whether there was legal justification for the original stop and/or detention;

g. Assess the incident for tactical and training implications, including whether the use of force may have been avoided through the use of de-escalation techniques or lesser force options;

h. Determine whether additional training or counseling is warranted;

i. Implement corrective action whenever there are material omissions or inaccuracies in the officers' use of force report, and for failing to report a use of force, whether applied or observed;

j. Document any non-disciplinary corrective action to remedy training deficiencies, policy deficiencies, or poor tactical decisions in EIS;

k. Notify PSD and the shift supervisor of every incident involving an officer's Serious Use of Force, and any Use of Force that could appear to a reasonable supervisor to constitute misconduct; and

l. Notify the Detective Division and shift supervisor of every force incident in which it could reasonably appear to a supervisor that an officer engaged in criminal conduct.

76. In consultation with the COCL, the Inspector shall conduct a quarterly analysis of force data and supervisors' Directive 940.00 reports designed to:

a. Determine if significant trends exist;

b. Determine if there is variation in force practice away from PPB policy in any unit;

c. Determine if any officer, PPB unit, or group of officers is using force differently or at a different rate than others, determine the reason for any difference and correct or duplicate elsewhere, as appropriate;

d. Identify and correct deficiencies revealed by the analysis; and

e. Document the Inspector's findings in an annual public report.

77. In consultation with the COCL, the Inspector shall audit the adequacy of chain of command reviews of After Action Reports using the following performance standards to ensure that all supervisors in the chain of command:

a. Review Directive 940.00 findings using a preponderance of the evidence standard;

b. Review Directive 940.00 reports to ensure completeness and order additional investigation, when necessary;

c. Modify findings as appropriate and document modifications;

d. Order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improve the reliability or credibility of the findings and counsel the investigator;

e. Document any training deficiencies, policy deficiencies, or poor tactical decisions, ensure a supervisor discusses poor tactical decisions with the officer and ensure the discussion is documented in EIS;

f. Suspend an investigation immediately and notify the branch Assistant Chief, the Director of PSD, and the Detectives Division whenever the investigating supervisor, shift commander or Division commander finds evidence of apparent criminal conduct by a PPB officer; and

20

g. Reports a matter to PSD for review and investigation whenever an investigating supervisor, shift commander or precinct commander finds evidence of apparent misconduct by a PPB officer or employee.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraphs 74 to 77 because PPB did not consult with the Compliance Officer on its audit of force used during crowd control and produced an audit that does not comply with this Agreement.

PPB continues to self-report compliance with these paragraphs, but does so based on its quarterly audit reports, not the significant audit of uses of force during crowd control events in 2020—when most force was used. PPB 2022 Q1 Update Report, at 25–42, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. PPB designed the crowd control audit without consulting the Compliance Officer, did not complete it until December 15, 2021, and did not include every element required by Paragraphs 74 to 77. We therefore agree with the Compliance Officer's assessment that PPB has not met the requirements of these paragraphs. ECF 291-1, COCL Q4 2021 Report, at 32–37.

**PPB's 2020 Crowd Control Audit:** We previously stated that "the lack of prompt supervisory force investigations of crowd-control events is likely to deprive the upcoming force inspector's audit of necessary data. We will assess the sufficiency of that audit in a future compliance assessment report." ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 17. PPB eventually presented a 2020 crowd control force audit that does not comply with this Agreement. PPB did not conduct a self-critical assessment, propose corrective action recommendations, or provide the necessary data for the EIS or for group-level comparisons between units. PPB, "2020 Crowd Control Audit Results," undated, available at www.portlandoregon.gov/police/article/799620 (hereinafter 2020 Crowd Control Audit Results). PPB designed and performed the audit without consulting with the Compliance Officer, in violation of this Agreement. Paragraphs 74–77.

PPB routinely audits force used during crowd control events at year's end, rather than as part of its quarterly audits. On January 19, 2021, we asked PPB for its force audit for crowd control in 2020. PPB did not have one. PPB eventually produced its 2020 crowd control force audit to the Compliance Officer and DOJ on December 15, 2021—more than a year after PPB determined the 2020 protests finally ended on November 16 2020. On December 14, 2021, we asked PPB to explain the delay in writing. In January 2022, PPB cited the volume of force being reviewed and lack of personnel to perform the audit. Yet this Agreement requires that the City provide, "necessary support and resources to enable PPB to fulfill its obligations under this Agreement." Paragraph 7. PPB also asserted a laudable position given the lack of resources:

> Expediency should not be the priority when auditing our Crowd Control Events. The Force Inspectors Office and Audit Team want to complete as thorough and accurate an audit of our events as possible, especially given the intense scrutiny given to Crowd Control and our desire to be as transparent as possible.

PPB's delayed audit did not meet those worthy goals for at least five reasons.

First, PPB did not post the audit until after May 6, 2022, when DOJ specifically asked the City to do so. This Agreement requires "All PPB audits and reports related to the implementation of this Agreement shall be made publicly available via website and at PPB, IPR, City Hall, and other public locations. Audits and reports shall be posted on PPB's website." Paragraph 155.

Second, the audit findings lack credibility. PPB gave itself an overall compliance rate of 96%. Even ignoring force policy requirements and assessing only the reporting requirements of crowd control policy,[7] as PPB designed its audit to do, a 96% compliance rate is inconsistent with the City's acknowledgement that it did not complete timely AARs or conduct full interviews and investigations of force during the 2020 protests. *See* Dir. 635.10, Procedure Par. 13.1.1 (requiring that the Incident Commander "Write an After Action in accordance with Directive(s) 905.00, Non-Force After Action Reporting, or 1010.00, Use of Force, if force was used"); *see also* Dir. 635.10, Par. 13.3.4 (requiring the supervisor to "write an after action of any force used by the squad in accordance with Directive 1010.00, Use of Force, during the incident").

Third, the audit did not qualitatively assess PPB's force. The audit consisted mainly of checkboxes regarding the reporting requirements of Directive 635.10. This Agreement requires that audits make qualitative assessments to ensure force is not used against people who passively resist (Paragraph 74(a)(ii)) and the least amount of appropriate force possible is used (Paragraph 74(a)(vi)). Questions 23–25 of Survey Tool 3 are the only qualitative questions about the force used. *See* 2020 Crowd Control Audit Results, at 23. Those questions do not independently assess whether force complied with training, policy, law, or this Agreement. Rather the questions merely ask whether *the AARs found* that the force was compliant. The net effect of this framing is to validate AAR findings without scrutinizing the actual findings.

The audit fails to qualitatively assess the force reporting requirements of Paragraph 74(b), the characteristics of supervisory review required by Paragraph 75, the trend analysis and corrective action required by Paragraph 76, or the adequacy of chain-of-command reviews required by Paragraph 77. Had the audit done so, it could address the concerns we identified last year, including the conflation of active and passive resistance, the reliance on sound truck warnings, the lack of connection with incident action plans, and the lack of witness interviews. We laid out a roadmap to identify these issues, and thereby improve outcomes, in our prior compliance assessment report. Instead PPB's audit asked a simple, binary question about chain-of-command review: "Does command agree with the sergeant's findings?" 2020 Crowd Control Audit Results, at 23.

Fourth, the audit sought to validate the specific overreliance on a sound truck that the Compliance Officer and DOJ agreed was not necessarily compliant. PPB devoted seven of 35 questions in its "Survey 2" tool to sound truck warnings. 2020 Crowd Control Audit Results, at 14–16. None of the questions asked about the specific issue the Compliance Officer and DOJ identified, i.e., did PPB identify whether the warning was effective for the specific force event. *Compare* ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 9 (stating "LRAD announcements may be valid warnings to the crowd generally, but as one reviewer aptly recognized in an AAR, members should not assume that subjects heard the LRAD. *See* AAR package 0625-0626").

PPB designed the 2020 crowd control audit to validate its responses and overlook numerous reporting deficiencies rather than critically assess the force that was used and the reporting processes that failed, and attempt to learn from the experience.

**Reporting and Correcting Deficiencies:** PPB has not produced an annual audit report as required by Paragraph 76(e) for this compliance period or the prior. *See* PPB, "Force Audit

---

[7] To be clear, the requirements of Directive 1010.00 apply. However, even if that policy did not apply, PPB did not always comply with prohibitions of Directive 635.10. For example, paragraph 10.4 of the policy prohibits bringing a motor vehicle into contact with protestors, but at least one officer did just that: www.youtube.com/watch?v=ZTJPBN_u8O8.

Reports," available at www.portlandoregon.gov/police/72521.  PPB provided a spreadsheet of Force Inspector recommendations it has tracked since January 10, 2021.  Though helpful, the tracking tool appears incomplete.  The list is extremely short and does not appear to address any trend issues.  When we found PPB in substantial compliance with the Agreement on January 10, 2020, the available data for Q3 2019 showed a force-to-custody rate of 3.3% (for non-crowd-control-related force events).  PPB, "Use of Force Summary," available at public.tableau.com/app/profile/portlandpolicebureau/viz/ForceAuditReport/Summary.  Since then, PPB has used force more frequently, including at a current rate of 5.4% of custodies based on Q4 2021 data, and at a rate as high as 7% in Q2 2021.  *Id.*  This is a significant trend that should have been identified and addressed.  Also, the spreadsheet does not include a specific training issue identified by a PPB supervisor in Case 21-175074.  This was an ECW use that raised the issue of the need for additional training on rearming a Taser before a second deployment.

**Audit Is Inconsistent with the Force Inspector's Training Slide:**  On January 14, 2022, the City's legal counsel first disclosed to us a training provided by PPB's Force Inspector—the same person responsible for the audits—that is dated July 9, 2020.[8]  This training contained a number of admissions that evidence a failure to collect adequate data for the audits that followed.  "There are several of these FDCR's (sic) that make an auditor cringe when it comes to reporting force . . .. Terms like deploying 30-50 rounds is problematic usage of our weapon systems.  We need to have a count of our munitions and justification for each round we are deploying."  The same training acknowledged that baton usage reporting was inconsistent and included no reporting on some reports.  The Force Inspector's statements indicate that PPB knew of problems that should have been addressed in its December 15, 2021 audit of crowd control uses of force.  Yet, PPB asserted a 96% success rate in that crowd control audit.  The audit is inconsistent with the Force Inspector's training.  Accordingly, PPB's largest and most consequential audit of this compliance period does not evidence substantial compliance with Paragraphs 74–77.

## IV.    TRAINING

78. All aspects of PPB training shall reflect and instill agency expectations that officers are committed to the constitutional rights of the individuals who have or are perceived to have mental illness whom they encounter, and employ strategies to build community partnerships to effectively increase public trust and safety.  To achieve these outcomes, PPB shall implement the requirements below.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraph 78 because PPB has not fully implemented the requirements of Section IV.

We share the Compliance Officer's assessment that PPB is in partial compliance with this paragraph. *See* ECF 291-1, COCL Q4 2021 Report, at 38–39.

**Training Accomplishments:**  In this compliance period, PPB's training achieved two new significant positive developments: (1) Active Bystandership for Law Enforcement (ABLE) Training and (2) the City's allocation of funds to create a civilian training dean position.  The training dean is intended to bring consistent and professional leadership and better incorporate all aspects of adult

---

[8] PPB is obliged to provide DOJ all force-related training materials pursuant to Paragraph 166.

learning techniques into the Training Division.  ABLE Training has been a long-term goal that finally came to fruition in this compliance assessment period.

PPB based its ABLE Training on course material from the Georgetown University Law Center's Center for Innovations in Community Safety, available at www.law.georgetown.edu/cics/able/. PPB added its own ABLE policy references to these materials.  All class participants were required to affirm in PPB's learning management system (LMS) that they read this new policy before taking the class.  We observed a recording of the training delivered via Zoom.  In contrast to other PPB training delivered by Zoom, the ABLE class instructor required participants to keep their cameras on and remain engaged.  The class included break-out sessions in small groups.  We witnessed in these a good example of personal intervention and strong affirmation by the ABLE facilitator.

Another accomplishment, though not a new development, was Taser and firearms training that effectively incorporated PPB's force use and reporting polices.

**Offensive RRT Training Materials:**  As the City has already acknowledged to the Court, the City did not disclose to the Compliance Officer or DOJ RRT training material until this compliance period.[9]  Had those materials been disclosed previously, we likely would not have found the City in compliance with Section IV, or likely other sections, absent remediation.

Paragraph 166 requires that "PPB shall send new or revised policies, procedures, protocols, and training curricula regarding use of force, interactions with persons in mental health crisis and systems of accountability to DOJ as they are promulgated, with a copy to the COCL."  This standing, court-ordered requirement obviates any need for a specific request.  In addition, we frequently make specific requests in our meetings or in writing.  One such set of requests centered on RRT.  In early 2019, we orally requested the specific dates and details of the Spring RRT training, which was listed in the 2019 Training Plan, so that we could review the materials and observe the training.  RRT apparently executed that training without informing PPB's Compliance Coordinator with sufficient time to permit our review or observation.  The Training Division should have had these materials as required by PPB Directive 1500.00 – Training, and as specifically identified in the October 2017 Training Division audit report at page 12 "85d-e-1 The Audit Team recommends that the Training Division maintain training records and course materials for specialty trainings (e[.]g. SERT, EDU, RRT, etc.)," available at www.portlandoregon.gov/police/article/666053.

We then focused on the planned Fall 2019 RRT training, also listed in the 2019 Training Plan. PPB's Compliance Coordinator memorialized our request in a June 12, 2019 email to an RRT Lieutenant, forwarded to us on June 13, 2019, when the Compliance Coordinator disclosed that PPB canceled the planned off-site training.  PPB did not amend the 2019 Training Plan.  On July 10, 2019, the Compliance Coordinator followed up with some information, but no course materials.

Though the Parties continued discussing RRT in our meetings, we provided PPB a written reminder of our request for RRT lesson plans in a September 12, 2019 email.  On Friday evening, September 13, 2019, PPB produced limited lesson plans.  We reviewed them over the weekend.  On Monday morning, September 16, we asked by email for any other RRT training materials that existed.  On September 20, 2019, we returned extensive written comments on the RRT lesson plans, including that the RRT training needed to comport with the Agreement's force and training provisions.  Both

---

[9] The City released the RRT training slides to DOJ, the Compliance Officer, and the media in January 2022.  They are available on the City's website:  www.documentcloud.org/documents/21180085-protests_riots_powerpoint_reduced_size_final.

in that email and in the comments to the attached lesson plans, we requested the slides and videos that RRT would use.  Ultimately, PPB produced certain lesson plans and three sets of slides.  But, PPB did *not* produce the problematic RRT slides until January 14, 2022.

**Training's Effect on Accountability:**  PPB has repeatedly asserted that RRT training instructed members that they could use force based on PPB's Directive 635.10, without following the requirements of Directive 1010.00.[10]  However, in our September 2019 emails and the written comments to the provided lesson plans, we stressed the need for the crowd control training to follow Directive 1010.00, and to stress de-escalation.  We stated, among other things:  "Both the lesson and the demonstrations must refer to and incorporate the approved use-of-force policy and the crowd-control policy.  The lesson plan should set forth this performance standard.  This lesson plan [also] implicates 1010.00 and 1010.10 for reporting requirements."

The City agrees that Directive 635.10 does not supplant Directive 1010.00.  However, the point is not yet permeating into PPB as it should.  Only recently, the written record of an accountability case showed that the *same* RRT Lieutenant to whom we wrote in September 2019 about the applicability of Directive 1010.00, served as an internal subject matter expert to justify use of force circumventing Directive 1010.00.  And an Assistant Chief disagreed with a contempt finding and instead stated that an officer's actions were consistent with training.  The City must ensure that all PPB members understand that the general use-of-force policy applies in crowd control situations.

**The Previously Undisclosed RRT Training Materials:**  The City is currently investigating at least one aspect of the RRT training, a slide depicting the "Prayer of the Alt Right":



---

[10]  On its face, the crowd control directive makes clear the preeminence of the force directive: "1. Directive 1010.00, Use of Force, governs all uses of force, including in crowd management and crowd control situations."  Directive 635.10, Procedure 1.

We await the outcome of that investigation to better understand the facts and context of the presentation during training.  We will likely have more to say about the slides and their effect on PPB after the close of the investigation.  We note, however, an additional issue that the City advised us is not part of its current investigation:  improper characterization of legal justification for force.

The ==RRT training materials incorrectly portray the legal justification for force==.  The slides picture a person standing with a sign as "active resistance":



Chief Judge Marco Hernández found in *Don't Shoot Portland* v. *Portland*, that the City was in contempt for violating its own force directive during the 2020 protests for precisely this sort of inappropriate justification.  A specific issue was whether PPB was authorized to use impact rounds on persons slow walking while holding a banner and refusing to let go of the banner.  The judge found:  "At most, the record shows that the individual who was refusing to let go of their sign was engaged in passive resistance."  *Don't Shoot Portland* v. *Portland*, 503 F. Supp. 3d 1022, 1034 (D. Or. 2020).

Similar to this slide, a separate set of late-disclosed RRT training slides cited a case overruled by the Ninth Circuit Court of Appeals, *Headwaters Forest Def.* v. *Cty. of Humboldt*, 1998 U.S. Dist. LEXIS 16953 (N.D. Cal. Oct. 26, 1998), which overstated the justification for use of chemical restraint.  Those same slides also cited cases from other judicial districts and another state, which are not binding legal authority in Oregon.  This training did not comply with Paragraph 78.

**Effects of RRT Training:**  PPB assigned grenadiers to be the "linebacker" for crowd control response, whether by RRT or MFF.  Grenadiers routinely used less lethal munitions in crowd control responses both during this compliance period and before.  Training materials for grenadiers were important for our compliance assessment report.  On March 29, 2021, PPB's Compliance Coordinator responded to our request for PPB grenadier certification lesson plans.  PPB responded that "they do not consider this a 'training' per se so there is no 'lesson plan.'"  Email from M. Buckley to J. Geissler, March 29, 2021.  In fact, after the City produced RRT training materials in response to our December 14, 2021 request, we found that there had already been a FN303 qualification training from 2018 and 2019, with materials not previously shared with DOJ.

Before the planned 2021 grenadier classes, we advised PPB about these specific qualification classes:

1. Qualification presupposes qualifying to use a weapon system in conformance with law and policy. For example, PPB routinely provides firearms instruction at in-service which provides law and policy guidance applicable to later firearms qualification. Also, PPB provides CEW training on law and policy as part of annual in-service that includes qualification on use of CEW. Here, PPB presents qualification independent of law or policy guidance on use of FN303 launchers, 40mm launchers, and hand-held riot control agents. This is insufficient. PPB should, at a minimum, provide a lesson plan on the law and policy guidance for use of these weapons to accompany the qualification—including the dos and don'ts of use. DOJ would like to review the lesson plan in advance.

2. We note that the FN303 qualification potentially contradicts the training from the City Attorney in response to Judge Hernández' sanction order. Specifically, the FN303 qualification requires firing two rounds in repeated sets. However, the March 24, 2021 legal training instructed that, to comply with the order, officers must pause in between FN rounds rather than fire volleys. The qualification is silent on this pause. At this time, we do not opine on the proper tactical application of the FN303 launchers. Rather we just note the potential contradiction. Indeed, the March 24, 2021 legal instruction acknowledged a conflict with training in the statements: "I'm just giving you legal advice but you should probably rely upon your training. I don't want to give you conflicting advice from your training." PPB should clarify how it expects grenadiers to behave before further confusing the topic.

Email from J. Geissler to M. Buckley, April 2, 2021. Without producing course materials, PPB conducted an "FN303 Armorers class" on April 10, 2021, and merely removed "qualification" from the class title, but otherwise went forward with the class on using the weapon.

**Remediating the RRT Training:** Throughout this rating period, the City did not remedy the poor training to RRT and its overall effect on the organization. As we said in our March 21, 2021, and April 2, 2021 emails to PPB: "We want PPB to train its RRT members—as well as all Mobile Field Force participants—as expeditiously as possible to address the issues that we identified in our compliance assessment report. However, PPB must do so in a fashion consistent with the Settlement Agreement, approved PPB policies, and the Constitution."

PPB has not provided this training. The 2021 Training Plan identified needed RRT training. After RRT resigned, PPB did not reconstitute the team. PPB did not train Mobile Field Force participants on all of the issues we identified. PPB also did not revise its Bureau-wide training plan in light of RRT's non-availability. In the absence of effective remedial training, the offensive RRT slides impose an unmitigated impact on the organization as a whole.

79. The Training Division shall review and update PPB's training plan annually. To inform these revisions, the Training Division shall conduct a needs assessment and modify this assessment annually, taking into consideration: (a) trends in hazards officers are encountering in performing their duties; (b) analysis of officer safety issues; (c) misconduct complaints; (d) problematic uses of force; (e) input from members at all levels of PPB; (f) input from the community; (g) concerns reflected in court decisions; (h) research reflecting best practices; (i) the latest in law enforcement trends; (j) individual precinct needs; and (k) any changes to Oregon or federal law or PPB policy.

| Status | Partial Compliance |
|--------|-------------------|

The City is no longer in substantial compliance with Paragraph 79 because the Training Division did not conduct a needs assessment for PPB's annual training plan

We agree with the Compliance Officer's assessment that PPB is in partial compliance pending a critical assessment of its 2020 protest response.  ECF 291-1, COCL Q4 2021 Report, at 39–40.

PPB has not prepared a fulsome needs assessment on which to base a training plan.  We acknowledge that new Paragraph 189 requires the City to contract with an outside entity to assess PPB's 2020 crowd control response to inform a future needs assessment and training plan.  In this compliance assessment period, though, there was no critical assessment.  Instead, as discussed in Section III, above, the City validated its response to 2020 crowd control events in its master after action report without critical assessment, thus failing to inform its need for training.  *See* ECF 286-2, MAAR Letter, at 2–3.  PPB's audit of the force used during 2020 crowd control events was not completed until December 15, 2021.  In all events, the audit did not meet the requirements of Paragraph 73.  Thus, in this compliance assessment period, PPB's needs assessment and training plans were not informed as required by Paragraph 79.

Additionally, PPB has not fully implemented its training plans for 2021 and 2022, or updated them for changed circumstances.  For instance, PPB planned to complete RRT training in April 2021.  *See* 2021 Training Plan, at 17, available at www.portlandoregon.gov/police/article/798653.  This was an important step for remedying compliance concerns arising from crowd control responses.  PPB provided COCL and DOJ certain lesson plans and material for this planned training—much of which was not even developed until we requested their production.  We reviewed and critiqued the material.  PPB did not correct the material, but delayed the training.  Then RRT members resigned.  PPB did not revise the training plan after this change.

Lastly, training plans cannot be viewed as compliant with Paragraph 79 when the Training Division did not even know of all of the trainings given throughout the Division.  The City recently admitted that PPB has not complied with the requirement of Directive 1500.00, which requires that all specialized unit trainings be approved by the Training Division.  *See* email from CAPT C. Gjovik Jan. 10, 2022.  To re-achieve substantial compliance, the Training Division must inform annual training plan revisions with a fulsome needs assessment that considers all inputs required by this paragraph, and any crowd control analysis prepared by the outside entity pursuant to Paragraph 189.

80. Within 180 days of the Effective Date, PPB shall develop and implement a process that provides for the collection, analysis, and review of data regarding the effectiveness of training for the purpose of improving future instruction, course quality, and curriculum.  These evaluations shall measure and document student satisfaction with the training received; student learning as a result of training; and the extent to which program graduates are applying the knowledge and skills acquired in training to their jobs.  This audit shall be reported to the Training Division Manager and shall include student evaluations of the program and the instructor.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 80.

We agree with the Compliance Officer's assessment that the Training Division's class survey data continues to demonstrate compliance with this paragraph.  ECF 236-1, DOJ 5th Periodic

Compliance Assessment Report, at 21–22; ECF 291-1, COCL Q4 2021 Report, at 44–48.  However, we have concerns that the Training Division has not consistently approved trainings for specialty units.  The City has not assured us that it is enforcing Directive 1500.00, the policy that requires all PPB trainings to be approved by the Training Division.  To prevent a reduced compliance rating, PPB should collect data from specialty unit trainings, then review and analyze the data for future training effectiveness.

81. PPB shall ensure that the Training Division is electronically tracking, maintaining, and reporting complete and accurate records of current curricula, lesson plans, training delivered, attendance records, and other training materials in a central, commonly-accessible, and organized file system.  Each officer's immediate supervisor shall review the database for the officers under his/her command at least semi-annually.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 81 because PPB is not ensuring that supervisors review the LMS database at least semi-annually, as required.

The Compliance Officer found PPB in substantial compliance with this obligation based on its analysis of data contained in the Training Division's Learning Management System (LMS).  ECF 291-1, COCL Q4 2021 Report, at 48–50.  We agree with the Compliance Officer's assessment of LMS.  However, during this reporting period, we learned from the LMS administrator that supervisors review LMS records annually as part of the performance evaluation cycle, not semi-annually as Paragraph 81 requires.  To re-achieve substantial compliance, PPB must ensure that supervisors conduct semi-annual evaluations of subordinate officers.

82. PPB shall report training delivered and received semi-annually to the Assistant Chief of Operations and, during the pendency of this Agreement, to DOJ.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 82.

We continue to agree with the Compliance Officer that PPB is reporting training as required.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 22; ECF 291-1, COCL Q4 2021 Report, at 50.

PPB prepares semi-annual reports that catalog internal and external trainings.  We share the Compliance Officer's concern that PPB may not be tracking specialty unit training given the City's admitted nonenforcement of Directive 1500.00's requirement that the Training Division review and approve all training.  Our concern is somewhat mitigated by reviewing LMS records for individual officers, which show attendance at many specialty unit trainings.  This indicates that LMS is centrally tracking specialty trainings, even if the Training Division is not reviewing and approving them as required.

83. PPB shall institute guidelines to govern its selection of officers that serve as trainers and shall ensure that those officers do not have a history of using excessive force.  The trainer selection guidelines shall prohibit the selection of officers who have been subject to disciplinary action based upon the use of force or mistreatment of people with mental illness within the three (3) preceding

years, or twice in the preceding five (5) years, and will take into account if a civil judgment has been rendered against the City in the last five (5) years based on the officer's use of force.

| Status | Substantial Compliance |
|---|---|
| The City remains in substantial compliance with Paragraph 83. | |

The City remains in substantial compliance with Paragraph 83.

We share the Compliance Officer's view that PPB's consistent performance of this obligation over time establishes compliance with the paragraph.  *See* ECF 291-1, COCL Q4 2021 Report, at 51.

We have concerns, however, that PPB has transferred a sworn member to an administrative role in the Training Division, characterizing them as not being an instructor, even though PPB previously applied Paragraph 83's requirement and PPB's procedure for checking disciplinary history to a similar transfer.  PPB's Compliance Coordinator did not report this new transfer on their quarterly report.  Other transfers complied with SOP 1-19 based on a review of the records provided indicating PPB checked the record of each for such discipline.  We will continue to monitor whether PPB adequately ensures that all members assigned to work in the Training Division are vetted for a history of using excessive force, consistent with PPB's SOP 1-19.

84. All training that PPB provides shall conform to PPB's current policies at the time of training.  PPB shall train all officers on the Agreement's requirements during the next in-service training scheduled.

    a. With respect to patrol officers, PPB shall:

        i. increase the use of role-playing scenarios and interactive exercises that illustrate proper use of force decision making, specifically including interactions with people who have or are perceived to have mental illness, including training officers on the importance and impact of ethical decision making and peer intervention;

        ii. emphasize the use of integrated de-escalation techniques, when appropriate, that encourage officers to make arrests without using force;

        iii. continue to provide training regarding an officer's duty to procure medical care whenever a subject is injured during a force event, and enhance and revise training as necessary to ensure that PPB's training in this regard is proactive and responsive to deficiencies identified by the Inspector, if any;

        iv. continue to train on proactive problem solving and to utilize, when appropriate, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, requesting specialized units, including CIT officers and mental health professionals, or delaying arrest;

        v. describe situations in which a force event could lead to potential civil or criminal liability; and

        vi. continue to train officers to avoid using profanity, prohibit using derogatory/demeaning labels, and also avoiding terms not currently appropriate for person-center communication, such as the term "mentals," in all work-related settings and communications, as well as when interacting with the public.

    b. With respect to supervisors, provide additional training on how to:

        i. conduct use of force investigations, including the supervisory investigatory responsibilities identified in Section III.A.3;

ii. evaluate officer performance as part of PPB's annual performance evaluation system; and

iii. foster positive career development and impose appropriate disciplinary sanctions and non-disciplinary corrective action.

| Status | Partial Compliance |
|--------|-------------------|

The City remains in partial compliance with Paragraph 84 because PPB's Training Division has not corrected identified gaps in training or adequately addressed compliance concerns.

We agree with the Compliance Officer's extensive analysis of the City's compliance and what PPB must do to re-achieve substantial compliance with this paragraph.  ECF 291-1, COCL Q4 2021 Report, at 52–66.

**PPB Executives Mainly Validated Actions in 2020:**  On September 22, 2021, we observed a bureau-wide in-service training.  The training was designed to focus on PPB's crowd control response and identify issues from 2020.  Among other things, this training included an introduction by way of a video from Chief Lovell and a short in-person presentation from an Assistant Chief speaking to PPB's 2020 crowd control response.  The organizational critique from the Assistant Chief was limited to acknowledging error in classifying the 2020 protests as "one event."  Officers in attendance were not satisfied.  One asked if there would be a PPB statement given that the City and public "blamed" PPB for either engaging or not engaging crowds in 2020.  The Assistant Chief promised that the PPB public information officer was planning a media event to discuss how PPB responds to crowd control and follow-up investigations.  A search of PPB's news releases since this training does not show such a media event occurred.   PPB appeared largely unwilling to acknowledge in this training shortcomings with its crowd control response or lack of leadership messaging internally and externally.  Indeed, the procedural justice class instructed by a Captain of training expressed the management view:  "Again, 99% of the time we did it well."

**Inconsistent Interactive Exercises:**  Some portions of PPB's classroom presentations included interactive exercises as required by Paragraph 84(a).  These included asking classes to respond to videos showing other law enforcement agencies' interactions.  Unfortunately, for one video, one legal instructor characterized an action as passive resistance, while another instructor in a later session characterized the same action as more than passive.  And for another video, one legal instructor characterized the resistance shown as physical resistance while the other instructor in the later session did not.  Thus, different classes received different instruction in these instances.  Also, a separate part of the in-service training including a video of instruction from a PPB commander.  This contained useful information, but was not interactive.  It would have benefited from exercises like learning to fill in PPB's incident action plan forms or AAR requirements.

**Wellness Exercise Showed Strains in Relationship with Public:**  The same in-service training included a wellness class that involved a class exercise consistent with Paragraph 84(a)(i)'s requirement to instruct on ethical decision making and peer intervention.  Officers broke into groups of 3-4 people to talk about the work-related and personal challenges of policing in Portland in 2020.  Officers spoke to being ostracized in their places of worship or their children's schools whether or not the officers were part of PPB's crowd control response.  Officers called out PPB's managers for not "owning poor training, policy, and direction."  This cathartic session spoke to the officer wellness programs that the Training Advisory Council and PCCEP have supported for PPB.

**Medical Aid Training Continues to Save Lives:**  Paragraph 84(a)(iii) refers to medical care for subjects injured during a force event.  However, PPB has effectively trained officers to provide care

to all injured people regardless of who or what caused the injury. The training has saved lives in the field. For example, in March 2022, PPB officers used a first aid kit to save the life of a gunshot victim. PPB, "Portland Officers Save Life of Gunshot Victim (Photo)," Mar. 9, 2022, available at www.portlandoregon.gov/police/news/search.cfm?id=412209&mode=read.

**Legal Training Addressed Difficult Truths:** An Assistant City Attorney routinely provides a legal-updates training to PPB. In the September 2021 in-service training, this training addressed difficult questions from students about justifications for uses of force in response to crowd control events. Students acknowledged that they had "a chip on their shoulder," and asserted that review of a use of force in a crowd control incident would "ignore *Graham* [v. *Connor*]," and that PPB was "applying 20/20 hindsight." In response, as the instructor aptly analogized that even if a criminal suspect is having a bad day, they are still guilty if they commit a crime; the conditions of the situation go to mitigation in the penalty phase, but not the guilt or innocence of the act. So, too, the instructor pointed out an officer's lack of sleep will not make a use of force reasonable. These were tense exchanges and the message was not always well received. But the instruction was accurate.

**Force Inspector Failed to Resolve Lingering Force Issues:** In contrast, the Force Inspector's instruction validated behavior and did not answer challenging questions from the class. The Inspector validated use of LRAD for warnings, instructed that "guidance" with a baton is not force without defining "guidance," a term not defined in policy. The Inspector characterized as "best practice" the counting of 40mm rounds used; this is short of the force reporting policy requirement that officers justify each round in their reports. PPB instructed a later class of students to address with the Force Inspector the issue of which Sergeant should review force reports for a crowd control event. However, the Force Inspector's class never addressed that issue. Accordingly, training did not clarify the question of who is responsible for force reviews in crowd control events.

**Supervisory In-Service:** We reviewed and obtained from PPB significant changes to lesson plans for the December 2021 supervisory in-service. We rely upon the Compliance Officer's observation of that training. Based on our review of the lesson plans and extensive discussions with PPB about them, we agree with the Compliance Officer that the critical incident management lesson plan crystalized an issue: PPB does not, but should, have a clear policy guiding incident management.

**ABLE Training:** As we described above, the ABLE Training was a highlight of training during this compliance assessment period. Specifically, ABLE's subject matter spoke directly to Paragraph 83(a)(i)'s requirement for training officers on the importance and impact of ethical decision making and peer intervention.

85. In consultation with the COCL, the Inspector shall audit the training program using the following performance standards to ensure that PPB does the following:

   a. Conducts a comprehensive needs assessment annually;

   b. Creates a Training Strategic Plan annually;

   c. Within 180 days of the Effective Date, develops and implements a process for evaluation of the effectiveness of training;

   d. Maintains accurate records of Training delivered, including substance and attendance;

   e. Makes Training Records accessible to the Director of Services, Assistant Chief of Operations, and DOJ;

   f. Trains Officers, Supervisors, and Commanders on areas specific to their responsibilities; and

g. Ensures that sworn PPB members are provided a copy of all PPB directives and policies issued pursuant to this Agreement, and sign a statement acknowledging that they have received, read, and had an opportunity to ask questions about the directives and/or policies, within 30 days of the release of the policy.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 85 because PPB has not conducted an up-to-date audit of training or maintained certain accurate training records required by this Agreement.

Despite recommending another training audit, the Compliance Officer found PPB in substantial compliance with this paragraph based on the Training Division's efforts and staffing shortages in the Office of the Inspector General. ECF 291-1, COCL Q4 2021 Report, at 67–68. We appreciate the challenges around staffing, but they do not excuse the need for a training audit.

PPB last released an audit of training in 2018. Four years later, that audit is out of date. Moreover, PPB did not adopt some of the audit's findings, including its recommendation "that the Training Division maintain training records and course materials for specialty trainings" such as "SERT, EDU, RRT, etc." Indeed, the City recently reported it had not been ensuring that PPB members comply with Directive 1500.00. Specifically, the City had not enforced the policy that requires the Training Division to review and approve all specialty unit trainings.

The City has also continued to train officers incorrectly on the initial version of this Agreement from 2014, ECF 4-1, and not the revised versions from either 2018, ECF 171, or 2021, ECF 262-1. For the pendency of this case, the City must ensure that all PPB officers read, understand, and sign the terms of the current version of this Agreement. Paragraph 187 ("All PPB officers and persons related to the implementation of this Agreement shall sign a statement indicating that they have read and understand this Agreement within 90 days of the effective date of this Agreement. Such statement shall be retained by PPB"). To re-achieve substantial compliance with this paragraph, PPB must also conduct another training audit.

86. In consultation with the COCL, the Inspector shall gather and present data and analysis on a quarterly basis regarding patterns and trends in officers' uses of force to the Chief, the PPB Training Division, and to the Training Advisory Council. The Training Division and Training Advisory Council shall make written recommendations to the Chief regarding proposed changes in policy, training, and/or evaluations based on the data presented. The Inspector shall also, in coordination with the COCL and PSD, identify problematic use of force patterns and training deficiencies. The Chief's Office shall assess all use of force patterns identified by the Training Division and/or Training Advisory Council and timely implement necessary remedial training to address deficiencies so identified.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 86 because PPB's audit of crowd control force from 2020 does not comply with this Agreement.

The Compliance Officer found substantial compliance based on the Inspector's quarterly force audits, despite concluding that PPB "must find ways to improve the quality of data on force used in crowd control settings." ECF 291-1, COCL Q4 2021 Report, at 69. We acknowledge the

33

Inspector has produced many compliant quarterly reports. However, in this reporting period, we identified significant concerns that downgrade compliance.

First, PPB did not complete an audit of force used in response to crowd control events in 2020 until December 15, 2021—more than a year after PPB marked the end of the 2020 protests. Training Advisory Council (TAC) minutes do not reflect that the Inspector presented this audit to TAC since its production. Even if the Inspector had done so, the audit does not track the requirements of Paragraph 73, which implicates the City's compliance with this paragraph's requirement to identify use-of-force patterns and trends to the Chief, Training Division, and the TAC. Thus, the audit did not produce the data necessary for TAC to assess use-of-force patterns and trends or make meaningful recommendations.

Second, the audit did not identify patterns or trends in crowd control uses of force, though a prior, previously undisclosed training by the Inspector from July 9, 2020 acknowledged problems in the justification and reporting of uses of force. The City did not provide the Inspector's July 9, 2020 training to us until January 14, 2022, and apparently has not provided the information contained in that training to TAC. Some relevant training slides include "problematic use of force patterns and training deficiencies" that the Inspector should have shared with TAC:



Finally, the Inspector's presentations to the Training Advisory Council typically include data showing force applications against persons in actual or perceived mental health crisis. But the Inspector's March 9, 2022 presentation excluded the 2021 Q4 data.

To re-achieve substantial compliance, the Inspector must complete all substantial regular force audits in accord with the terms of this Agreement.

87. Training Advisory Council meetings will be open to the public unless the matter under discussion is confidential or raises public safety concerns, as determined by the Chief.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 87.

We continue to agree with the Compliance Officer that TAC meetings are appropriately open to the public.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 27–28; ECF 291-1, COCL Q4 2021 Report, at 70.

## V.    COMMUNITY-BASED MENTAL HEALTH SERVICES

88. The absence of a comprehensive community mental health infrastructure often shifts to law enforcement agencies throughout Oregon the burden of being first responders to individuals in mental health crisis.  Under a separate agreement, the United States is working with State of Oregon officials in a constructive, collaborative manner to address the gaps in state mental health infrastructure.  The state-wide implementation of an improved, effective community-based mental health infrastructure should benefit law enforcement agencies across the State, as well as people with mental illness.  The United States acknowledges that this Agreement only legally binds the City to take action.  Nonetheless, in addition to the City, the United States expects the City's partners to help remedy the lack of community-based addiction and mental health services to Medicaid clients and uninsured area residents.  The City's partners in the provision of community-based addiction and mental health services include:  the State of Oregon Health Authority, area Community Care Organizations (CCOs), Multnomah County, local hospitals, health insurance providers, commercial health providers, and existing Non-Governmental Organizations (NGOs) such as community-based mental health providers, and other stakeholders.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 88.

PPB continues to engage with the City's partners to bridge gaps in Oregon's statewide mental health infrastructure.  PPB's Behavioral Health Unit (BHU) is collaborating with state and county entities, area CCOs, community-based mental health service providers, the PCCEP, and other stakeholders.  *See* PPB BHU, available at www.portland.gov/police/divisions/behavioral-health-unit.

The BHU Advisory Committee (BHUAC), the Service Coordination Team (SCT), and the Behavioral Health Response Team (BHRT) maintain positive relationships with NGOs and governmental organizations, including the Behavioral Health Coordination Team, the Unity Center Advisory Council, the Oregon Behavioral Health Collaborative, and the Legacy ED Community Outreach Group.  The SCT continues to partner successfully with Central City Concern to connect BHRT clients with essential resources, such as housing via the Supportive Transition & Stabilization Program.  ECF 291-1, COCL Q4 2021 Report, at 99–100; *see* BHU Newsletter, Jan. 2016, available at www.portlandoregon.gov/police/article/561475 (announcing program).  The BHU publicizes its efforts by alerts to an email list anyone can join, *see* PPB Flash Alerts, available at flashalert.net/id/portlandpolice/150918, and in semi-regular public newsletters available on the City's external website, *see* BHU Newsletters, available at www.portlandoregon.gov/police/63093.

117. PPB agrees to use force audit data to conduct similar analyses at supervisor- and team-levels.

| Status | Partial Compliance |
|--------|-------------------|

The City is no longer in substantial compliance with Paragraphs 116 and 117 because PPB has not fully implemented the relevant policies. *See generally* Dir. 345.00 – Employee Information System, available at www.portlandoregon.gov/police/article/731768; Dir. 215.00 – Member Performance Evaluations, available at www.portlandoregon.gov/police/article/759103.

We agree with the Compliance Officer's well-formed analysis of the City's partial compliance with these paragraphs. ECF 291-1, COCL Q4 2021 Report, at 104–06. Other factors relevant to our assessment relate to data, staffing, and risk management.

**Incomplete and Inaccessible EIS Data:** We share the Compliance Officer's concern that PPB's failure to record all uses of force in 2020 continues to deprive the EIS system of necessary data during this compliance assessment period. The Force Inspector's July 9, 2020 training, which the City produced to us on January 14, 2022, admits that many supervisors lack access to the EIS, in violation of this Agreement:



"After Action Training – 7/9/20," Slide 12. Thus, the performance data tracker entries for that period are incomplete. It follows that supervisors could not accurately check the EIS entries of officers who transferred to their command during this compliance assessment period.

**Reduced Staffing Impacting EIS Operations:** In addition to incomplete EIS data that moves the City into partial compliance with Paragraphs 116 and 117, insufficient staffing may have a future effect on compliance. In the third quarter of 2021, PPB eliminated the EIS Lieutenant position "[d]ue to budget and staffing issues." PPB 2021 Q3 Update Report, at 281–82, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. PPB divided the workload among the assigned EIS Sergeant and civilian EIS administrator. *Id.* The reduced staffing negatively impacted the EIS Team, in particular their ability to timely ensure that supervisors review their subordinates' EIS data. *Id.* PPB's on-time percentages for EIS reviews of transfers decreased from 90.3% in the fourth quarter of 2021 to 87.9% in the first quarter of 2022.

PPB 2022 Q1 Update Report, at 282–83, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. PPB attributes the increased untimeliness to lacking two EIS administrators. *Id.*

**Effective Identification of At-Risk Employees:** This Agreement requires an EIS system that is intended to be predictive. PPB's EIS should identify at-risk officers based on certain thresholds or outlier metrics, then offer those officers intervention before career-ending behavior and other bad outcomes happen to the officer or the public. To that end, the Compliance Officer has endeavored to assist PPB in assessing the efficacy of current EIS thresholds. This effort should meet PPB's business purposes, i.e., PPB invests significant person hours and software expense in a system; the system should produce a useful result.

A review of a sample of EIS records for officers who ultimately became subject to criticism for poor outcomes shows that PPB repeatedly declined any interventions. The EIS also shows no interventions following the City's settlement of significant civil claims based on PPB uses of force. We believe the inefficacy of the current EIS system requires the PPB to explore enhancements, as required by Paragraph 116. We agree with the Compliance Officer, who made a similar assessment on May 11, 2022, and offered the City assistance.

118. PPB shall continue to use existing thresholds, and specifically continue to include the following thresholds to trigger case management reviews:

   a. Any officer who has used force in 20% of his or her arrests in the past six months; and

   b. Any officer who has used force three times more than the average number of uses of force compared with other officers on the same shift.

119. Within 90 days of the Effective Date, PPB shall add one additional threshold to trigger case management review any officer who has three uses of force in a one-month period.

| Status | Substantial Compliance – Continued Technical Assistance |
|--------|--------------------------------------------------------|

The City remains in substantial compliance with Paragraphs 118 and 119.

PPB reports that it sends roughly half of the alerts generated by EIS to responsible unit (RU) managers each quarter. *See* ECF 291-1, COCL Q4 Report, at 107. The specific thresholds required by this Agreement remain in place. Dir. 345.00 – Employee Information System, creates the following thresholds for review:

- Shift Force Ratio: a sworn member's force ratio is greater than or equal to three times their shift's average ratio in the preceding six months;

- Force Ratio: a sworn member's force ratio is greater than or equal to 20% of their arrests in the preceding six months;

- Force Count: a sworn member uses force three or more times in the preceding 30 days;

- Criminal Complaint: a member receives a complaint with an allegation of criminal misconduct;

- Complaint in Same Category:  a member receives two or more complaints with at least one allegation in each complaint being in the same category (such as two complaints that both have conduct allegations) for events in the preceding six months;

- Complaint Count:  a member receives three or more complaints for events in the preceding six months;

- Traumatic Incidents:  a member experiences three or more traumatic incidents in the preceding 30 days; and

- Commendations:  a member receives two or more commendations for events in the preceding six months.

PPB data indicate an all-time low percentage of alerts closed with interventions in the fourth quarter of 2020, 28.9%, but a steady increase in 2021, to a high of 75.3%.  ECF 291-1, COCL Q4 Report, at 108.  By the first quarter of 2022, interventions fell to 51.8% of alerts.  *Id.*  Still, we agree with the Compliance Officer that PPB policy and implementation data currently support a substantial compliance assessment.  ECF 291-1, COCL Q4 2021 Report, at 106–08.

120. Within 90 days of the Effective Date, PPB shall identify and train a second EIS administrator. This individual may be assigned to other tasks within the Professional Standards Division or as otherwise needed.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 120.

In 2021, PPB used the Force Inspector as a second EIS administrator in an interim capacity.  The Compliance Officer, PPB, and DOJ agree that this is not a long-term solution.  ECF 291-1, COCL Q4 Report, at 109.  PPB should implement a durable solution going forward.

In January 2022, PPB was short two EIS staff.  PPB 2022 Q1 Update Report, at 282, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. However, we agree with the Compliance Officer's most recent assessment that PPB is meeting its obligation to identify and train a second EIS administrator, as required by this paragraph.  ECF 291-1, COCL Q4 2021 Report, at 109.

## VIII.   OFFICER ACCOUNTABILITY

PPB and the City shall ensure that all complaints regarding officer conduct are fairly addressed; that all investigative findings are supported by a preponderance of the evidence and documented in writing; that officers and complainants receive a fair and expeditious resolution of complaints; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent.  The City and PPB seek to retain and strengthen the citizen and civilian employee input mechanisms that already exist in the PPB's misconduct investigations by retaining and enhancing IPR and CRC as provided in this Agreement.

169 PPB shall apply policies uniformly and hold officers accountable for complying with PPB policy and procedure.

| Status | Partial Compliance |
| --- | --- |

The City remains in partial compliance with Paragraph 169 because PPB does not consistently apply policies uniformly or hold officers accountable for complying with policy and procedure.

The Compliance Officer has not assessed the City's compliance with this paragraph.[15] We find the City is in partial compliance with its obligations to hold officers accountable for complying with PPB policies through investigative findings that are supported by a preponderance of the evidence, documented in writing, and resolved in a fair and expeditious manner.

New Section XI includes a requirement that the City initiate certain accountability investigations. ECF 275-1, Am. Settlement Agreement, ¶ 192.  New Paragraph 192 provides:

> Within 60 days of the date this paragraph is entered as an order of the Court, the City shall initiate an appropriate investigation through IPR to identify: (a) the PPB Lieutenant(s) and above who trained Rapid Response Team members to believe that they could use force against individuals during crowd control events without meeting the requirements of PPB Directive 1010.00; (b) the PPB incident commander(s) and designee(s) with the rank of Lieutenant or above who directed or authorized any officer to use force in violation of PPB Directive 1010.00, or who failed to ensure that FDCRs and After Action Reports arising from the crowd control events starting on May 29, 2020, and ending on November 16, 2020, were completed as required by Section 13.1 of PPB Directive 635.10; and (c) the PPB Commanders and above who failed to timely and adequately clarify misunderstandings and misapplications of PPB policy (including this Agreement) governing the use, reporting, and review of force during the crowd control events starting on May 29, 2020, and ending on November 16, 2020. Once the IPR investigation is complete, the Police Commissioner and/or the Chief of Police, as required by this Agreement, shall hold accountable those investigated members of the rank of Lieutenant and above who are determined to have violated PPB policies (including this Agreement) as outlined in this paragraph. The Parties affirm the obligation in this Agreement and Directive 330 for IPR and PPB to investigate any sworn member if, during the investigations of Lieutenants and above required by this paragraph, information is discovered suggesting that any sworn member may have violated PPB policy or this Agreement.

This new remedy resolves certain compliance concerns that we raised last year.  The City retains an ongoing obligation to comply with Paragraph 169.  Accordingly, though we give a frank assessment of the City's compliance since January 10, 2021, we expect that the Settlement will enable the City to address our concerns.

---

[15] The Compliance Officer has assessed Section VIII, but not Paragraph 169 because it is part of Section X – Agreement Implementation and Enforcement.  Several paragraphs in Section X impose obligations on the City and PPB with which their compliance can and should be assessed.  We assess compliance with Paragraph 169 because it relates directly to the subject matter of Section VIII – Officer Accountability.

**Fundamental Issue of Accountability:**  The City's accountability investigations take around a year to reach a finding.  In this compliance assessment period, January 10, 2021, to March 31, 2022, DOJ—as well as the Court and public—should have seen efforts to fully and fairly investigate allegations arising from PPB's 6,600-plus reported uses of force in response to the protests in 2020. To be clear, there are a couple of examples from investigations of 2020 crowd control allegations in which PPB ultimately sustained an allegation and the Chief followed the approved discipline guide.  And there are examples of PPB correctly finding that no misconduct occurred or that insufficient evidence led to a not-sustained finding.  However, the City failed to identify misconduct in several cases and did not hold any supervisors responsible for their conduct.  In the accountability process we continued to see PPB members from line officers to deputy chiefs conflate the actions of the crowd generally with the individual justification required for each separate application of force.  When the City reaches a sustained finding, it does not necessarily impose the applicable discipline.  Seven times during this compliance period, the City voluntarily resolved grievances of imposed discipline by agreeing that the "discipline be rescinded" and "that all references of this matter be removed from [the Grievant's] personnel file."

**Collateral Misconduct:**  In this compliance assessment period, there were a number of instances of failure to identify collateral misconduct, i.e., potential violations of PPB directives that are uncovered during the primary investigation of another directive or part of the directive that was the original focus of the investigation.  The issue repeatedly arose in written files that underlay a Police Review Board (PRB).  This issue continued even after we notified the City of our concern that PPB was excluding from its investigations applicable administrative charges and did not identify collateral misconduct.  *See* ECF 286-3, PRB Letter, Mar. 23, 2021, at 7–8.  In the PRB process, all members must assert that they have read the entire PRB file.  The files are often 1,000-2,000 pages, sometimes more, and include video and audio recordings and photographs.  It is not surprising with this large amount of data that not all aspects of a force event are covered in a PRB dealing with specific allegations against specific officers.  But, the professionals in IA and IPR who put together the investigative material in these files are responsible for identifying potential collateral misconduct of other officers that becomes apparent in the investigation of the incident.  And, certainly, the IA and IPR investigators and the chains of command who review the PRB files and underlying reports should be able to make sure that the directives are properly applied to the accused officers.  We found gaps in both of these areas:  identifying potential misconduct of others officers and correctly applying directives to the accused officers.

As described above, the FDCRs and AARs for September 30, 2020 were the subject of a PRB in this compliance assessment period.  *See* 21-C-0187.  Though IA and IPR spent months with this case, neither raised allegations about other officers' separate uses of three pellet grenades that night. These indiscriminate uses of force could not meet the requirement of the Agreement or PPB policy requiring individual justification for force.  And their use—thrown directly at people—was contrary to PPB's own training.  Yet, the City did not identify or address this potential collateral misconduct that was part of the administrative review in this compliance period.[16]

**Double Jeopardy Issue:**  In prior assessments of accountability investigations, we have critiqued the failure to address all allegations raised, or which should have been raised, in the review of a

---

[16] The administrative investigation file also contained the training records for a different officer than the subject officer and training records that predated the subject officer's tenure.  IA and IPR failed to note or correct this in their review of the file.

critical force incident. In such assessments, we have told the City that it should remedy this deficiency by completing investigations of the allegations that PPB did not investigate from the critical force incident. ECF 236-1, DOJ Fifth Periodic Compliance Assessment Report, at 52 (citing City Attorney Memo of July 29, 2020 admitting that "PPB did not investigate whether [the supervisor] satisfactorily performed his duties in terms of operational planning and supervision," but asserting double jeopardy and untimeliness would bar administrative review). In response to our critiques, the City has asserted, based on its interpretation of relevant labor law, that double jeopardy—the legal concept of prosecuting the same person twice for the same offense—attaches to the entire event for the involved officers. Setting aside whether an officer could validly assert a double jeopardy defense to a wholly different administrative charge than previously considered, the City is required by this Agreement to identify and investigate all allegations in critical force incidents. The City has not done so.

In this compliance assessment period, for example, the City reviewed a May 22, 2021 officer involved shooting that involved a pursuit of the subject following the shooting. *See* 2021-B-0019. The investigative file showed that IA never cited or applied PPB's pursuit policy, yet PPB still found the actions of a supervisor within policy for that pursuit. The record did not show that the supervisor had completed an AAR for the pursuit as required by policy. *See* Dir. 630.05 – Vehicle Interventions and Pursuits, Pars. 9.1.10, 9.1.10.1. This omission from investigation, again, arguably and unnecessarily created a double jeopardy issue.

The City created another such double jeopardy situation in a review of a different shooting in this compliance period. *See* 2020-B-0066. One of the central issues of this December 24, 2020 incident is the position of the officer's vehicle directly in front of a large, stolen pickup truck. In that instance, the officer pulled their police vehicle in front of the truck, with the officer's door opening directly in front of the heavy truck's bumper. The subject rammed and injured the officer, who fired their handgun. The administrative investigation did not cite or address the operative provisions of Directive 1010.00 for the positioning of the vehicle:

> 8.5.3. Members are prohibited from intentionally positioning themselves in the path of a moving vehicle or in a location that is clearly vulnerable to vehicular attack.

> 8.5.8. Members shall not use poor tactics or positioning as justification for shooting at or from a moving vehicle.

To the credit of the training analysis of that incident, the Training Division did cite these provisions. Even equipped with that analysis, though, both IA and the chain of command still omitted all consideration of those provisions from the administrative investigation. While the subject officer's horrific injuries may serve as mitigation when considering a consequence of violating policy, the injuries do not suspend the Agreement's requirement to apply policies uniformly and hold officers accountable for complying with PPB policy and procedure. Not only does the omission of these policy provisions give rise to a double jeopardy defense to a later attempt to enforce them, but PPB's reluctance to address the fundamental issue of the position of the police vehicle fails to address the risk that was involved in the interaction. When PPB does not enforce a policy designed to protect officers, PPB's systems do not prevent repetition of poor outcomes in the future.

In another example, PPB initiated an accountability investigation during this compliance period based on a tort claim that asserted, among other things, a First Amendment claim against an officer. *See* 2021-C-0187. Yet, the administrative investigation did not include this separate allegation. Similarly, an administrative investigation in this compliance period did not include a First Amendment allegation against the involved officer, even though the complaint stemmed from an

application for a temporary restraining order that alleged a First Amendment violation.  *See* 2020-B-0075.

**Interfering with Administrative Investigative Interviews:** We previously identified to the City a problem with officers' representatives interfering with administrative interviews, coaching responses, answering for officers, or changing the direction of questioning.  This continued to be a problem in this compliance assessment period.  It was commonplace in many of the most consequential PRB events that such interference occurred in the administrative interviews.  *See, e.g.,* 2020-C-0269; 2020-B-0066; 2020-B-0066.  This issue continued in this compliance assessment period even though we gave notice to the City of the issue:

> The collective bargaining agreement between the Portland Police Association and the City does not permit a union representative to participate in an interview.  *See* Labor Agreement between the Portland Police Association and the City of Portland, November 11, 2016 to June 30, 2020, Sec. 61.2.2.3, available at  www.ppavigil.org/wp-content/uploads/2017/04/PPA-CBANov-16-June-20-searchable.pdf ("The officer may have an Association representative present to witness the interview provided the representative does not participate in the interview").[17]  Thus, PPB permitted a violation of its collective bargaining agreement to interfere with its accountability process.

ECF 286-3, PRB Letter, Mar. 23, 2021, at 6.  We saw no data or outcomes to show PPB corrected this known issue.

**Transition Period for Accountability:**  As we stated in our prior compliance assessment report, the City's charter amendment potentially will establish a board for PPB oversight that, among other things, may displace IPR's role, but it is unclear when and in what shape this reorganization would occur.  ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 52.  Paragraph 195(b) of Section XI adopts the City's charter amendment as an additional accountability remedy and puts a timeframe on the City to give effect to the will of the voters.

During this compliance assessment period, before the Court approved Section XI, the City Auditor withdrew consent to oversee IPR.  This led to an interim step, in part anticipated by Paragraph 195(a).  The City established IPR as a standalone office, outside of the Auditor's purview.  This was a reasonable solution for the interim.  However, the expected creation of the oversight board has led to insecurity in the longevity of job positions within IPR.  In turn, this has led to attrition from the IPR ranks.  The lack of assurance of ultimate career positions will continue to prove a challenge.  The City must maintain a sufficient complement of qualified IPR investigators and managers to ensure timely and adequate investigations during this period of transition.

## A.    Investigation Timeframe

121. PPB and the City shall complete all administrative investigations of officer misconduct within one-hundred eighty (180) days of receipt of a complaint of misconduct, or discovery of misconduct by other means.  For the purposes of this provision, completion of administrative investigations includes all steps from intake of allegations through approval of recommended findings by the Chief, excluding appeals, if any, to CRC.  Appeals to CRC shall be resolved within 90 days.

---

[17] The City extended this contract for one year.  Rebecca Ellis, "Portland Extends Contract With Police Union For 1 Year," OPB, July 1, 2020, available at www.opb.org/news/article/portland-police-contract-extendnegotiations-street-response/.

123. If PPB is unable to meet these timeframe targets, it shall undertake and provide to DOJ a written review of the IA process, to identify the source of the delays and implement an action plan for reducing them.

| Status | Partial Compliance |
|--------|--------------------|

The City remains in partial compliance with Paragraphs 121 and 123 because the required timelines continue to be unmet.

The Compliance Officer concluded that the City is in substantial compliance with these paragraphs, but did not analyze whether CRC appeals are being resolved within 90 days, as required. ECF 291-1, COCL Q4 2021 Report, at 109–11. We have not seen sufficient evidence of compliance.

**PPB Self-Reporting:** PPB issues a quarterly self-report, which concludes that the City complies with these paragraphs. *See* PPB 2022 Q1 Update Report, at 309–10, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf. In the last six quarters, PPB reported the below levels of compliance with the 180-day timeline, excluding days tolled pursuant to Paragraph 122. PPB's self-reported statistics count only cases that are closed each quarter; so an overdue case counts against only the quarter in which it is closed.

2020 Q4:  1 of 56 administrative investigations closed in this quarter exceeded 180 days.

2021 Q1:  6 of 43 administrative investigations closed in this quarter exceeded 180 days.

2021 Q2:  7 of 55 administrative investigations closed in this quarter exceeded 180 days.

2021 Q3:  5 of 42 administrative investigations closed in this quarter exceeded 180 days.

2021 Q4:  0 of 31 administrative investigations closed in this quarter exceeded 180 days.

2022 Q1:  3 of 32 administrative investigations closed in this quarter exceeded 180 days.

According to PPB, 22 of 259 cases, or 8.5% are late.  PPB does not coordinate its reporting with IPR, but excludes IPR independent administrative investigations of alleged policy violations. Accordingly, PPB's self-assessment does not reflect all administrative investigations.

**IPR Self-Reporting:**  IPR reported the following data from its "All Investigations" count:

2020 Q4:  8 of 33 administrative investigations closed in this quarter exceeded 180 days.

2021 Q1:  5 of 29 administrative investigations closed in this quarter exceeded 180 days.

2021 Q2:  1 of 19 administrative investigations closed in this quarter exceeded 180 days.

2021 Q3:  5 of 21 administrative investigations closed in this quarter exceeded 180 days.

2021 Q4:  4 of 14 administrative investigations closed in this quarter exceeded 180 days.

According to IPR's self-reporting, 23 of 116 cases, or 19.8% are late.  This rate of untimeliness falls short of substantial compliance.

**Review of Underlying Investigative Files:**  Some of the lengthy administrative investigations we reviewed lacked clear or justifiable reasons for delay:

- 2020-C-0043 closed during this compliance period with findings approved 439 days after receipt of the tort claim that initiated the investigation.

- Case 2020-C-0267 began September 16, 2020, and became IPR independent investigation assigned January 4, 2021. The investigation was due March 15, 2021. On its weekly report, "Age of All IPR Intakes as of April 19, 2021," IPR reported the investigation as overdue—the 180 days had already elapsed. But, on the next weekly report, "Age of All IPR Intakes as of April 26, 2021," IPR only then began reporting the tolling of the administrative investigation during the pendency of a criminal investigation. On the same report, however, IPR created a new "assigned date" of April 21, 2021. As of the "Age of All IPR Intakes as of May 23, 2022" IPR report, the case is reported overdue, again, with a total case age of 614 days.

- A spot check of the October 4, 2021 weekly report from IPR and IA showed four of seven IPR investigations were far beyond the 180-day deadline, and only one was tolled for criminal investigation according to PPB's quarterly reports:

  1. 2020-C-0117: 483 days total case age (concurrent criminal listed in Q2 2020)

  2. 2020-C-0137: 481 days total case age (not listed as concurrent criminal)

  3. 2020-C-0207: 454 days total case age (not listed as concurrent criminal)

  4. 2020-C-0220: 421 days total case age (not listed as concurrent criminal)

**PPB Reviews of Level 1 Uses of Force:** The City presented no reasons why outstanding administrative investigations of Level 1 uses of force, e.g., officer-involved shootings, have lasted far beyond 180-day deadline in this compliance period. According to the IPR Director's Report, Feb. 2, 2022, available at www.portland.gov/sites/default/files/2022/directors-report-2-2-22.pdf, the following officer-involved shooting and in-custody death cases remained open past 180 days:

| Incident Date | Case Number | Subject |
|---|---|---|
| 12-24-20 | 20-B-66 | Dahlen |
| 6-24-21 | 21-B-23 | Townsend |
| 3-31-21 | 21-B-15 | Tran |
| 4-16-21 | 21-B-16 | Delgado |
| 5-22-21 | 21-B-19 | Carr |
| 7-20-21 | 21-B-26 | Merritt |
| 8-27-21 | 21-B-30 | Tadros |
| 9-12-21 | 21-B-32 | Boinay |

For the shooting on May 22, 2021, the grand jury returned a no true bill on June 15, 2021, but PPB did not present the investigation to the PRB until March 30, 2022. The administrative file did not include reasons for this inordinate period of time to resolve the case.

**CRC Timelines:** CRC appeals must be resolved within 90 days. Few appeals comply. For example, in Case 2020-C-0043, the City received a request for a CRC appeal on November 19, 2020, and did

not hear the appeal until June 2, 2021.  CRC, Meeting Minutes, June 2, 2021, available at efiles.portlandoregon.gov/Record/14680254/File/Document.  That means 195 days elapsed from the request for appeal to the appeal hearing.  Even with some of that time attributable to a request of the appellee's counsel, this length of time is excessive.

The City did not present data to demonstrate that it resolves CRC appeals within 90 days, as required.  IPR tracks CRC timeframes in the City's AIM database.  However, IPR reports that CRC timelines are based on the opening and closing of the window of time within which a complainant or officer may request appeal.  The relevant dates are when an appeal is requested and when it is resolved by the Chief's approval or rejection of CRC's recommended findings.  The City must show that CRC appeals are resolved within 90 days to comply with Paragraph 121.

122. PPB shall conduct administrative investigations concurrently with criminal investigations, if any, concerning the same incident.  All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a concurrent criminal investigation, or as otherwise provided by law, or as necessary to meet the CRC or PRB recommendation to further investigate.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 122 because the City continues to allow appropriate tolling and apply approved procedures for concurrent criminal and administrative investigations, subject to tolling.  ECF 212, DOJ Interim Compliance Assessment Report, at 10; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 53–54; PPB SOP 39 – Criminal Internal Investigations, effective Dec. 5, 2018; PPB SOP 6 – Criminal Case Review, effective June 5, 2017.

Though we rate this provision in substantial compliance, we have some concern about PPB tolling administrative investigations for multiple months while waiting for an outside agency to complete criminal investigations.  Paragraph 122 allows only for "appropriate tolling."  The professional standard in many large law enforcement agencies requires that the agency conducting the administrative investigation make periodic contact with the prosecutor to ensure that any tolling is appropriate.  Accused officers should receive reasonably expedient processing of complaints.  Otherwise, an officer must work under the pallor of an unresolved accusation, which can hold up transfers or promotions.  Likewise, complainants should receive reasonably expedient resolution to their complaints.  Accordingly, we sought information about the lengthy delays following presentations at a February 1, 2022 IA/IPR meeting.  Specifically, we asked who was the point of contact for PPB to communicate with state and local prosecutors concerning open criminal investigations of PPB officers.  PPB reported being mere passive receivers of information.  It does not appear that PPB tracks the progress of criminal investigations, which could potentially result in excessive tolling.  PPB should institute a tracking practice.

## B.    On Scene Public Safety Statements and Interviews

124. Within 90 days of the Effective Date, the City and PPB shall review its protocols for compelled statements to PSD and revise as appropriate so that it complies with applicable law and current professional standards, pursuant to *Garrity* v. *New Jersey*, 385 U.S. 493 (1967). The City will submit the revised protocol to DOJ for review and approval. Within 45 days of obtaining DOJ's approval, PPB shall ensure that all officers are advised on the revised protocol.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 124.

We continue to agree with the Compliance Officer that PPB's protocol for compelled statements complies with the requirements of this paragraph. ECF 291-1, COCL Q4 2021 Report, at 112–13; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 54. We previously credited PPB's enactment and application of Directive 1010.10 – Deadly Force and In-Custody Death Reporting and Investigation Procedures; SOP 7 – Deadly Force; In-Custody Death Investigations; and SOP 30 – Concurrent Administrative/Criminal Investigations. ECF 212, DOJ Interim Compliance Assessment Report, at 10–11. PPB continues to implement these policies and procedures.

125. Separation of all witness and involved officers to lethal force events is necessary in order to safeguard the integrity of the investigation of that event. Immediately following any lethal force event, PPB shall continue to issue a communication restriction order ("CRO") to all witnesses and involved officers, prohibiting direct or indirect communications between those officers regarding the facts of the event. The CRO will continue, unless extended further, until the conclusion of the Grand Jury or, if no Grand Jury is convened, until a disposition is determined by the District Attorney.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 125 because in this compliance period, PPB repeated a past practice that undermines CROs.

The Compliance Officer found substantial compliance based on PPB providing CROs that were issued within reasonable timeframes, without assessing whether the CROs were effective. ECF 291-1, COCL Q4 2021 Report at 113–14. We reviewed several Level 1 force investigations. While CROs timely issued in most cases, PPB allowed some CROs to be undermined.

For example, on December 24, 2021, a PPB member used deadly force when a stolen pickup truck rammed the officer (2020-B-0066). The file provided for that event showed repetition of a prior issue that undercut the CROs. On the night of the incident, PPB compromised the CRO requirement by emailing "AllPPBUsers" a video of the interaction, while the scene was still active. In a prior compliance assessment report, we raised concerns about a similar action compromising CROs:

> In our 2015 report card, we admonished the former Assistant Chief for permitting officers to view surveillance videos before providing their statements. We found that permitting the officers to view the video served as an "indirect communication between the officers regarding the facts of the event," in violation of Paragraph 125.
>
> Even after that admonishment, PPB showed the FLIR[18] video from the May 2016 incident at roll call within days of the incident and before PPB rescinded CROs. Auditor interview, August 17, 2016. Though this may have been innocuous in this case, generally the sharing of videos between officers may serve to subvert the effectiveness of the CROs.

ECF 124-1, DOJ 2nd Periodic Compliance Assessment Report, at 102–03.

---

[18] Forward Looking Infrared, a thermographic camera typically attached to an aircraft.

126. PPB shall continue to require witness officers to lethal force events to give an on-scene briefing to any supervisor and/or a member of the Detective Division to ensure that victims, suspects, and witnesses are identified, evidence is located, and provide any information that may be required for the safe resolution of the incident, or any other information as may be required.

| Status | **Partial Compliance** |
|--------|------------------------|

The City is no longer in substantial compliance with Paragraph 126 because PPB did not properly implement the requirements of Directive 1010.10 in multiple cases this reporting period.

The Compliance Officer found substantial compliance based on identifying only one instance of noncompliance during 2021. ECF 278-1, COCL Q3 2021 Report, at 61–62; ECF 291-1, COCL Q4 2021 Report, at 114. As described in the assessment of Paragraph 69, two of ten officer-involved-shooting events that occurred during this compliance period did not comply with this paragraph.

First, on July 20, 2021, a PPB member used lethal-level force in shooting a subject who was in a convenience store (Case 21-199178). The store clerk had called 911 when the subject ate food without paying and sat down on the floor refusing to leave. Two PPB officers responded. The subject broke a wine bottle on the floor. Armed with the neck of the bottle, the subject approached the officers. One officer shot their firearm. The other twice deployed a Taser. The witness officer (who deployed the Taser but did not fire his gun) refused to provide a witness statement at the scene, citing through their attorney the stress of the incident and off-duty stresses. The witness officer also should have completed the FDCR for the Taser use before the end of shift.

We asked the City to explain the lack of a timely statement from the witness officer. The City excused the witness officer by reading the approved directive to allow discretion to the agency in directing the witness officer to provide a statement. Specifically, the City cited Directive 1010.10 – Use of Force:

> 2.1.2.4. Witness member(s) shall also be subject to on-scene interviews to discuss the incident with detectives. They shall provide a full and candid account of the use of force event.

The City interprets "subject to" as optional not mandatory. We disagree with that reading, but take the City's interpretation at face value. We are more troubled, however, by two items in the City's response. One, the City described in its response a discussion between PPB members at the scene regarding this issue and the witness officer's interview. However, the City's response omits from this description that the IPR Director was at the scene and objected to forgoing the witness officer interview. Two, the detective's report from the night of the shooting records that the witness officer refused through his attorney to submit to an interview, but also records that the witness officer nonetheless agreed to "a brief walkthrough." It is unclear how one can be incapacitated for an interview, but not incapacitated to conduct a walkthrough. We cannot know the extent of the discussion on the walkthrough, however, because the detective's report ends at this agreement and does not report any content of the walkthrough.

Second, on December 24, 2021, a PPB member used lethal-level force when a stolen pickup truck rammed the officer (2020-B-0066). The involved officer suffered serious injuries that no officer should ever be subject to in the course of doing their job. The injury amounted to physical incapacitation at that time and for some time later. However, the documentation provided to us failed to identify the justification for the length of the delay in the interview. PPB did not interview

the involved officer until February 10, 2021—a length that limited the utility of the officer's statement and clouds recollection by the passage of time.  Certainly, Directive 1010.10 envisions incapacitation of the involved officer:

> 2.2.5.1.  The PSD Captain or designee shall ensure that the involved member(s) provides a compelled statement as soon as practicable, but no later than within 48 hours of the event, unless the member is physically incapacitated and unable to provide a statement.

The file provided to DOJ contained an email which was supposed to have an attached letter from the officer's attorney, but did not.  Accordingly, it is unclear why the physical incapacitation to provide a statement lasted for such an extensive period of time.

127. In agreement and collaboration with the Multnomah County District Attorney, PPB shall request that involved officers in lethal force and in-custody death events provide a voluntary, on-scene walk-through and interview, unless the officer is incapacitated.

| Status | Substantial Compliance |
|---|---|

The City remains in substantial compliance with Paragraph 127.

We continue to agree with the Compliance Officer that PPB is adhering to the requirements of this paragraph on-scene at lethal force and in-custody death events.  ECF 291-1, COCL Q4 2021 Report, at 115.  For example, in case 2021-B-0019 concerning the May 22, 2021 officer-involved shooting, on-scene detectives asked the involved officer for an on-scene briefing and an interview.  The involved officer declined.  *See also* 2020-B-0066 (same).

## C.    Conduct of IA Investigations

128. Currently, both IPR and PPB's PSD have authority to conduct administrative investigations, provided that IPR interview of PPB Officers must only be conducted jointly with IA.  Within 120 days of the Effective Date, the City will develop and implement a plan to reduce time and effort consumed in the redundant interview of witnesses by both IPR and IA, and enable meaningful independent investigation by IPR, when IPR determines such independent investigation is necessary.

| Status | Partial Compliance |
|---|---|

The City is no longer in substantial compliance with Paragraph 128 because PPB's records backlog and other structural challenges have materially impacted IPR's ability to conduct meaningful independent investigations, as required by this Agreement.

We agree with the Compliance Officer's assessment of partial compliance.  *See* ECF 291-1, COCL Q4 2021 Report, at 115–16; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 55–56.  Two concerns are most prevalent.

**Record Backlog:**  We agree with the Compliance Officer that the City's backlog in producing records affected IPR's ability to conduct meaningful investigations:

> During the fourth quarter of 2021, we were also informed of a 45,000-50,000 document Records Division backlog that led IPR to not have a key document as part of their investigation for one case (IPR ultimately received this document from the alleged officer in the case after IPR realized they did not have it). While PPB and the City inform us that

the vast majority of documents in the backlog are likely inconsequential to administrative investigations, we have yet to receive an update as to the current size of the backlog, the impact of the backlog, or City efforts to reduce the backlog. Upon receiving an update, we will provide additional information in future reports.

ECF 291-1, COCL Q4 2021 Report, at 115.

**Meaningful Independent Investigation:**  IPR has a crucial role as the outside civilian oversight agency to shed light on potential misconduct, conduct credible investigations, reach reliable conclusions, and earn public and organizational trust in the accountability process.  But the City did not ensure that IPR initiated investigations of managers who approved inappropriate crowd control force or collateral misconduct in the more than 6,000 reported uses of force during the 2020 protests.[19]  The City and the United States agreed to resolve this and several other accountability concerns with new Section XI.  New Paragraph 192 specifically affirms that Directive 330 – Internal Affairs, Complaint Intake, and Processing, and this Agreement require PPB to investigate *any* sworn member whose misconduct is discovered in any setting.  We understand that IPR is now spearheading implementation of Paragraph 192's requirements for certain supervisory investigations stemming from the 2020 crowd control force incidents.  Going forward, the City should also ensure IPR is able to affirmatively assert itself and investigate known misapplications of policies, failures in reporting and reviewing force, and general mismanagement of force.

129. The City and PPB shall ensure that all allegations of use of excessive force are subject to full and completed IA investigations resulting in findings, unless there is clear and convincing evidence to IPR that the allegation has no basis in fact.

| Status | Partial Compliance |
|--------|--------------------|

The City is no longer in substantial compliance with Paragraph 129 because the City did not investigate all allegations of excessive force.

This Agreement does not allow PPB to administratively close investigations of excessive force allegations without a full investigation.  IPR may do so, but only when its intake investigation shows by clear and convincing evidence that the allegation has no basis in fact.  PPB did not administratively close any reported allegations of excessive force from the fourth quarter of 2020 through the first quarter of 2022.  *See* PPB 2022 Q1 Update Report, at 340–41, available at www.portland.gov/sites/default/files/2022/DOJ%20Quarterly%20Updates_2022Q1.pdf; *see also* IPR SOP, Sec. 2.3, revised Jan. 10, 2020 (clarifying that clear and convincing evidence is needed to administratively close a force allegation).

However, in several administrative investigations, the City did not identify collateral misconduct or correctly apply parts of PPB's force policy.  IPR also did not administratively investigate known management issues in PPB's response to the 2020 protests.  New Paragraph 192 codifies a remedy designed to address the last issue, and we understand IPR is spearheading implementation now.

---

[19] IPR's protocols provide that IPR will prioritize:  "Allegations involve a member of the rank of Captain or higher;" and "Allegations arising from a crowd control event, demonstration, or other constitutionally protected speech event."  PSF-5.02 - Independent Police Review - Administrative Investigations, available at www.portland.gov/sites/default/files/2020-06/psf-5.02-ipr-administrative-investigations-draft-2-698939.pdf.

Also, we agree with COCL's assessment that IPR should not have closed the investigation of a complaint alleging excessive force when there was not clear and convincing evidence to IPR that the allegation had no basis in fact.  ECF 291-1, COCL Q4 2021 Report, at 116.

130. The City and PPB shall continue to expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

| Status | Substantial Compliance |
|--------|------------------------|

The City remains in substantial compliance with Paragraph 130.

We agree with the Compliance Officer's assessment that the City continues to adequately prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.  ECF 291-1, COCL Q4 2021 Report, at 118; ECF 236-1, DOJ 5th Periodic Compliance Assessment Report, at 3 (citing Dir. 310.20 – Discrimination, Harassment, and Retaliation Prohibited, effective May 15, 2020, available at www.portlandoregon.gov/police/article/760883).

The Compliance Officer found no allegations of retaliation and has not reported on the City's compliance with this paragraph since January 10, 2021.  However, the CRC considered an appeal that included a retaliation claim, indicating continued enforcement of the directive.  ECF 238-1, COCL Q4 2020 Report, at 10, 52.  We also assessed an investigation of a retaliation allegation and found it sufficient to demonstrate PPB's implementation of the policy.

131. The City and PPB shall retain Police Review Board procedures currently utilized for purposes of investigation and making recommended findings on administrative complaints, except as outlined below:

a. Currently, seven voting members of the PRB review use of force incidents, including two citizen members. When PRB reviews uses of force case, one of the two citizen member slots shall be drawn from the Citizen Review Committee members.

b. The CRC slot on the PRB in use of force cases will rotate among the CRC membership so that different CRC members participate on the PRB. Within 60 days of the Effective Date, the Auditor shall develop a membership rotation protocol.

c. All members participating in the PRB must maintain confidentiality and be able to make thoughtful, unbiased, objective recommendations to the Chief of Police and Police Commissioner that are based on facts, consistent with PRB city code provisions and "just cause" requirements set forth in Portland City Charter, City rules, and labor agreements.

d. Cases in which the member elects, with the concurrence of the Chief and the Police Commissioner, to accept the investigative findings and recommended discipline. This option will only be available to a member following implementation of code language which shall require at a minimum a full investigation of the alleged misconduct, issuance of the investigative findings, and concurrence with the findings by the Independent Police Review, the Professional Standards Division and the member's Branch Chief.  The scope of cases eligible for stipulated discipline shall be identified in the authorizing code, and cases involving alleged used of excessive force, cases involving alleged discrimination, disparate treatment or retaliation, reviews of officer